**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>SALEM HARBOR POWER DEVELOPMENT LP (f/k/a Footprint Power Salem Harbor Development LP), *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 22-10239 (MFW)<br><br>(Jointly Administered)<br><br>**Hearing Date: April 21, 2022 at 3:00 p.m. (ET)**<br>**Obj. Deadline: April 14, 2022 at 4:00 p.m. (ET)** |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING BIDDING PROCEDURES FOR THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (II) SCHEDULING CERTAIN DATES RELATED THERETO, (III) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (IV) APPROVING CONTRACT ASSUMPTION AND ASSIGNMENT PROCEDURES, AND (V) GRANTING RELATED RELIEF**

Salem Harbor Power Development LP and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "Debtors"), respectfully represent as follows in support of this motion (this "Motion"):[2]

## Preliminary Statement

1. By this Motion, the Debtors seek to establish bidding procedures for the potential sale of all or substantially all of their assets pursuant to the *Joint Chapter 11 Plan of*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Salem Harbor Power Development LP (f/k/a Footprint Power Salem Harbor Development LP) (1360); Highstar Salem Harbor Holdings GP, LLC (f/k/a Highstar Footprint Holdings GP, LLC) (2253); Highstar Salem Harbor Power Holdings L.P. (f/k/a Highstar Footprint Power Holdings L.P.) (9509); Salem Harbor Power FinCo GP, LLC (f/k/a Footprint Power Salem Harbor FinCo GP, LLC) (N/A); Salem Harbor Power FinCo, LP (f/k/a Footprint Power Salem Harbor FinCo, LP) (9219); and SH Power DevCo GP LLC (f/k/a Footprint Power SH DevCo GP LLC) (9008). The location of the Debtors' service address is: c/o Tateswood Energy Company, LLC, 480 Wildwood Forest Drive, Suite 475, Spring, Texas 77380.

[2] Detailed information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of John R. Castellano in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 9] (the "First Day Declaration"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

*Reorganization of Salem Harbor Power Development LP and Its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").[3] In further support of this Motion, the Debtors submit the *Declaration of Matthew A. Mazzucchi in Support of Debtors' Motion for Entry of An Order (I) Approving Bidding Procedures for the Sale of All or Substantially All of the Debtors' Assets, (II) Scheduling Certain Dates Related Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* (the "Mazzucchi Declaration"), attached hereto as **Exhibit B**.

2. Prior to the Petition Date, the Debtors and their advisors engaged in extensive discussions regarding potential restructuring transactions with the Prepetition Secured Parties, IEP, and the holders of equity interests in the Debtors. As more fully described in the First Day Declaration, while the Debtors sought to reach consensus among all of their key stakeholders, the parties were collectively unable to reach mutually acceptable terms regarding the terms of a consensual restructuring transaction. Nonetheless, discussions with certain parties ultimately resulted in the execution of a restructuring support agreement (as may be amended, supplemented, or otherwise modified from time to time, the "RSA"), dated as of March 23, 2022, by and among the Debtors, certain Prepetition Lenders (the "Consenting Lenders"), and certain holders of equity interests in the Debtors (the "Consenting Equityholders" and, together with the Consenting Lenders, the "Consenting Stakeholders"). Pursuant to the RSA, the various parties thereto agreed to support the restructuring transactions that will be set forth in the Plan. Among other things, the Prepetition Secured Parties agreed to permit the Debtors to use cash collateral on a consensual basis to enable the Debtors to implement their restructuring process through confirmation and

[3] The Debtors intend to file the Plan prior to the hearing on this Motion.

consummation of the Plan, including a continuation of a marketing process commenced prepetition for the sale of all or substantially all of the Debtors' assets.[4]

3. The RSA contemplates implementation of either (a) a standalone restructuring transaction (the "Standalone Restructuring Transaction") through which holders of Secured Credit Facility Claims would receive, among other things, 100% of the equity of the reorganized Debtors on account of their Secured Credit Facility Claims or (b) a sale transaction (the "Sale Transaction") through which all, or substantially all, of the Debtors' assets would be sold and proceeds generated therefrom would be distributed to the Debtors' creditors in accordance with the absolute priority rule. As set forth in the RSA, the Plan contemplates a "toggle" structure, whereby the Debtors will pursue consummation of the Standalone Restructuring Transaction simultaneously with the Sale Transaction, in consultation with the Consultation Parties (defined below), to ultimately determine the outcome that would maximize value for the Debtors' estates, and therefore should be consummated (such election between the Standalone Restructuring Transaction and the Sale Transaction, the "Transaction Election"). The Debtors will make the Transaction Election in connection with filing supplements to the Plan (collectively, the "Plan Supplement"), which, subject to the entry of an order approving the disclosure statement for the Plan and the related solicitation process and materials (the "Solicitation Order"), shall be no later than ten (10) days prior to the deadline by which applicable parties in interest must submit votes to approve the Plan (the "Voting Deadline").

4. Accordingly, the Debtors propose to continue their prepetition marketing process on a postpetition basis and pursue a potential Sale Transaction in accordance with the

---

4 The terms of the consensual use of cash collateral by the Debtors are set forth in the *Interim Order (I) Authorizing Postpetition Use of Cash Collateral, (II) Granting Adequate Protection to the Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [D.I. 54].

Bidding Procedures (defined below). To the extent the Debtors are able to identify a viable and value-maximizing Sale Transaction, the Debtors, in consultation with the Consultation Parties, will toggle to implement such Sale Transaction by making the Transaction Election. Consummation of any Sale Transaction will ultimately be subject to entry of an order confirming the Plan (the "Confirmation Order") and will be pursuant to the Plan and such Confirmation Order. The Debtors anticipate such Sale Transaction would close contemporaneously with the effective date of the Plan (the "Plan Effective Date").

5. The Debtors believe the Bidding Procedures will best facilitate a value-maximizing Sale Transaction (if one is available) for the benefit of the Debtors' estates. The Bidding Procedures provide for substantial flexibility with respect to the structure of any Sale Transaction. For example, the Debtors may, in an exercise of their business judgment, select a Stalking Horse Bidder (as defined below) and provide Bid Protections (as defined below) to the extent that doing so would maximize the value of the estates. The Bidding Procedures likewise will allow the Debtors sufficient time to fully market their assets, receive and evaluate bids, execute a stalking horse agreement and designate a Stalking Horse Bidder (if any), and hold an auction (if necessary) to determine the highest or otherwise best bid. In addition, the marketing process and the Bidding Procedures proposed herein are aligned with the milestones set forth in the RSA and have the full support of the Consenting Stakeholders.

6. The Debtors respectfully submit that the Bidding Procedures establish a process to identify if there is any potential Sale Transaction that will provide value that exceeds the value contemplated under the Standalone Restructuring Transaction. The Debtors believe that their prepetition marketing efforts combined with the postpetition process contemplated by the Bidding Procedures provide for a fulsome marketing and sale process for the Debtors' Assets (as

defined below), and that approval of the Bidding Procedures and the related relief requested in this Motion are in the best interests of the Debtors' estates and their stakeholders. Accordingly, the Debtors respectfully request that the Court grant the relief requested herein.

**Relief Requested**

7. By this Motion, the Debtors request entry of an order (the "Bidding Procedures Order"), substantially in the form attached hereto as **Exhibit A**:

(a) approving the proposed bidding procedures (the "Bidding Procedures") attached as **Exhibit 1** to the Bidding Procedures Order, pursuant to which the Debtors will solicit and select the highest or otherwise best offer for the sale of all, or substantially all, of the Debtors' assets (collectively, the "Assets") free and clear of all claims, liens, interests, and encumbrances;

(b) establishing the following dates and deadlines in connection with the Bidding Procedures:

i. Stalking Horse Motion Deadline: June 3, 2022, at 5:00 p.m. (prevailing Eastern time), as the deadline by which the Debtors must file a Stalking Horse Motion (as defined below) to be heard on shortened notice;

ii. Bid Deadline: June 10, 2022, at 5:00 p.m. (prevailing Eastern time), as the deadline by which all binding bids must be actually received by the Debtors pursuant to the Bidding Procedures (the "Bid Deadline"); and

iii. Auction: June 14, 2022, at 10:00 a.m. (prevailing Eastern time), as the date by which the Debtors will conduct an auction pursuant to the Bidding Procedures (the "Auction"), if necessary;

(c) authorizing the Debtors, in consultation with the Consultation Parties, in their discretion to (i) select one or more bidders to act as stalking horse bidders (each, a "Stalking Horse Bidder") and enter into a purchase agreement with such Stalking Horse Bidder (each such agreement, a "Stalking Horse Agreement") and (ii) in connection with any Stalking Horse Agreement, provide (A) a break-up fee (the "Breakup Fee"), (B) an expense reimbursement (the "Expense Reimbursement"), and/or (C) other forms of bid protections (together with the Breakup Fee and the Expense

Reimbursement, collectively, the "Bid Protections"), subject to Court approval on an expedited basis;

(d) approving the form and manner of notice of the Auction, attached to the Bidding Procedures Order as **Exhibit 2** (the "Sale Notice");

(e) approving procedures (the "Assumption and Assignment Procedures") for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale Transaction (collectively, the "Assigned Contracts"), and approving the form and manner of notice thereof, attached as **Exhibit 3** to the Bidding Procedures Order (the "Cure Notice"); and

(f) granting any related relief.

**Jurisdiction and Venue**

8. The Court has jurisdiction over these chapter 11 cases and this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b), and pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue of these chapter 11 cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

9. The statutory and legal predicates for the relief requested herein are sections 105(a), 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1 and 6004-1.

**BACKGROUND**

10. On March 23, 2022 (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code.

11. The Debtors are authorized to continue to operate their business and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. To date, no trustee, examiner, or statutory committee has been appointed in these chapter 11 cases.

**THE PROPOSED SALE PROCESS**

12. The Debtors seek approval of the Bidding Procedures to establish an open process for the solicitation, receipt, and evaluation of bids on a timeline that allows the Debtors to potentially consummate a sale of substantially all of their Assets in connection with confirmation and consummation of the Plan to the extent such Sale Transaction provides a higher or otherwise better value than is contemplated by the Standalone Restructuring Transaction.

13. Prior to the Petition Date, on March 7, 2022, the Debtors, with the assistance of Houlihan Lokey Capital, Inc. ("Houlihan"), the Debtors' proposed investment banker, formally commenced a marketing process to sell the Debtors' Assets (the "Phase I" process). Prior to the Petition Date, Houlihan reached out to 100 potential acquiring parties (the "Initial Contact Parties") to solicit initial non-binding indications of interest (each, a "Non-Binding Indication of Interest"). As of the date hereof, the Debtors have entered into approximately 31 confidentiality agreements with potentially interested parties. Such parties have received a confidential information memorandum, as well as access to additional diligence materials to assist them in formulating Non-Binding Indications of Interest.

14. As of the Petition Date, the Phase I process remains ongoing. The Debtors have or will soon advise interested parties that have executed confidentiality agreements that they will have until on or about April 12, 2022 to submit Non-Binding Indications of Interest. The Debtors and their advisors continue to engage in discussions with certain of these parties regarding the submission of Non-Binding Indications of Interest.

15. The Debtors intend to continue the marketing process on a postpetition basis, including completing the Phase I process for submissions of Non-Binding Indications of Interest and commencing the second phase ("Phase II") for solicitation of binding bids pursuant to the Bidding Procedures. In connection therewith, the Debtors, with the assistance of Houlihan, have established a virtual data room to provide potential acquirors with access to the diligence materials necessary to assist them in formulating binding bids. The Debtors, with the assistance of Houlihan, will continue to work closely with interested parties to explore and address transaction structure, diligence questions, timing, and process considerations.

16. As set forth in this Motion, the Bidding Procedures establish deadlines by which Potential Bidders must submit binding bids for the Assets and outline the procedures for an Auction process designed to encourage active participation and obtain the highest or otherwise best possible offer for the Assets. To the extent any additional Initial Contact Parties or any other potential interested parties reach out to the Debtors and/or their advisors or any additional potential interested parties are otherwise identified by the Debtors and their advisors, Houlihan will coordinate execution of confidentiality agreements with such parties (to the extent not previously executed), and facilitate such parties' diligence of the Assets over the coming days and weeks in accordance with the Bidding Procedures.

17. By this Motion, the Debtors are seeking to run a postpetition marketing process for the Debtors' Assets under the supervision of this Court pursuant to and in accordance with the Bidding Procedures. The timeline set forth in the Bidding Procedures was calculated to balance the need to provide adequate notice to parties in interest and potential bidders while enabling the Debtors to run a fulsome but efficient postpetition marketing and sale process. The Bidding Procedures are designed to generate the highest or otherwise best available recoveries to the Debtors' stakeholders by encouraging prospective bidders to submit competitive, value-maximizing bids for the Assets.

18. In the event the Debtors select a Stalking Horse Bidder, as soon as reasonably practicable following the selection of a Stalking Horse Bidder, and by no later than 5:00 p.m. (prevailing Eastern time) on June 3, 2022 (the "Stalking Horse Motion Deadline"), the Debtors shall file a motion (a "Stalking Horse Motion") to be heard on shortened notice seeking approval of such Stalking Horse Bidder, entry into the Stalking Horse Agreement, and provision of the Bid Protections with the Court and serve such motion by overnight mail, email or facsimile on (i) all persons known or reasonably believed to have expressed interest in acquiring the Assets since March 7, 2022, (ii) all non-Debtor parties to any executory contracts and/or unexpired leases proposed to be assumed and assigned pursuant to the Stalking Horse Agreement, and (iii) all parties that have requested notice in these chapter 11 cases as of the date of such motion. The Debtors further propose that the Court authorize the Debtors to seek approval of a Stalking Horse Motion on shortened notice and that such motion be heard by the Court on an expedited basis, and, in any case, by no later than June 9, 2022, subject to Court availability and provided that the Debtors file such Stalking Horse Motion by no later than the Stalking Horse Motion Deadline. Specifically, the Debtors propose to provide at least three (3) business days' notice of any hearing on any

Stalking Horse Motion and further propose that the Debtors be authorized to serve such motion and any applicable related pleadings on shortened notice, with objections due at 4:00 p.m. (prevailing Eastern Time) on the day prior to such hearing.

19. Having the flexibility to designate a Stalking Horse Bidder and provide Bid Protections will provide the Debtors with the ability to maximize the value of the Assets and therefore Plan recoveries. Given the Debtors' need to maximize value for their estates through a timely and efficient marketing and sale process, the ability to designate a Stalking Horse Bidder and offer Bid Protections to such bidder (although the Debtors ultimately may, in the exercise of their business judgment, not designate a Stalking Horse Bidder at all) is a reasonable and sound exercise of the Debtors' business judgment and provides an actual benefit to the Debtors' estates.

20. In light of the foregoing, the Debtors have determined that the Bidding Procedures are in the best interests of the Debtors' estates, will establish whether and to what extent any market for the Assets exists, and provide interested parties with sufficient opportunity to participate.

## **THE BIDDING PROCEDURES**

### A. The Bidding Procedures

21. The Debtors, with the assistance of Houlihan and their other advisors, have developed and proposed the Bidding Procedures, attached as **Exhibit 1** to the Bidding Procedures Order, to govern the Phase II sale and Auction process. The Debtors believe the Bidding Procedures will provide the Debtors sufficient time to conduct a fulsome marketing process with outreach to both strategic and financial parties, particularly in light of the Debtors' prepetition and ongoing marketing efforts. Furthermore, the Debtors believe that potential bidders will have ample notice and time to conduct thorough due diligence to submit binding bids in advance of the Bid Deadline. The Bidding Procedures are designed to encourage all prospective bidders to put their

best bid forward and create a path towards the highest or otherwise best available recoveries to the Debtors' stakeholders.

22. The following chart summarizes material provisions of the Bidding Procedures and discloses certain information required by Local Rule 6004-1(c):[5]

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| **Provisions Governing Qualification of Bidders** Local Rule 6004-1(c)(i)(A) | **A. Potential Bidder Requirements –** To participate in the bidding process, all parties other than the Prepetition Agent, on behalf of the Prepetition Secured Parties, must deliver or have previously delivered the Preliminary Bid Documents, which comprise (i) a confidentiality agreement on terms acceptable to the Debtors, (ii) sufficient evidence in a form acceptable to the Debtors and their advisors, in consultation with the Consultation Parties, of the financial capability to consummate the Sale Transaction, and (iii) any other evidence the Debtors, in consultation with the Consultation Parties, may reasonably request to evaluate the Potential Bidder.<br>**B. Diligence Access Requirements for Potential Bidders –** To access the Debtors' data room, all parties must satisfy the requirements to qualify as a Potential Bidder. The Debtors likewise reserve the right to withhold any diligence materials that the Debtors determine are sensitive or otherwise not appropriate for disclosure to a Potential Bidder that the Debtors determine is a competitor of the Debtors or is affiliated with any competitor of the Debtors.<br>**C. Qualified Bidder Requirements –** A Potential Bidder that (i) demonstrates the financial capability to consummate the Sale Transaction as determined by the Debtors in consultation with the Consultation Parties, (ii) demonstrates the ability to obtain all necessary governmental, licensing, regulatory, or other approvals necessary to consummate the Sale Transaction in a timely manner as determined by the Debtors in consultation with the Consultation Parties, and (iii) submits a Qualified Bid, may, as determined by the Debtors in consultation with the Consultation Parties, be considered a Qualified Bidder. |
| **Provisions Governing Qualified Bids**<br>Local Rule 6004-1(c)(i)(B) | **A. Bid Deadline –** The Bid Deadline to submit a Qualified Bid to acquire the Assets, as may be extended without notice or hearing by the Debtors, is **June 10, 2022, at 5:00 p.m. prevailing Eastern Time**.<br>**B. Stalking Horse Bidder –** Any Stalking Horse Bid shall be deemed a Qualified Bid for purposes of the Bidding Procedures.<br>**C. Qualified Bid Requirements –** A proposal, solicitation, or offer (each, a "Bid") by a Qualified Bidder that is submitted in writing and satisfies each of the following requirements as determined by the Debtors, in their reasonable business judgment and after consultation with the Consultation Parties, shall constitute a Qualified Bid:<br>• **Assets.** Each Bid must clearly state which Assets the Qualified Bidder is agreeing to acquire.<br>• **Assumption of Obligations.** Each Bid must clearly state which liabilities and obligations of the Debtors the Qualified Bidder is agreeing to assume. |

5 The following summary is provided for convenience purposes only. To the extent any of the terms described below are inconsistent with the Bidding Procedures, the Bidding Procedures control in all respects. Capitalized terms used in the summary chart below but not otherwise defined in this Motion shall have the meanings ascribed to such terms in the Bidding Procedures.

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | • **Purchase Price.** Each Bid must clearly set forth the purchase price to be paid for the Assets, including and identifying separately any cash and non-cash components, which non-cash components shall be limited only to assumed liabilities and/or credit bids (the "Purchase Price").<br>• **Qualified Bid Documents.** Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid and shall include a schedule of assumed contracts applicable to the Bid, and a copy of the Bidder's Proposed APA (as further defined below), including those related to the respective Purchase Price and Assets to be acquired by such Qualified Bidder, as well as all other material documents integral to such bid (the "Qualified Bid Documents").<br>• **Proposed APA Requirements.** Each Bid must be accompanied by an executed purchase agreement (the "Proposed APA"), the form of which will be provided by the Debtors to any Potential Bidder prior to the Bid Deadline and, in the case of an Auction with a Stalking Horse Bidder, a markup of the Stalking Horse Agreement, including the exhibits, schedules, and ancillary agreements related thereto, and any other related material documents integral to such Bid pursuant to which the Potential Bidder proposes to effectuate the proposed Sale Transaction, along with copies that are marked to reflect any amendments and modifications from the form purchase agreement provided to such Potential Bidder. Each Proposed APA must provide a representation that the Qualified Bidder will: (i) make all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), if applicable, and submit and pay the fees associated with all such necessary filings under the HSR Act as soon as reasonably practicable; (ii) make all necessary filings with, and obtain all necessary approvals authorizations from, the Federal Energy Regulatory Commission ("FERC") under the Federal Power Act (the "FPA"); (iii) make all necessary filings with, and obtain all necessary approvals from, any applicable "state commission" as defined in 18 C.F.R. § 1.101(k) (each, a "PUC"), and submit and pay the fees associated with all such necessary obligations to such PUCs, as applicable, as soon as reasonably practicable; (iv) make all necessary filings with, and obtain all necessary approvals from, ISO New England Inc. ("ISO-NE"); (v) make all necessary filings with, and obtain all necessary approvals from, the Federal Communications Commission ("FCC"), and submit and pay the fees associated with all such necessary obligations to the FCC as soon as reasonably practicable; and (vi) make all necessary filings with, and obtain all necessary approvals from, the Committee on Foreign Investment in the United States ("CFIUS"), if applicable, and submit and pay the fees associated with all such necessary obligations to CFIUS, if applicable, as soon as reasonably practicable ((i)-(vi) collectively, the "APA Regulatory Requirements"). For the avoidance of doubt, the timing and likelihood of satisfying the APA Regulatory Requirements shall be a consideration in determining the highest or otherwise best Bid.<br>• **Deposit.** Each Bid must be accompanied by a cash deposit (the "Deposit") in the amount equal to ten percent (10%) of the cash consideration of the Purchase Price of the Bid, to be held in an interest-bearing escrow account to be identified and established by the Debtors; *provided* that no Deposit shall be required for any Bid that is solely comprised of a credit bid.<br>• **Committed Financing.** To the extent that a Bid is not accompanied by evidence of the Qualified Bidder's capacity to consummate the sale set forth in its Bid with cash on hand, each Bid must include unconditional committed financing from a reputable financing institution, documented to the satisfaction of the Debtors, in |

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | consultation with the Consultation Parties, that demonstrates that the Qualified Bidder has: (i) received sufficient debt and/or equity funding commitments to satisfy the Qualified Bidder's Purchase Price and other obligations under its Bid; and (ii) adequate working capital financing or resources to finance going-concern operations for the Assets and the proposed transactions. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions reasonably acceptable to the Debtors, in consultation with the Consultation Parties.<br><br>• **Contingencies; No Financing or Diligence Outs.** A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions, which shall be acceptable to the Debtors in their business judgment, after consultation with the Consultation Parties. The Qualified Bidders are expected to have completed all of their due diligence by the Bid Deadline, including all business, legal, accounting, and other confirmatory diligence. The extent and nature of any remaining due diligence should be set forth in a specific list attached to each Bid.<br><br>• **Identity.** Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Qualified Bidder if such Qualified Bidder is an entity formed for the purpose of consummating the proposed transaction contemplated by such Bid), and the complete terms of any such participation. Each Bid must also fully disclose whether any current or former officer, director, or equity holder of the Debtors, or any entity affiliated with any current or former officer, director, or equity holder of the Debtors, will be bidding or otherwise participating in connection with such Bid. Under no circumstances shall any undisclosed insiders, principals, equity holders, or financial backers of the Debtors be associated with any Bid (including any Overbid at the Auction). Each Bid must also include contact information for the specific persons and counsel whom Houlihan Lokey Capital, Inc. and Paul, Weiss, Rifkind, Wharton & Garrison LLP should contact regarding such Bid. All information disclosed pursuant to this paragraph shall be made available by the Debtors to the Consultation Parties promptly upon the Debtors' receipt thereof, but in any event no later than one (1) business day following the Bid Deadline.<br><br>• **Adequate Assurance of Future Performance.** Each Bid must: (i) identify the executory contracts and unexpired leases to be assumed and assigned in connection with the proposed Sale Transaction; (ii) provide for the payment of all cure costs related to such executory contracts and unexpired leases by the Qualified Bidder; and (iii) demonstrate, in the Debtors' reasonable business judgment, after consultation with the Consultation Parties, that the Qualified Bidder can provide adequate assurance of future performance under all such executory contracts and unexpired leases, as required by section 365 of the Bankruptcy Code.<br><br>• **Time Frame for Closing.** A Bid by a Qualified Bidder must be reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors, after consultation with the Consultation Parties. |

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | • **Binding and Irrevocable.** A Qualified Bidder's Bid for the Assets shall be irrevocable unless and until the Debtors accept a higher Bid for the Assets and such Qualified Bidder is not selected as the Backup Bidder (as further defined below) for the Assets.<br>• **Expenses; Disclaimer of Fees.** Each Bid, other than a Stalking Horse Bid, if any, must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, no Qualified Bidder (other than a Stalking Horse Bidder, if any, solely to the extent set forth in such Stalking Horse Agreement) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction, if any, or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid, each Qualified Bidder is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.<br>• **Authorization.** Each Bid must contain evidence that the Qualified Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors, in consultation with the Consultation Parties) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.<br>• **As-Is, Where-Is.** Each Bid must include a written acknowledgement and representation that the Qualified Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid; (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder's Proposed APA; and (iv) the sale of the Assets is on an "as-is, where-is" basis.<br>• **Adherence to Bid Procedures.** By submitting its Bid, each Qualified Bidder is agreeing to abide by and honor the terms of the Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction, if any.<br>• **Government Approvals.** Each Bid must include a description of all governmental, licensing, regulatory, or other approvals or consents that are required to close the proposed Sale Transaction (including the APA Regulatory Requirements), together with evidence satisfactory to the Debtors, after consultation with the Consultation Parties, of the ability to obtain such consents or approvals in a timely manner, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such consents or approvals.<br>• **Government Approvals Time Frame.** Each Bid must set forth an estimated time frame for obtaining any required internal, governmental, licensing, regulatory, or other approvals or consents (including the APA Regulatory Requirements) for consummating any proposed Sale Transaction.<br>• **Consent to Jurisdiction.** The Qualified Bidder must submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of bids, the Auction, if any, the construction |

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | and enforcement of the Bidding Procedures, the Sale Transaction documents, and the consummation of any Sale Transaction, as applicable.<br><br>• **Bid Deadline.** Each Bid must be transmitted via email (in .pdf or similar format) so as to be **actually received** on or before **5:00 p.m. (prevailing Eastern Time) on June 10, 2022** by:<br><br>o **Debtors' Proposed Counsel.** Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019, Attn: Brian S. Hermann (bhermann@paulweiss.com), John T. Weber (jweber@paulweiss.com), and Alice Nofzinger (anofzinger@paulweiss.com).<br><br>o **Debtors' Proposed Financial Advisors.** AP Services, LLC, 300 N. LaSalle Street, Suite #1900, Chicago, Illinois 60654, Attn: John R. Castellano (jcastellano@alixpartners.com) and David Hindman (dhindman@alixpartners.com).<br><br>o **Debtors' Proposed Investment Bankers.** Houlihan Lokey Capital, Inc., 225 S. Sixth Street, Suite #4950, Minneapolis, Minnesota 55402, Attn: Matthew Mazzucchi (MMazzucchi@hl.com) and Spencer Anderson (SJAnderson@hl.com).<br><br>• **Non-Qualifying Bids.** The Debtors, in consultation with the Consultation Parties, expressly reserve the right to notify a Potential Bidder that its bid is not a Qualifying Bid (a "Non-Qualifying Bid") and permit a Potential Bidder to revise or supplement a Non-Qualifying Bid to make it a Qualified Bid. Notwithstanding the foregoing, Qualified Bidders shall be prohibited from including in their Bid a proposed use of any cash component of the Purchase Price that would be received by the Debtors if such Bidder were the Successful Bidder. |
| **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder**<br><br>Local Rule 6004-1(c)(i)(C) | **A. Stalking Horse Protections –** Subject to Court approval on an expedited basis, the Debtors shall be authorized, but not obligated, in consultation with the Consultation Parties and in an exercise of their business judgment to:<br><br>• Select one or more Qualified Bidders to act as stalking horse bidders in connection with the Sale Transaction (each, a "Stalking Horse Bidder" and any bid submitted by any Stalking Horse Bidder, a "Stalking Horse Bid"), and enter into a purchase agreement(s) with respect to a Sale Transaction with such Stalking Horse Bidder (each such agreement, a "Stalking Horse Agreement"); and<br><br>• In connection with any Stalking Horse Agreement with a Stalking Horse Bidder, provide the Bid Protections.<br><br>**B. Minimum Overbid Increment –** The initial Overbid(s) for all of the Debtors' Assets shall provide for total consideration to the Debtors with a value that (i) satisfies the Bid Protections, if any, and (ii) exceeds the value of the consideration under the Baseline Bid by an incremental amount that is not less than $1 million, and successive Overbids higher than the previous bid, as Debtors shall, in consultation with the Consultation Parties, announce at the Auction (the "Minimum Overbid Increment"), if any. |
| **Modification of Bidding and Auction Procedures** | **A. General Reservation –** The Debtors reserve their rights to modify the Bidding Procedures, in their reasonable business judgment and after consultation with the Consultation Parties, in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, if any, additional customary terms and conditions on the sale of the Assets, including, without limitation: (i) extending the |

<table>
<tr><th colspan="2">MATERIAL TERMS OF THE BIDDING PROCEDURES</th></tr>
<tr><td>Local Rule<br>6004-1(c)(i)(D)</td><td>deadlines set forth in the Bidding Procedures; (ii) adjourning the Auction, if any, at the Auction without further notice; (iii) modifying the Bidding Procedures and/or adding procedural rules or methods of bidding that are reasonably necessary or advisable under the circumstances for conducting the Auction; (iv) canceling the Auction; (v) waiving, or imposing, additional terms and conditions set forth in the Bidding Procedures with respect to Potential Bidders; (vi) rejecting any or all bids; and (vii) managing information provided to certain Potential Bidders where the protection of such information is, in the Debtors' reasonable business judgment, of critical importance to the Debtors in maintaining their competitive position; provided, however, that any modification, extension, waiver, or addition to the Bidding Procedures shall not be inconsistent with the Bidding Procedures Order, unless otherwise ordered by the Court.<br><br>B. Specific Reservations – The Bidding Procedures contain the following specific provisions governing modifications:<br><br>• The Debtors reserve the right, in their reasonable business judgment and after consultation with the Consultation Parties, to adjourn the Auction, if any, one (1) or more times to, among other things: (i) facilitate discussions between and amongst the Debtors, the Qualified Bidders, and the Consultation Parties, as appropriate; (ii) allow Qualified Bidders to consider how they wish to proceed; and (iii) provide Qualified Bidders the opportunity to provide the Debtors and the Consultation Parties with such additional evidence as the Debtors, in their reasonable business judgment, after consultation with the Consultation Parties, may require that the Qualified Bidder has sufficient resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing Overbid amount.<br><br>• The Debtors reserve the right, in consultation with the Consultation Parties, to announce reductions or increases in the Minimum Overbid Increment at any time during the Auction, if any.</td></tr>
<tr><td>Closing with Alternative Backup Bidders<br>Local Rule<br>6004-1(c)(i)(E)</td><td>A. Backup Bid; Backup Bidder – If an Auction is conducted for the Assets, the Qualified Bidder with the next-highest or otherwise second-best Bid at the Auction for such Asset(s), as determined by the Debtors in the exercise of their reasonable business judgment, after consultation with the Consultation Parties (the "<u>Backup Bid</u>"), shall be required to serve as a backup bidder (the "<u>Backup Bidder</u>") for such Asset(s), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors.<br><br>B. Identity of Backup Bidder – The identity of the Backup Bidder and the amount and material terms of the Backup Bid shall be announced by the Debtors at the conclusion of the Auction, if any, at the same time the Debtors announce the identity of the Successful Bidder. The Backup Bidder shall be required to keep its Bid (or if the Backup Bidder submits one (1) or more Overbids at the Auction, its final Overbid) open and irrevocable until the closing of the Sale Transaction with the applicable Successful Bidder. The Backup Bidder's Deposit shall be held in escrow until the closing of the Sale Transaction with the applicable Successful Bidder.</td></tr>
</table>

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | **C. Acceptance of Backup Bid –** If the Successful Bidder fails to consummate the approved Sale Transaction contemplated by its Successful Bid, the Debtors may select the Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed the Successful Bidder for all purposes. The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party. In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder, including with respect to specific performance. For the avoidance of doubt, to the extent the defaulting Successful Bidder is a Stalking Horse Bidder, no Bid Protections shall be payable by the Debtors to such defaulting Successful Bidder.<br>**D. Rejection of Other Qualified Bids –** All Qualified Bids (other than the Successful Bid and the Backup Bid) shall be deemed rejected by the Debtors on and as of the date of approval of the Successful Bid and Backup Bid by the Court, and any Deposits from such Qualified Bidders shall be returned to such Qualified Bidders not later than five (5) business days after the Confirmation Hearing. |

23. The Bidding Procedures also provide for the right to credit bid within the meaning of section 363(k) of the Bankruptcy Code and clarify that a credit bid of the Prepetition Agent, on behalf of the Prepetition Secured Parties, will be deemed a Qualified Bid of a Qualified Bidder as more fully described therein. The Bidding Procedures further require that the Prepetition Agent, on behalf of the Prepetition Secured Parties, provide written notice to the Debtors by no later than the Bid Deadline affirming that the Prepetition Agent, on behalf of the Prepetition Secured Parties, intends to retain its right to credit bid at the Auction. Upon receipt of such written notice, the Prepetition Agent and the Consenting Lenders shall no longer be considered Consultation Parties under the Bidding Procedures. To the extent the Prepetition Agent does not provide such written notice to the Debtors by the Bid Deadline, the Prepetition Agent, on behalf of the Prepetition Secured Parties, will not be entitled to credit bid at the Auction and the Prepetition Agent and the Consenting Lenders will continue to be considered Consultation Parties under the Bidding Procedures.

24. Importantly, the Bidding Procedures recognize the Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the Debtors' ability to consider all

Qualified Bids made at or prior to the Auction, and, as noted, preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates.

**B. Proposed Sale Schedule**

25. The Debtors are seeking approval of the Bidding Procedures and the Sale Schedule (as defined below) to establish a clear and open process for the solicitation, receipt, and evaluation of third-party bids on a timeline that would allow the Debtors to consummate a sale of the Assets pursuant to the Plan and consistent with the milestones set forth in the RSA and Cash Collateral Order. A defined path toward effectuating a Sale Transaction will drive the sale process in an expeditious and efficient manner and is designed to encourage all prospective bidders to put their best bids forward in order to provide the highest or otherwise best available recoveries to the Debtors' stakeholders.

26. The Debtors will use the time both before and following entry of the Bidding Procedures Order to continue to actively market the Assets. Subject to the Court's availability, the key dates and deadlines the Debtors seek to establish pursuant to the Bidding Procedures Order are as follows (collectively, the "Sale Schedule"), *provided* that the Debtors may amend the Sale Schedule, in consultation with the Consultation Parties[6] and subject to the terms of the RSA, from time to time, as necessary:

[6] "Consultation Parties" means the Prepetition Agent, on behalf of the Consenting Lenders, and any official committee appointed by the U.S. Trustee in these chapter 11 cases; *provided*, *however*, that during any period in which a Consultation Party has submitted a Qualified Bid and has become a Qualified Bidder, such Consultation Party shall no longer be considered a Consultation Party under these Bidding Procedures until such time such party withdraws its Bid.

| Date and Time[7] | Event or Deadline |
|---|---|
| **June 3, 2022, at 5:00 p.m. (prevailing Eastern time)** | **Stalking Horse Motion Deadline**: Deadline by which the Debtors must file a Stalking Horse Motion to be heard on shortened notice |
| **June 10, 2022, at 5:00 p.m. (prevailing Eastern time)** | **Bid Deadline**: Deadline by which parties must submit Bids and submit Deposits |
| **June 13, 2022, at 5:00 p.m. (prevailing Eastern time)** | Deadline by which the Debtors will determine which Bids are Qualified Bids and notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder |
| **June 13, 2022, at 5:00 p.m. (prevailing Eastern time)** | Deadline by which the Debtors will provide each Qualified Bidder a schedule setting forth the Baseline Bid |
| **June 14, 2022, at 10:00 a.m. (prevailing Eastern time)** | **Auction** (if necessary), which will be held at Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019 or via remote video |
| **June 21, 2022, at 4:00 p.m. (prevailing Eastern time)** | **Transaction Election Deadline**: Deadline by which the Debtors will provide notice of the Transaction Election |
| **July 1, 2022, at 4:00 p.m. (prevailing Eastern time)** | **Assigned Contract Objection Deadline**: Deadline by which all objections to the assumption and assignment of any executory contracts in connection with the Sale Transaction must be filed with the Court and served so as to be ***actually received*** by the appropriate notice parties |
| **July 11, 2022, at [●] (prevailing Eastern time)**<br>*Subject to the Court's availability, on such date the Debtors request. | **Confirmation Hearing**, which will be held before the Honorable Judge Mary F. Walrath, United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, Wilmington, Delaware 19801 or via remote video |

27. Following conclusion of the Auction, if any, and the selection of a Successful Bidder, if any, if the Debtors elect to consummate a Sale Transaction, the Debtors intend to present the results of the Auction prior to the Confirmation Hearing and seek

[7] All dates and deadlines are subject to Bankruptcy Rule 9006. Capitalized terms used in this summary table shall have the meanings ascribed to such terms in the Bidding Procedures.

authorization and approval to consummate the Sale Transaction pursuant to the Plan in connection with Plan confirmation. For the avoidance of doubt, consummation of any Sale Transaction will be subject to entry of the Confirmation Order, and the closing of the Sale Transaction will be a condition to the occurrence of the Plan Effective Date.

**C. Notice of Auction**

28. As soon as reasonably practicable, but no later than three (3) business days after entry of the Bidding Procedures Order (the "Mailing Date"), the Debtors (or their agents) will cause the Sale Notice, substantially in the form attached as **Exhibit 2** to the Bidding Procedures Order, to be served on the following parties or their respective counsel, if known, via first class mail, electronic mail, or overnight delivery: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the official committee of unsecured creditors appointed in these cases, if any; (c) counsel to the Prepetition Agent; (d) all known parties who have expressed interest in some or all of the Debtors' Assets; (e) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or other interest in the Debtors' Assets; (f) the Internal Revenue Service; (g) the United States Attorney for the District of Delaware; (h) the Environmental Protection Agency and similar state agencies for states in which the Debtors conduct business; (i) the Federal Energy Regulatory Commission; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002.

29. In addition, on the Mailing Date, or as soon thereafter as practicable, the Debtors (or their agents) will serve, by first class mail or electronic mail, the Sale Notice, upon all other known creditors of the Debtors and all counterparties to the Debtors' executory contracts and unexpired leases.

30. Finally, within seven (7) business days of the Mailing Date, the Debtors will publish the Sale Notice, with any modifications necessary for ease of publication, once in the

national edition of one of the following newspapers to provide notice to any other potential interested parties: *The Wall Street Journal*, *The New York Times*, or *USA Today*.

31. The Debtors will also post the Sale Notice and the Bidding Procedures Order (and Bidding Procedures) on the website of the Debtors' claims and noticing agent.

32. The Debtors submit that the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed sale, including the date, time, and place of the Auction (if one is held) and the Bidding Procedures and the dates and deadlines related thereto. Accordingly, the Debtors request that the form and manner of the Sale Notice be approved and that the Court determine that no other or further notice of the Auction is required.

**D. Summary of the Assumption and Assignment Procedures**

33. The Transaction Election shall be made by the Debtors no later than fourteen (14) days prior to the Confirmation Hearing (the "Plan Supplement Deadline") and consistent with Local Rule 3016-2 (requiring the filing of plan supplements at least seven days prior to the earlier of the deadline to object to confirmation of a plan of reorganization or the deadline to vote on a plan of reorganization). To the extent the Debtors elect to implement the Sale Transaction, the Debtors propose the Assumption and Assignment Procedures set forth below for notifying applicable contract counterparties to executory contracts and unexpired leases (collectively, the "Contract Counterparties" and, each a "Contract Counterparty") of proposed cure amounts with respect to executory contracts and unexpired leases to be assumed and assigned in connection with consummation of the Sale Transaction.

*i. Notice of Assumption and Assignment*

34. In accordance with the Bidding Procedures Order, at least seven (7) days in advance of the Assigned Contract Objection Deadline (as defined below) (such date, the "Assumption and Assignment Service Date"), the Debtors shall file with the Court, as part of the

Plan Supplement, and serve via first class mail, electronic mail, or overnight delivery the Cure Notice, the form of which is annexed as **Exhibit 3** to the Bidding Procedures Order on all Contract Counterparties and, include as **Exhibit A** to the Cure Notice, a list (the "Assigned Contracts Schedule") that specifies: (a) each of the Debtors' executory contracts and unexpired leases that may be assumed and assigned in connection with the Sale Transaction pursuant to the Plan (*i.e.*, the Assigned Contracts), including the name of the Contract Counterparty to each such contract; (b) the proposed amount necessary, if any, to cure all monetary defaults, if any, under each Assigned Contract (the "Cure Costs"); and (c) the deadline by which any Contract Counterparty may file an objection to the proposed assumption, assignment, cure, and/or adequate assurance and the procedures relating thereto. The Debtors believe the service as set forth herein shall be deemed compliant with the Local Rules, proper, due, timely, good, and sufficient notice, and no other or further notice will be necessary.

35. A Contract Counterparty listed on the Assigned Contract Schedule may file an objection (an "Assigned Contract Objection") to the proposed assumption and assignment of the applicable Assigned Contract or the proposed Cure Costs, if any. All Assigned Contract Objections must: (a) be in writing; (b) comply with the applicable provisions of the Bankruptcy Rules, the Local Rules, and any order governing the administration of these chapter 11 cases; (c) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Costs, state the cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; and (d) be filed with the Court and served and ***actually received*** by the Objection Notice Parties (as defined in the Bidding Procedures) no later than **July 1, 2022 at 4:00 p.m. (prevailing Eastern Time)** (the "Assigned Contract Objection Deadline").

36. If a Contract Counterparty files an Assigned Contract Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute prior to the Confirmation Hearing, such objection will be resolved at the Confirmation Hearing or such later date as determined by the Court. To the extent that any Assigned Contract Objection cannot be resolved by the parties, such Assigned Contract shall be assumed and assigned only upon satisfactory resolution of the Assigned Contract Objection, to be determined in the Successful Bidder's reasonable discretion. To the extent an Assigned Contract Objection remains unresolved, the Assigned Contract may be conditionally assumed and assigned, subject to the consent of the Successful Bidder in connection with a Sale Transaction, pending a resolution of the Assigned Contract Objection after notice and a hearing. If an Assigned Contract Objection is not satisfactorily resolved, the Successful Bidder or the Debtors, as applicable, may determine that such Assigned Contract should be rejected and not assumed and assigned, in which case the Successful Bidder or the Debtors, as applicable, will not be responsible for any Cure Costs in respect of such contract.

*ii.* *Supplemental Cure Notice*

37. If (a) the Debtors discover contracts inadvertently omitted from the Assigned Contracts Schedule, (b) the Successful Bidder identifies other executory contracts or unexpired leases that it desires to be assumed and assigned in connection with the Sale Transaction, or (c) the previously stated Cure Cost associated with any Assigned Contract requires modification, the Debtors may at any time after the Assumption and Assignment Service Date: (i) supplement the Assigned Contracts Schedule with the previously omitted Assigned Contracts; (ii) remove any Assigned Contracts from the list of executory contracts and unexpired leases ultimately selected as Assigned Contracts that the Successful Bidder proposes to be assumed and

assigned in connection with the Sale Transaction, or add to such list; and/or (iii) modify the previously stated Cure Costs associated with any Assigned Contract.

38. In the event that the Debtors exercise any of the rights reserved above, the Debtors shall promptly serve a supplemental notice of assumption and assignment by first class mail, electronic mail, or overnight delivery on the Contract Counterparty, and its counsel, if known, at the last known address available to the Debtors (a "Supplemental Cure Notice"). Each Supplemental Cure Notice shall include the same information with respect to listed Assigned Contracts as would have been included in the Notice of Assumption and Assignment (a "Supplemental Assigned Contracts Schedule").

39. Any Contract Counterparty that receives a Supplemental Cure Notice may file an objection (a "Supplemental Assigned Contract Objection") to the proposed assumption and assignment of the applicable Assigned Contract or the proposed Cure Costs, if any. All Supplemental Assigned Contract Objections must: (a) state, with specificity, the legal and factual basis for the objection as well as what Cure Costs are required, if any; (b) include appropriate documentation in support thereof; and (c) be filed with the Court and served and ***actually received*** by the Objection Notice Parties no later than the date that is the later of (i) the Assigned Contract Objection Deadline, and (ii) seven (7) days following the date of service of such Supplemental Cure Notice, which date will be set forth in the Supplemental Cure Notice (the "Supplemental Assigned Contract Objection Deadline").

40. If a Contract Counterparty files a Supplemental Assigned Contract Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors shall seek an expedited hearing before the Court (a "Supplemental Assigned Contract Hearing") to determine the Cure Costs, if any, and

approve the assumption and assignment of the relevant Assigned Contracts. If there is no such objection, then the Debtors shall obtain an order of this Court fixing the Cure Costs and approving the assumption and assignment, as applicable, of any Assigned Contract listed on a Supplemental Cure Notice.

*iii.* *Additional Notice of Assumption and Assignment Procedures*

41. If a Contract Counterparty does not file and serve an Assigned Contract Objection or Supplemental Assigned Contract Objection in a manner that is consistent with the requirements set forth above, and absent a subsequent order of the Court establishing an alternative Cure Cost, (a) the Cure Costs, if any, set forth in the Cure Notice (or Supplemental Cure Notice) shall be controlling, notwithstanding anything to the contrary in any Assigned Contract or any other document, and (b) the Contract Counterparty will be deemed to have consented to the assumption and assignment, as applicable, of the Assigned Contract and the Cure Costs, if any, and will be forever barred from objecting to the assumption and assignment of such Assigned Contract and rights thereunder, including the Cure Costs, if any, and from asserting any other claims related to such Assigned Contract against the Debtors or the Successful Bidder, or the property of any of them.

42. Any objections to the Successful Bidder's proposed form of adequate assurance of future performance must be filed by the Assigned Contract Objection Deadline or Supplemental Assigned Contract Objection Deadline, as applicable, and such objections will be resolved at the Confirmation Hearing or Supplemental Assigned Contract Hearing, as applicable. The Debtors may, with the consent of the Successful Bidder, adjourn the resolution of any such objection to a later hearing. For the avoidance of doubt, the inclusion of an Assigned Contract on the Assigned Contracts Schedule or Supplemental Assigned Contracts Schedule shall not obligate the Debtors to assume and assign any such Assigned Contract or obligate the Successful Bidder to

take assignment of any such Assigned Contract. The Successful Bidder shall determine whether to take assignment of any Assigned Contracts pursuant to the terms of the APA (as defined in the Bidding Procedures).

**Basis for Relief**

**A. The Bidding Procedures Are Fair, Designed to Maximize the Value Received by the Debtors' Estates, and Consistent with the Debtors' Reasonable Business Judgment**

43. Section 363(b) of the Bankruptcy Code provides that "[t]he [debtor in possession], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1). Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g.*, *In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("'In determining whether to authorize use, sale or lease of property of the estate under [Section 363], courts require the [Debtor] to show that a sound business purpose justifies such actions.' If the [Debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should approve the sale." (*quoting In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999)); *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification.'") (internal citations omitted); *see also In re Martin*, 91 F.3d 389, 394–95 (3d Cir. 1996) (explaining that courts usually defer to the trustee's "legitimate business justification" with respect to the "disposition of assets of the estate"); *In re Integrated Res., Inc.*, 147 B.R. 650, 656–57 (S.D.N.Y. 1992) (noting that bidding procedures that have been negotiated by a trustee are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

44. The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See In re Adams Res. Expl. Corp.*, 2017 Bankr. LEXIS 4506, at *12 (Bankr. D. Del. Sep. 7, 2017) ("The relief requested in the Sale Motion…is a necessary and appropriate step toward enabling the Debtor to maximize the value of its bankruptcy estate, and it is in the best interests of the Debtor, its estate, and its creditors."); *In re Integrated Res.*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *Cello Bag Co. v. Champion Int'l Corp. (In re Atlanta Packaging Prods., Inc.)*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."). To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. *See*, *e.g.*, *In re Integrated Res.*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets").

45. The Debtors have carefully evaluated a number of qualitative and quantitative factors in designing a process that they believe will maximize the value of their estates, produce maximum recoveries, and result in a successful restructuring of their estates. This process includes approval of the Bidding Procedures, which are fair, designed to facilitate orderly yet competitive bidding to maximize the value of the Debtors' estates, and to elicit the highest or otherwise best offers available for all or substantially all of the Debtors' assets. In particular, the Bidding Procedures contemplate an open auction process with minimum barriers to entry and

provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

46. Further, the Bidding Procedures provide the Debtors with an opportunity to consider competing bids and select the highest or otherwise best offers for the completion of the Sale Transaction. Moreover, having the option to enter into a Stalking Horse Agreement with a Stalking Horse Bidder ensures that the Debtors retain flexibility to set a minimum purchase price for the Assets that will be tested by the marketplace. As such, the Debtors and creditors of the Debtors' estates can be assured that, taking into account the financial condition of the market and the economy, the consideration obtained will be fair and reasonable and at or above market, and that Plan recoveries will be maximized.

47. The Debtors respectfully submit that the Bidding Procedures will encourage competitive bidding and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings. Accordingly, for all of the foregoing reasons, the Debtors believe that the Bidding Procedures should be approved.

**B. The Bid Protections Have a Sound Business Purpose and Should Be Approved**

48. The Debtors are also seeking authority to designate one or more Stalking Horse Bidders and offer Bid Protections to each such Stalking Horse Bidder, subject to Court approval on an expedited basis. The use of a stalking horse in a public auction process for sales is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value." *In re Interforum Holding LLC*, 2011 WL 2671254, at *1 n.1 (E.D. Wis. July 7, 2011). As a result, stalking horse bidders virtually always require break-up fees and, in many cases, other forms of bidding protections as an inducement for "setting the floor at auction, exposing its bid to competing

bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement." *Id*. (internal quotation marks and citation omitted). Thus, the use of bidding protections has become an established practice in chapter 11 cases.

49. Approval of bid protections in connection with the sale of significant assets is analyzed under the business judgment standard, and courts routinely deem bid protections appropriate in chapter 11 cases. *See In re Integrated Res.*, 147 B.R. at 657–58 (noting that overbid procedures and breakup fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); *In re 995 Fifth Ave. Assoc., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (holding that the business judgment standard protects breakup fees and other provisions negotiated in good faith).

50. Indeed, breakup fees and other forms of bidding protections are a normal and, in many cases, necessary component of sales conducted in chapter 11: "Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . . In fact, because the directors of a corporation have a duty to encourage bidding, break-up fees can be *necessary* to discharge the directors' duties to maximize value." *Integrated Res.*, 147 B.R.at 659–60 (emphasis in original). Specifically, bid protections "may be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking." *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. at 28 (internal quotation marks and citation omitted); *see also Integrated Res.*, 147 B.R. at 660–61 (noting bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid").

51. As a result, courts in this jurisdiction routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement

provides a benefit to the estate. *See In re O'Brien Env't Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999) ("In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate."); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010). The allowance of Bid Protections, in the event that the Debtors execute a Stalking Horse Agreement, is in the best interests of the Debtors' estates and their creditors, as any Stalking Horse Agreement will establish a floor for further bidding that may increase the consideration given in exchange for the Assets, which will inure to the benefit of the Debtors' estates.

52. The Debtors believe that the ability to provide Bid Protections will attract and retain a Stalking Horse Bidder. By inducing the Stalking Horse Bidder to hold its offer open as a baseline from which other potential bidders can submit higher or better offers, the Bid Protections will serve to encourage more competitive bidding, which will hopefully increase the purchase price of the Assets. As such, the Bid Protections will, among other things, enable the Debtors to maximize the value of their estates.

53. If the Court does not approve the provision of Bid Protections, a potential Stalking Horse Bidder may elect not to serve as the stalking horse, to the detriment of the Debtors' estates. Further, if the Bid Protections were to be paid, it will be because the Debtors have received higher or otherwise superior offers for the Assets. In short, the proposed provision of Bid Protections, which will remain subject to further Court approval on an expedited basis, are fair and reasonable under the circumstances because they constitute a "fair and reasonable percentage of the proposed purchase price" and are "reasonably related to the risk, effort, and expenses of the prospective purchaser." *Integrated Res.*, 147 B.R. at 662 (citing *995 Fifth Ave.*, 96 B.R. at 28).

54. Preserving the ability to designate a Stalking Horse Bidder on an expedited basis and provide Bid Protections to such Stalking Horse Bidder is a sound exercise of the Debtors' business judgment and is in the best interests of the Debtors, their estates, and all stakeholders. Accordingly, the Court should approve the expedited process proposed by the Debtors for seeking approval of a Stalking Horse Bidder, entry into a Stalking Horse Agreement, and any related Bid Protections.

**C. The Form, Manner, and Extent of Notice of this Motion and the Proposed Sale Transaction Are Appropriate and Adequate under the Circumstances**

55. The Debtors will serve the Sale Notice and the Cure Notice in accordance with the Bidding Procedures Order. The notice of the proposed Sale Transaction to be provided by the Debtors as set forth herein sufficiently describes the process through which the Debtors seek to sell their Assets pursuant to a Sale Transaction.

56. Several sections of the Bankruptcy Code and Bankruptcy Rules dictate the sufficiency of notice and adequacy of service. As discussed below, the content and manner of service of this Motion and the related notices satisfy all such requirements:

- Sale Notice – Section 363 of the Bankruptcy Code provides that a trustee may sell property "after notice and a hearing." Under section 102(1) of the Bankruptcy Code, the phrase "after notice and a hearing" means "notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances." 11 U.S.C. § 102(1)(A). As set forth above, creditors have been provided notice of the salient details regarding this Motion, and notice is sufficient under section 363 of the Bankruptcy Code.

- Bankruptcy Rule 2002 – Bankruptcy Rule 2002 requires twenty-one (21) days' notice of the proposed sale of property other than in the ordinary course of business. In addition, Bankruptcy Rule 2002 provides that notice of a sale shall "include the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections." Fed. R. Bankr. P. 2002(c)(1). As set forth above, the notice of this Motion that has been and will be provided by the Debtors satisfies each of these requirements.

- Bankruptcy Rules 6004 and 6006 – Bankruptcy Rule 6004 requires that notice of sales of property out of the ordinary course of business complies with Bankruptcy Rule 2002. As set forth above, the Debtors have complied with Bankruptcy Rule 2002. Bankruptcy Rule 6006 requires notice of a motion to assume and assign an executory contract or unexpired lease to be served on the counterparty to such contract or lease, as well as on other parties in interest as the Court may direct. The Sale Notice and the Cure Notice have been or will be served on counterparties to the Assigned Contracts, thereby satisfying this requirement.

- Procedural Due Process – The notices of this Motion that are being provided as described herein, including the notice being provided by publication as set forth above, are "reasonably calculated" to apprise interested parties of the pendency of the matter and to afford them an opportunity to object. *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 319 (1950). Parties in interest have been and should be found to have been afforded adequate notice of this Motion, the Sale Transaction, the Bidding Procedures, and the other relief requested herein.

57. The Debtors submit that the notice, including by publication of the Sale Notice in in the national edition of either *The Wall Street Journal*, *The New York Times*, or *USA Today*, they have provided and intend to provide as outlined with respect to the proposed Sale Transaction, the Bidding Procedures, and the Cure Costs, as applicable, is reasonable and appropriate and constitutes good and adequate notice of the proposed Sale Transaction and the procedures and proceedings related thereto and therefore should be approved by the Court.

**D. The Assumption and Assignment Procedures Are Appropriate and Should Be Approved**

58. To facilitate and effectuate the Sale Transaction, the Debtors are seeking approval of the Assumption and Assignment Procedures. Section 365 of the Bankruptcy Code authorizes a debtor to assume or to assume and assign its executory contracts and unexpired leases, subject to the approval of the court; *provided* that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.

59. The Debtors respectfully submit that the Assumption and Assignment Procedures are reasonable and necessary to properly notify parties of potential assumption and assignment of executory contracts and unexpired leases and provide the Contract Counterparties with sufficient time to determine the accuracy of the proposed cure amounts and whether the Successful Bidder has provided adequate assurance of future performance. The Assumption and Assignment Procedures will enable the Debtors to satisfy the statutory requirements of section 365(b)(1) of the Bankruptcy Code because the Assumption and Assignment Procedures provide a clear process by which to resolve disputes over cure amounts or other defaults. The Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-Debtor parties.

60. As set forth in the Bidding Procedures Order, the Debtors also request that any party that fails to object to the proposed assumption and assignment of any Assigned Contract be deemed to consent to the assumption and assignment of the applicable Assigned Contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the order approving the Sale Transaction, along with the cure amounts identified in the Cure Notice. *See, e.g.*, *Hargrave v. Twp. Of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

61. The Debtors believe that they can and will demonstrate at the Confirmation Hearing that the requirements for assumption and assignment of the Assigned Contracts to the Successful Bidder will be satisfied, including with respect to demonstrating adequate assurance of future performance. As required by the Bidding Procedures, the Debtors will evaluate the financial

wherewithal of potential bidders before designating such party a Qualified Bidder or Successful Bidder (*e.g.*, financial credibility, willingness, and ability of the interested party to perform under the Assigned Contracts), including as it relates to such Qualified Bidder's willingness and ability to perform under the Assigned Contracts assigned to the Successful Bidder. Further, the Assumption and Assignment Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Successful Bidder to provide adequate assurance of future performance and object to the assumption of the Assigned Contracts or proposed cure amounts. The Court therefore will have a sufficient basis to authorize the Debtors to assume and assign the Assigned Contracts as set forth in the definitive agreement of the Successful Bidder.

62. Accordingly, the Debtors submit that the Assumption and Assignment Procedures should be approved as reasonable and necessary measures to adequately notify parties in interest and conduct the proposed sale process in a fair, efficient, and proper manner.

**Waiver of Bankruptcy Rule 6004(h)**

63. To implement the foregoing successfully, the Debtors request that the Court enter an Order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Notice**

64. Notice of this Motion has been provided to: (a) the Office of the United States Trustee for the District of Delaware (Attn: Joseph Cudia); (b) the holders of the thirty (30) largest unsecured claims on a consolidated basis against the Debtors; (c) the Internal Revenue Service; (d) the United States Attorney's Office for the District of Delaware; (e) counsel to the Prepetition Agent; (f) the Environmental Protection Agency and similar state agencies for states

in which the Debtors conduct business; (g) the Federal Energy Regulatory Commission; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request entry of the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other relief as the Court may deem just and proper.

Dated: March 31, 2022
Wilmington, Delaware

Respectfully Submitted,

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Andrew L. Magaziner*
Pauline K. Morgan (No. 3650)
Andrew L. Magaziner (No. 5426)
Katelin A. Morales (No. 6683)
Timothy R. Powell (No. 6894)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: pmorgan@ycst.com
amagaziner@ycst.com
kmorales@ycst.com
tpowell@ycst.com

- and -

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Brian S. Hermann (admitted *pro hac vice*)
John T. Weber (admitted *pro hac vice*)
Alice Nofzinger (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Tel: (212) 373-3000
Fax: (212) 757-3990
Email: bhermann@paulweiss.com
jweber@paulweiss.com
anofzinger@paulweiss.com

*Proposed Counsel to the Debtors and Debtors in Possession*