**<u>EXHIBIT A</u>**

# INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
**International Arbitral Tribunal**

**ICDR Case No. 01-18-0001-6009**

---

**In the Matter of Arbitration Between:**

**IBERDROLA ENERGY PROJECTS, INC.,**

**Claimant/Counterclaim Respondent,**

**and**

**FOOTPRINT POWER SALEM HARBOR DEVELOPMENT, LP,**

**Respondent/Counterclaimant.**

---

**FINAL AWARD**

---

**Arbitral Tribunal**

**John R. Heisse (Chair)**
**Michael C. Loulakis**
**John A. Wolf**

**October 15, 2021**

WE, THE UNDERSIGNED ARBITRATORS ("Tribunal"), having been designated in accordance with the arbitration agreement entered into between the above-named Parties and dated December 2, 2014, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, and having considered the facts, contract and applicable law, and for the reasons set forth herein, do hereby issue this AWARD, as follows.

## 1.  Introduction

This arbitration concerns claims arising between Respondent, Footprint Power Salem Harbor Development, LP ("Footprint"), and Claimant, Iberdrola Energy Projects, Inc. ("IEP"), under a December 2, 2014, Engineering, Procurement and Construction Contract ("EPC Contract") for the Salem Harbor Energy Center Project (the "Project").  Footprint is the owner and developer of the Project, a 674 MW combined-cycle power plant located in Salem, Massachusetts.[1]  IEP is the contractor under the EPC Contract, and, among other things, was obligated to meet the Guaranteed Substantial Completion Date of May 31, 2017, for a lump sum price of $702,060,000,[2] each such obligation being subject to adjustment in accordance with the terms of the EPC Contract.

Disputes arose during the Project concerning changes, added costs, delays, and inefficiencies. The Parties disputed the reasons for those costs, delays, and inefficiencies, as well as responsibility therefor. Over the course of the Project, Footprint rejected nearly all of IEP's claims for additional costs, denied all of IEP's efforts in seeking time extensions, terminated IEP for default on April 15, 2018 (319 days after the EPC Contract's original Guaranteed Substantial Completion Date), and replaced IEP with Burns & McDonnell.  The Project achieved Commercial Operation on May 31, 2018, although Burns & McDonnell did not appear to finally complete the Project until sometime in 2020.

The aggregate costs incurred by IEP and Footprint in attempting to complete the EPC Contract, including legal and expert fees, amount to hundreds of millions of dollars over the EPC Contract's original lump sum price.  The answer to the question of which Party is to bear the burden of these costs is primarily based on whether Footprint's default termination of the EPC Contract was justified by the facts and law and undertaken properly (as Footprint contends), or whether the termination was wrongful as a matter of fact or law (as IEP contends).  The sections below explain our answer to this question.  However, the Tribunal first thought it necessary and appropriate to provide a high level perspective of this case.  Stated simply, we found that neither IEP nor Footprint distinguished itself by its performance on the Project, and that each Party's actions contributed to the Project's major cost overruns and problems.

The evidence demonstrated that IEP seriously underbid the EPC Contract, and it never recovered from that self-inflicted financial harm.  Compounding that initial error, IEP's performance of each of the Project phases – design, contracting, procurement, and execution – was marked by IEP's blunders, including poor subcontracting and labor practices/assumptions, poor performance by its most critical design and construction subcontractors, and project management shortfalls.  In our view, IEP would have faced

---

[1]  The plant was constructed on a 23-acre portion of a 65-acre site along Salem Harbor that formerly housed a coal and oil-fired power plant owned by Dominion Power.  The new plant consists of two gas-fired trains, each consisting of a gas turbine and a heat recovery steam generator ("HRSG") laid out in an "L" shape and venting to a single stack. Steam generated in each of the HRSGs is then directed to a separate steam turbine generator building ("STG building"), which consists of two steam turbines ("ST"), where the steam is used to generate additional power. The steam is then diverted to a stand-alone air-cooled condenser ("ACC") structure to return the steam to water, which is then recycled and reused in the HRSGs. The plant is surrounded by a landscaped earthen berm and gabion wall.

[2]  This amount is the original Contract Price, before any adjustments for Change Orders.

substantial challenges and financial losses even if it was dealing with an ideal owner – one who was cooperative, forthcoming, and responsible.

However, the evidence demonstrated Footprint to be the opposite of an ideal owner. There is compelling evidence that Footprint itself either misconceived the actual cost of the Project or had inadequate financial resources to honor its commitments (as was quite evident by its approach to the removal of the City of Salem's existing 48-inch storm drain line). Perhaps this explains why Footprint adopted a confrontational and non-cooperative project management approach with IEP that started from the beginning of the Project and never stopped. Regardless of the reason, Footprint's project management approach made a troubled project far worse.

Many specific examples of Footprint's confrontational style were presented to the Tribunal, including Footprint's refusal to grant even one day of extension of time for excusable delay, its refusal to accept virtually any changes, its vacillation and delay in the design and permitting of the berm and gabion wall, and its withholding of critical information regarding permitting and commercial deadlines. Despite Footprint's protestations to the contrary, there is little question that Footprint's decision to terminate IEP was driven by its goal of drawing on IEP's Performance Letter of Credit ("LOC") to fund completion of the Project, notwithstanding that commercial operation by IEP was within sight. Default termination and the LOC draw were extreme self-help measures, and when combined with the many specific and general examples of lack of cooperation, tainted Footprint's position.

During the course of this lengthy arbitration process, each Party was very adept at identifying the failings of the other – some of which were cited in the preceding two paragraphs. However, while IEP acknowledged some missteps, neither Party took any meaningful responsibility in the proceedings for its own failings or attempted to explain to the Tribunal how to deal with these failings in the award deliberation process. This was not only evident from the pre-hearing submissions, evidence and arguments presented during the hearings, but also from the post-hearing briefs and proposed awards.

The Tribunal has evaluated all of the evidence and arguments and arrived at this Award. We will explain the basis for our decision below, after reviewing the procedural background of this proceeding.[3]

## 2. Applicable Procedural Rules and Substantive Law

### 2.1. Procedural Rules

Section 17.2 of the EPC Contract requires that disputes such as those presented in this arbitration be resolved in an arbitration administered by the International Centre for Dispute Resolution ("ICDR") of the American Arbitration Association ("AAA"), in accordance with its International Arbitration Rules ("ICDR Rules") in effect at the time of the arbitration. Those Rules have been followed throughout the course of this matter and in the preparation of this Award.

### 2.2. Substantive Law

Section 18.9 of the EPC Contract states that the EPC Contract shall be governed by, and construed in accordance with, the laws of the state of New York, and the Parties have so agreed. Consequently, the Tribunal has applied the substantive laws of the state of New York in this matter.

---

[3] The Parties requested a reasoned award, and provided their views of what a proposed reasoned award should look like. The Tribunal developed this Award based in part on the guidance provided by the Parties in their respective proposed awards.

### 3.   Procedural History

#### 3.1.  Appointment of the Tribunal Members

On or about July 19, 2018, John R. Heisse and Michael C. Loulakis were duly appointed and affirmed as the Tribunal members.  Per the agreement of the Parties, Messrs. Heisse and Loulakis, working from a list of candidates approved by the Parties, selected the third member of the Tribunal, Larry D. Harris, who was duly appointed and affirmed on or about August 24, 2018.  Mr. Harris tendered his resignation from the Tribunal on or about July 18, 2019.  On or about October 30, 2019, John A. Wolf was duly appointed and affirmed as Mr. Harris's replacement on the Tribunal.

#### 3.2.  Major Pre-Award Motions

The Tribunal considered several major pre-Award motions from the Parties (i.e., those motions that did not involve process-related issues, such as discovery disputes or issues over statements of claim and defense).  They are briefly addressed below.

##### 3.2.1.  Footprint's Motion to Join Iberdrola, S.A.

On June 28, 2018, prior to the Tribunal's appointment, Footprint filed a Demand for Arbitration against Iberdrola, S.A. ("IEP's Parent"), seeking relief under the guarantee that IEP's Parent issued under the EPC Contract.  Footprint also sought to join IEP's Parent into these proceedings.  On June 30, 2018, IEP's Parent, through counsel, objected to this attempt at joinder.  The issue was presented to the Tribunal once it was fully constituted, and briefing and oral arguments were taken.

The Tribunal issued an order on October 22, 2018, which stated that Footprint had the right to seek arbitration against IEP's Parent and join it into this arbitration.  However, if Footprint chose to do so, the Tribunal found that IEP's Parent would be unduly prejudiced by not having had an opportunity to participate in the selection of the Tribunal.  Consequently, the order gave Footprint the choice to either: (a) withdraw the demand for arbitration against IEP's Parent; or (b) decide that it wanted to maintain its demand for arbitration against IEP's Parent and have it as a party to this arbitration.  If Footprint chose option (b), the order gave IEP's Parent the right to determine whether it wished to accept any or all of the Tribunal members.  If one or more Tribunal members were not acceptable, the order required that all parties work together to determine replacement(s).  Footprint elected option (a) and withdrew its demand for arbitration against IEP's Parent without prejudice, which had the effect of removing IEP's Parent as a party to this arbitration.

##### 3.2.2.  Footprint's Motion for Approval to Draw on IEP's LOC

On or about November 8, 2018, Footprint filed a Motion for Approval to Draw on IEP's Performance Letter of Credit ("LOC"), which was in the amount of $140,881,675.  Because the chronology of this is relevant to the default discussions set forth below, we provide a brief explanation of that chronology here.

Footprint terminated IEP for default on April 15, 2018, and on that same day notified IEP of its intent to draw upon the LOC.  On April 20, 2018, before payment was made to Footprint, IEP filed a Notice of Arbitration (which initiated the present matter) and an Application for Emergency Relief under the ICDR Rules to enjoin Footprint from drawing upon the LOC.  On April 23, 2018, Footprint presented to Deutsche Bank a sight draft and certification, the necessary documents required by the LOC to draw on the LOC.  On May 14, 2018, the Emergency Arbitrator, after considering the arguments of the Parties, issued an Interim Emergency Order temporarily enjoining Footprint from drawing on the LOC.  The Interim Emergency

Order also required that Footprint make no further presentation of the LOC without reasonable prior notice to IEP and the approval of this Tribunal (once constituted).

For several months after the Tribunal was constituted, the Parties briefed and argued their positions to the Tribunal on the Motion for Approval to Draw on the LOC. On February 1, 2019, the Tribunal found in favor of Footprint and ruled that Footprint could make presentment to Deutsche Bank on the LOC. Our decision was based on the well-settled rules applicable to standby Letters of Credit, particularly the independence principle, by which we concluded we were bound. In summary, the independence principle clearly states that injunctions should not be issued to halt the draw of a letter of credit pending the examination and resolution of the merits of underlying contract disputes. We also declined IEP's invitation to implement conservatory measures and place limitations on Footprint's use of the funds to protect the status quo, as that was also contrary to well-settled legal principles. Our ruling specifically stated that it was made without prejudice to our future deliberations in the arbitration itself.

### 3.2.3.  IEP's Application for Security

During the hearing, on or about February 2, 2021, IEP filed an Application for Security Pursuant to Article 24 of the ICDR Rules. The essence of the Application was principally grounded in IEP's assertion that the December 13, 2019, Omnibus Amendment and Waiver between Footprint and the Project's lenders served to limit, if not completely strip, Footprint of the power to pay an arbitral award in IEP's favor. Each Party provided submissions related to the Application, and the issue was discussed and arguments were made on March 4, 2021. The Tribunal ultimately denied the Application on March 18, 2021, based on our review of the changes made to Footprint's Credit Agreement and Depositary Agreement through the Omnibus Amendment and Waiver. In short, we did not find that IEP's position as a potential creditor of Footprint had been materially prejudiced through the Omnibus Amendment and Waiver.

### 3.3.  Pre-Hearing Discovery/Disclosures and Preparation

The Parties had been dealing with the claims and counterclaims involved in this arbitration for many months prior to the engagement of the Tribunal. In order to ensure the fair and efficient presentation of the evidence in this matter, the Scheduling and Procedural Orders entered set forth specific milestones which had to be met by the Parties over a period in excess of 28 months before the commencement of hearings. Those requirements were developed in consultation with the Parties.

Discovery and Disclosures were conducted with the International Bar Association Rules for the Taking of Evidence serving as guidance. Milestones for the completion of Discovery and Disclosures included, among other activities,: (a) deadlines for the identification of both expert and fact witnesses; (b) the date on which the production of documents, including electronically stored information, was to be completed; (c) a date on which each Party was required to provide the other with the names of individuals (fact and expert) expected to testify on behalf of the Party; (d) the date for itemization and explanation of damages sought; (e) the date when expert reports were to be exchanged; (f) the date on which each Party was required to provide the other with Witness Statements and a list of all exhibits expected to be offered in its case-in-chief at the hearings; and (g) the date on which the Parties were required to exchange their pre-hearing briefs, including a final list of witnesses expected to be called by each, as well as a final list of all exhibits to be submitted, and to provide the Tribunal with copies of the same.

Over the course of this pre-hearing period, discovery and other process-related disputes did arise. These disputes were ultimately either worked out cooperatively with the assistance of the Tribunal's Chair, or resolved by the Tribunal and/or the Tribunal Chair.

### 3.4.  The Hearings and the Impact of the COVID-19 Pandemic

Section 17.2 of the EPC Contract established New York City, New York, as the seat of the arbitration, although the clause gave the Parties the ability to agree upon a different hearing location.  The initial Scheduling and Procedural Order called for the hearings to be held in Boston, Massachusetts, with 20 hearing days initially scheduled for the first quarter of 2020.  The Tribunal later agreed to the Parties' request to reschedule the hearings for the third and fourth quarters of 2020.  A site visit in Salem was scheduled for December, 16, 2020, to be followed by an in-person final preliminary hearing in Boston.

As the result of the onset of the global COVID-19 pandemic ("Pandemic"), the site visit was cancelled and the final preliminary hearing was conducted remotely.  Over concern about the impact of the Pandemic on the actual hearings, and because a substantial number of witnesses were located outside of Boston (and, indeed, outside the United States), the Parties and the Tribunal worked together to identify a revised hearing schedule and address the possibility of a remote virtual hearing procedure.  At the Tribunal's request, the Parties conferred and agreed on new hearing dates for the first quarter of 2021, and new deadlines for the milestone events which had to occur prior to the commencement of hearings.  Further, and in light of the difficulties presented by restrictions on movement and gatherings imposed in response to the Pandemic, the Parties and Tribunal agreed that hearings must be conducted virtually rather than in-person.

In this regard, the Parties reached agreement on a Virtual Hearing Protocol, as set out in the Tribunal's Order of January 4, 2021, that applied to the hearing. The Virtual Hearing Protocol was based upon the principle that, notwithstanding any circumstances arising from the Pandemic (including restrictions on mobility that could affect the Parties in disparate degrees), each Party had an equivalent opportunity to present and take evidence through a secure and sound digital platform.

The Parties agreed that 360 Litigation Services would be engaged to provide a virtual hearing Zoom platform and perform as Virtual Hearing Administrator. The virtual hearings were ultimately held on January 18-23, January 25-29, February 23-26, and March 1-4, 2021.  They were conducted with the Tribunal members participating from their respective locations in Kentfield, California; Great Falls, Virginia; and Vero Beach, Florida.  Counsel were variously located in or around Boston, Massachusetts; Houston, Texas; New York City; and San Francisco, California. Witnesses were located at, and testified from, various locations within the United States, and internationally, from Madrid, Spain, and Buenos Aires, Brazil.  The virtual platform provided a stable and secure environment and the remote proceedings were completed without issue.

Direct testimony concerning the Parties' respective claim and counterclaim items was presented by means of signed witness statements by fact and expert witnesses, prepared with the International Bar Association Rules on the Taking of Evidence as guidance.  Only expert witnesses were allowed to offer limited direct testimony, by way of summarizing their opinions. Most fact and all expert witnesses were submitted to cross-examination and provided rebuttal testimony, while some fact witnesses' written witness statements were not challenged through cross examination. All testimony was under oath, and all proceedings at the hearings were stenographically recorded, as agreed by the Parties. Simultaneous translation/interpretation was available during the hearings. The testimony at the hearings is contained in a 5,784-page transcript.

The Parties agreed to a "chess clock" approach, with each having equal speaking times.  In order to assure that the available hearing time was divided equally between the Parties, the Tribunal implemented a procedure which allocated to each Party all the hearing time which it consumed by opening and closing arguments and examination or cross-examination of witnesses.  No issue as to time consumed arose during the proceedings.

### 3.5.  Witnesses, Exhibits, Pre-Hearing, and Post-Hearing Submissions

The Tribunal was presented with substantial amounts of evidence and arguments throughout these proceedings.  The following summarizes what is in the record:

- <u>Witnesses and Witness Statements</u>. Each Party provided numerous Witness Statements, setting forth affirmative and rebuttal testimony for both fact and expert witnesses.  IEP submitted: (a) 13 Affirmative Witness Statements and 12 Rebuttal Witness Statements from a total of 18 fact witnesses; and (b) Expert Reports (Affirmative and, in some cases, Rebuttal) from seven expert witnesses.  Footprint submitted: (a) 13 affirmative Witness Statements and 15 rebuttal Witness Statements from a total of 19 fact witnesses; and (b) Expert Reports (Affirmative and, in some cases, Rebuttal) from 10 expert witnesses. Not all fact witnesses submitting Witness Statements appeared at the hearings because cross-examination as to certain witnesses was waived by the opposing Party. During the course of the 19 hearing days, the Tribunal heard testimony from 20 different individuals called as fact or expert witnesses on behalf of IEP and 19 different individuals called as fact or expert witnesses on behalf of Footprint.

- <u>Exhibits</u>.  The Tribunal requested the Parties to pre-mark their exhibits, and each did so.  IEP had over 7,000 pre-marked exhibits and Footprint had approximately 2,500 pre-marked exhibits.  Over the course of the hearings, the Parties referred to well over 500 of these exhibits.

- <u>Pre-Hearing and Post-Hearing Briefs</u>. The Parties provided voluminous Pre-Hearing Briefs that addressed each element of their respective positions.  IEP's Pre-Hearing Brief was 108 pages. Footprint's Pre-Hearing Brief was 396 pages, plus attachments.  At the conclusion of the hearing, each Party provided Post-Hearing Briefs and Replies to the Post-Hearing Brief of the opposing Party.  Again, these were voluminous and cited extensively to the record.  IEP's Post-Hearing Brief was provided in three parts, aggregating to 456 pages, and its Reply Brief was 126 pages.  Footprint's Post-Hearing Brief was 353 pages, and its Reply Brief was 255 pages.

- <u>Proposed Award</u>.  At the request of the Tribunal, each Party submitted a proposed award, limited to 50 pages.

In an effort to streamline the process of presenting the Parties' positions on issues of importance to this Award, the Tribunal provided the Parties with an outline of those issues to assist in the structure of their Post-Hearing Briefs and proposed award.  The headings for Sections 5 through 9 of this Award reflect this outline.

### 4.  The Parties' Claims and Counterclaims – An Overview

As we noted in Section 1, the primary issue in this proceeding is whether Footprint's default termination of IEP was proper (as Footprint contends) or whether it was wrongful (as IEP contends).  The claims and counterclaims from the Parties are largely structured around the answers to that question.

IEP contends that Footprint wrongfully terminated the EPC Contract for reasons that will be discussed in greater detail below.  As a result of this wrongful termination, IEP contends that under New York law it had the right to use quantum meruit as the basis for its recovery.  The value of its quantum meruit claim is $574,978,604 (i.e., the difference between IEP's actual costs, marked up for overhead and profit, and what Footprint had already paid IEP).  As an alternative argument, IEP contends that even if the Tribunal determines that Footprint did not execute a wrongful termination, IEP would still be entitled to

recover damages arising out of Footprint's material breaches of the EPC Contract.[4] IEP seeks $235,559,537 in contract damages for the wrongful termination, based on the items set forth below:[5]

- Contract balance and retainage as of IEP's Application for Payment ("AFP") 41.4, for amounts earned and approved through February 27, 2018 ($61,005,218).

- The following three Change Order Notices: CON 61 (Constructive Acceleration and Delays to Power Island); CON 72 (Unanticipated and Untimely Construction of Administration Building); and CON 70 (Berm and Gabion Wall).  CONs 61 and 72 amount to $144,110,317, and CON 70 amounts to $10,604,714, for a combined total of $154,715,031.

- Reimbursement of Massachusetts Sales Tax pursuant to Sections 2.2(f) and 3.14(a) of the EPC Contract ($874,937).[6]

- Reimbursement under the cost sharing provision of Section 5.4(a) of the EPC Contract ($13,500,000).

- Amounts invoiced as "undisputed work" ($2,198,172).

- Other change orders ($1,768,228).[7]

- LOC extension, which is based on an extension of the LOC through December 31, 2019 ($231,487).

- Post-termination close-out costs, comprising: (a) IEP staff costs; (b) IEP office costs; and (c) legal costs to close-out subcontracts and purchase orders ($1,266,464).

In addition to the above, under both theories of recovery, IEP seeks: (a) the return of the $140,881,675 Footprint obtained when it drew down the full amount of the LOC; (b) pre-award interest, including interest on the LOC funds; and (c) arbitration costs and attorneys' fees.

Aside from Footprint's primary argument (i.e., that Footprint properly terminated IEP for default), Footprint has put forward a plethora of defenses to these claims, which will be addressed in detail below. In summary, Footprint contends that even if the termination was improper, quantum meruit is not the proper remedy under New York law, and that IEP's claim would reward IEP for the losses that it would have incurred by its own substantial problems.  Footprint further argues that under IEP's alternative contract

---

[4]  IEP's Post-Hearing Brief, Part III, pp. 53-54.

[5]  This figure, as well as the figures set forth in the bullets below, are (with one exception) taken from Chart 2 of the February 15, 2021 Errata Expert Report of Patrick A. McGeehin ("McGeehin Errata Report") (Ex. R-2594).  We note that IEP's Post-Hearing Brief and Attachment H (February 15, 2021) contain slightly different values for some of these items.  Because IEP is relying upon Mr. McGeehin to support its requested quantum, we thought it appropriate to defer to the McGeehin Errata Report, which is his last report and formed the basis for his testimony before the Tribunal.  To the extent that there is a difference between the McGeehin Errata Report and another figure, we have noted it below.

[6]  This is the amount shown in the McGeehin Errata Report (Chart 2).  Note that IEP's Post-Hearing Brief (Part III, p. 71) contains the amount of $1,018,439.  The reason for this difference is discussed in Section 8.1.3 below.

[7]  The amount in the McGeehin Errata Report (Schedule 9) for Other Change Orders is $1,768,229, or $1 higher than what we have shown here.  This is likely due to a rounding error, as the sum of the items that make up Other Change Orders in Schedule 9 is the figure we have shown ($1,768,228).

theory, IEP is still responsible for the approximately $132 million in costs to complete the remaining work under the EPC Contract.  It also rejects, for many of the same reasons it expressed during the course of the Project, IEP's other contract claims.

Footprint contends that the termination fully complied with the terms of the EPC Contract and that IEP's performance dating from early in the Project justified termination. Footprint seeks to recover $8,837,455, based on the following:

- Costs paid to Burns & McDonnell and other contractors/vendors to complete IEP's work and estimated costs of deferred completion items ($132,051,305) in excess of the total unpaid EPC Contract balance ($68,766,186) (such excess costs being $63,285,119).[8]

- Liquidated damages due to IEP's failure to achieve Substantial Completion by the Guaranteed Substantial Completion Date for the 365-day period from June 1, 2017 through May 31, 2018 ($73,000,000).

- Project management costs incurred by Footprint after May 31, 2018 ($7,115,230).

- Cost of excess natural gas purchases based on IEP's substantially overestimating the quantifies of natural gas required ($2,735,301).

- Lost profits due to outages ($1,246,479).[9]

- Additional financing costs and legal fees incurred for Footprint's extending terms under its Credit Agreement with its syndicate of lenders ($2,337,001).

The sum of the above damages is $149,719,130.  After offsetting the $140,881,675 Footprint received in LOC proceeds, the amount of Footprint's contract claim is $8,837,455.  Footprint also seeks pre-award interest, arbitration costs, and attorneys' fees.

IEP's primary defense against Footprint's contract damage claim is that Footprint wrongfully default terminated the EPC Contract, for reasons that will be discussed later in this Award.  Additionally, IEP argues, among other things, that: (a) Footprint's costs to complete were excessive; (b) IEP was entitled to time extensions that would fully eliminate Footprint's ability to recover liquidated damages or other delay-related damages; and (c) several of Footprint's claims are foreclosed based upon the EPC Contract's provisions (e.g., waiver of consequential damages and exclusivity of remedies).

In addition to its contract damages, Footprint asserts that IEP engaged in extortionist and bad-faith conduct that violated the Massachusetts Unfair Trade Practices Act ("Chapter 93A") and supported the Tribunal's awarding treble damages against IEP, for total additional damages of $236,348,928.  Footprint alleges, among other things, that IEP: (a) misrepresented its engineering progress and manipulated the schedule to mask engineering delays; (b) developed an "Action Plan" in October 2016 to create a barrage of claims and force Footprint into a negotiated solution; (c) demobilized its workforce throughout March

---

[8]  Footprint's Post-Hearing Brief, p. 341.

[9]  Footprint acknowledges that this amount, as well as the additional financing costs in the next bullet, are consequential damages, but that under Section 16.3 of the EPC Contract, are nevertheless recoverable based upon its position that IEP's conduct satisfies the standards for "gross negligence" or "willful misconduct" under New York law, such that the waiver of consequential damages does not apply.

and April 2018; and (d) put forth unreasonable, self-serving positions in the term sheets provided to Footprint during negotiations conducted in the January-April 2018 time period.

IEP denies that Footprint has the ability to use Chapter 93A for its claims, relying on the fact that the ECP Contract is governed by New York law, which does not have an equivalent to Chapter 93A and or recognize a bad faith breach of contract.  IEP also asserts that Footprint's attempt to argue that this is a tort claim under Massachusetts law is not supported by the Massachusetts courts.  In any event, IEP argues that even if Chapter 93A was applicable, the allegations made by Footprint about IEP's conduct would not be actionable under Chapter 93A.

IEP argues that if the Tribunal were to find Chapter 93A applicable, IEP would be entitled to treble damages in its favor based on Footprint's conduct, and thereby increasing the value of its claims to approximately $1.8 billion.  IEP castigates Footprint for, among other things, withholding or concealing: (a) an extension to the Commercial Operations deadline secured from ISO-NE; (b) necessary permit modification information; and (c) the results of acoustical testing relating to the relaxed requirement for completion of the berm and gabion wall.  It also points to Footprint's clandestine engagement of Burns & McDonnell months before termination and not paying IEP for work performed, as well as Footprint's having terminated IEP wrongly, intentionally, and in bad faith.[10]

## 5.  Delay

It is undisputed that there were 319 days of delay between the Guaranteed Substantial Completion Date of May 31, 2017, and the termination of the EPC Contract on April 15, 2018.  A substantial portion of the hearings, as well as the evidence presented to the Tribunal, focused on which Party was accountable for such delays.  This was as expected, given that the issue of delay responsibility is central to not only the issue of the propriety of the default termination but also to elements of the damages sought by each Party.

Three major Change Order Notices served as the basis for much of the discussion and evidence relative to the delays:

- CON 61 (Constructive Acceleration and Delays to Power Island).  This CON is based on a series of alleged Footprint-responsible delays, including Footprint's alleged late turnover of the site and the discovery of adverse subsurface conditions that, according to IEP, not only delayed the Project, but resulted in Footprint's constructively accelerating IEP's work because of its failure to grant time extensions for these Footprint-responsible delays.

- CON 70 (Berm and Gabion Wall).  This CON is based on changes made to the berm and gabion wall surrounding the site, and Footprint's decision to leave the City of Salem's existing 48-inch storm drain in place rather than relocate it as originally contemplated by the EPC Contract and applicable permits.  As will be discussed further below, the berm and gabion wall was central to much of the evidence presented during the hearing.

- CON 72 (Unanticipated and Untimely Construction of Administration Building). This CON is based on Footprint's timing of the construction of the Administration Building and its interference with IEP's work.  It is undisputed that the Administration Building was not within

---

[10]  IEP's submissions relative to its affirmative claim under Chapter 93A have been inconsistent.  Its Post-Hearing Brief contained the argument set forth in this paragraph.  However, its proposed award included a finding that Chapter 93A was not applicable to Footprint's contract claim, but was applicable to IEP's wrongful termination claim, which "is, by its nature, extra-contractual because [Footprint] has abrogated and forfeited the contract."  The Tribunal was unable to find any other submission by IEP that made this argument.

IEP's contractual scope of work.  IEP contends that because this was not identified in the EPC Contract as "concurrent work," IEP did not have an obligation to accommodate it during construction.

Each of these CONs was used by IEP as a basis for claiming it had the right to extensions of the Guaranteed Substantial Completion Date, as well as a defense to the default termination.

As noted in Section 3.5 above, the Tribunal provided the Parties with an outline of issues it considered to be of importance to assist the Parties in structuring their Post-Hearing Briefs and proposed award.  That outline included the following topics pertaining to delay-related issues:

- Identify the Contract provisions relevant to the issue of delay, including whether the Contract required completion of the berm and gabion wall as a prerequisite to Mechanical Completion and Substantial Completion.

- Under the EPC Contract, which party assumed the risk that a greater than 40-hour work week would have to be offered in order to attract the union labor force?

- What does the evidence objectively show as to the cause and duration of delays on the project, and whether each delay was owner-caused, contractor-caused, excusable, and/or concurrent with other delays?

The following sections generally explain the respective Party's positions on these topics, as well as the Tribunal's findings on these positions.  Note that the Tribunal has limited its discussion to those elements of these topics that we ultimately found relevant to the Award.

### 5.1. Contract Notice and Submission Provisions

One of the major issues presented to the Tribunal was whether IEP complied with the EPC Contract's notice and submission requirements for CONs 61, 70, and 72.  The following summarizes the Parties' respective positions, as well as the Tribunal's decision on this particular issue.

#### *IEP's Position*

IEP asserts that CONs 61, 70, and 72 arise from Owner-initiated changes under Section 10.2(b) ("Changes Initiated by Owner") and Section 10.3 ("Mandatory Change Orders"), neither of which has a notice requirement.  Specifically:

- Section 10.2(b) states if the Owner desires to make a change, it must issue a Change Order Request (COR) to Contractor, which Contractor must review and respond to within ten (10) Business Days unless extended by Owner.  The Owner must then decide whether to issue a Change Order based on the options supplied by Contractor.

- Section 10.3 states that the Contractor (subject to certain conditions) will be entitled to receive Change Orders for certain enumerated events, such as force majeure events, suspension of work by Owner, the Owner's non-performance of certain obligations, including the remediation of hazardous substances and certain subsurface conditions, and changes in law.

IEP explains in its Post-Hearing Brief why these provisions were applicable to CONs 61, 70 and 72.  IEP further states that even the Tribunal were to accept Footprint's argument that these CONs were to be treated

under Section 10.2(a) ("Changes Initiated by Contractor"), it nevertheless complied with such provision, and that the waiver component of such provision was not applicable. Section 10.2(a) reads as follows:

> As soon as Contractor becomes aware of any circumstances which Contractor has reason to believe may necessitate a Change, Contractor will issue to Owner a "*Change Order Notice*." All Change Order Notices shall include documentation sufficient to enable Owner to determine (i) the factors necessitating the possibility of a Change, (ii) the impact which the Change is likely to have on the Contract Price; (iii) the impact with the Change is likely to have on the timely achievement of the Approved Project Schedule (including the Guaranteed Substantial Completion Date), and (iv) such other information which Owner may request in connection with such Change. If Contractor does not notify Owner of a circumstance necessitating a Change within 15 Business Days of the date Contractor became, or a diligent contractor using Prudent Industry Practices reasonably should have become, aware of such a circumstance, or does not provide an estimate of the cost of such Change within five additional Business Days, and Owner is harmed by such delay, then notwithstanding anything in this Article10 to the contrary, Contractor will be deemed to have waived any right to receive a Change Order based upon such circumstances. Owner may, but except as provided in Section 10.3 below, shall not be obligated to issue a Change Order pursuant to a Change Order Notice. Unless otherwise stated by Owner in writing, any work outside the Work described in this Contract performed by Contractor prior to its having received a Change Order from owner will be at Contractor's sole risk and expense unless such work is part of a subsequent Change Order. (emphasis added)

IEP contends that it timely filed its notice "after becoming aware" of the potential change, and that in any event, Footprint suffered no harm. As to the latter point, IEP cites to, among other things, IEP's general unwillingness to consider or acknowledge any delay whatsoever to any activities, critical or non-critical, and that, in effect, its actions would not have been any different regardless of when it received these CONs.

*Footprint's Position*

Footprint asserts that Section 10.2(a) is the relevant contract clause for these three CONs and quotes extensively from that provision. It argues that this clause imposes a strict timing requirement upon IEP's submission of CONs and that because IEP failed to meet these notice requirements, in some instances by over two years, that IEP waived its rights to seek contractual relief. Footprint also states that it was harmed by IEP's failure, as these delays deprived Footprint of the opportunity to cure the alleged problems in those CONs.

Footprint also argues that under Section 10.4(b), IEP must demonstrate to Footprint's reasonable satisfaction that a change will delay IEP in complying with the Guaranteed Substantial Completion Date, as well as the number of critical path delays. According to Footprint, this showing must be made at the time the CON was submitted, and not "years down the road."[11] Footprint argued that IEP failed to meet this obligation for CONs 61, 70, and 72.

*Tribunal Determination*

We focus on Section 10.2(a), as it is what Footprint primarily relies upon in arguing that IEP's COR 61, 70, and 72 claims are waived. While Footprint has alleged that this provision is a "strict timing" provision, the provision's language clearly does not reflect this. The waiver component is based upon whether Footprint suffered harm as a result of IEP's submitting these CONs when it did.

---

[11] Footprint's Post-Hearing Brief, p. 87.

<mark>We find that Footprint has failed to demonstrate that it suffered any harm.</mark>  Footprint's course of conduct throughout the Project was to reject virtually every CON.  It never offered any persuasive evidence to demonstrate that its actions on CONs 61, 70, and 72 would have been different had it received the formal CONs on these issues earlier.  We are also influenced by the fact that even though Footprint may not have received formal CONs on these issues, Footprint was aware, or should have been aware, of the issues underlying these CONs – particularly CON 70.  The berm and gabion wall issues were discussed regularly throughout the Project, particularly between the Parties' respective schedulers, and Footprint acknowledged that it had changed IEP's original scope of work, as evident by CON 69.  Footprint's failure to address promptly these issues had a major impact on the Project, and supports the Tribunal's view that Footprint would have rejected these CONs regardless of when they were submitted.

For the reasons set forth above, <mark>we reject Footprint's argument that IEP has waived its rights to make claim for CONs 61, 70, and 72 under Section 10.2(a).  The Tribunal also finds that CONs 61, 70, and 72 could be considered Owner-initiated changes under Section 10.2(b) and/or mandatory changes under Section 10.3 where notice was not required.  Finally, we reject Footprint's arguments that Section 10.4(b) somehow affects IEP's claim rights.</mark>

## 5.2. Berm and Gabion Wall as a Prerequisite to Mechanical Completion

The issues related to the berm and gabion wall impact not only the propriety of Footprint's default termination, but also how to address several of IEP's claims, including CON 70.  There is no dispute that the completion of the berm and gabion wall was required for Substantial Completion under the EPC Contract.  However, the Parties are at odds over whether completion of this work was a prerequisite to Mechanical Completion.

Before reviewing the Parties' positions, we cite below the definitions of "Mechanical Completion" and "Facility," each of which is central to this issue.  Section 6.1(a) states that "Mechanical Completion of the Facility will be achieved when each of the following conditions has been met," and then lists seven specific conditions, the first three of which are as follow:

> (i)  Contractor has completed the design, engineering, procurement, permitting, construction and installation of the Facility in accordance with the Contract, . . .

> (ii)  The entire Facility is ready to commence commissioning, testing and integrated operations without the use of temporary equipment or installations, except for items contained on the preliminary punch list;

> (iii)  Contractor has completed such Work as necessary to cause the Facility to be (A) capable of operating safety in accordance with Applicable Laws, Applicable Permits, Prudent Industry Practices and without threat of penalty, assessment or fine to Owner under Applicable Law and Applicable Permits …

Section 1.1 of the EPC Contract defines the term "Facility" as follows:

> '*Facility*' means those components comprising a nominal 674 megawatt net combined-cycle natural gas-fired electricity generating plant, including Interconnection Facilities, and all other systems relating thereto (as further described in the Technical Specifications), to be located on the Facility Site, and to be fully designed, engineered, procured, permitted, constructed, installed, started-up, tested, commissioned and completed by Contractor as provided in this Contract.

The following summarizes the Parties' respective positions, as well as the Tribunal's decision on this particular issue.

### *IEP's Position*

IEP argues that the berm and gabion wall were requirements for achievement of Mechanical Completion because the berm and gabion wall were necessary for the delivery of a completed "Facility;" and that the Applicable Permits required completion of the berm and gabion wall as a predecessor to the Facility's ability to export electricity to the grid ("Commercial Operation"). In addition to relying upon the contract language cited above for "Mechanical Completion" and "Facility," IEP cites to the testimony of Footprint's Project Manager, Majid Yavary, on this subject. Mr. Yavary testified that his understanding (during both the course of the Project and for purposes of the arbitration) was that Mechanical Completion required completion of every part of the Work except for items contained in the preliminary punchlist.[12]

### *Footprint's Position*

Footprint asserts that the berm and gabion wall are not "components" of a nominal 674-megawatt combined-cycle natural gas-fired electricity generating plant. Footprint also asserts that under the Technical Specifications, the berm and gabion wall are not characterized as "systems" relating to the Facility, and are not discussed in any of the sections of the Technical Specifications concerning systems. Rather, Footprint argues that the berm is identified as among the "Contractor's physical scope of the common plant shared facilities" and is addressed in Section 5.5 of the Technical Specifications, "Site Preparation." Footprint concludes that because the berm and gabion wall are neither a "component" nor a "system," they are not included within the defined term "Facility" under the EPC Contract.

### *Tribunal Determination*

We agree with IEP that completion of the berm and gabion wall was a necessary predicate to Mechanical Completion. Preliminarily, IEP's position on the definition of "Facility" might be considered credible, particularly when contemplating the requirement of the berm and gabion wall for operation of the completed Facility in compliance with Applicable Permits. We need not, however, resolve the dispute over whether the definition of the term "Facility" is as broad as suggested by IEP, or limited in the way Footprint suggests, since, through at least early 2018, the completion of the berm and gabion wall was required in order for the Facility to be capable of operating safely in accordance with Applicable Permits. The evidence, including the testimony of Mr. Yavary, is clear that in late 2017, the Far Field Noise test was a requirement of the permits issued by the City of Salem, the Massachusetts Department of Environmental Protection ("MassDEP"), and the Massachusetts Energy Facilities Siting Board ("EFSB"). The evidence demonstrates that all Parties understood that the berm and gabion wall needed to be completed before a successful Far Field Noise test could be conducted.

Footprint has argued that the berm and gabion wall ceased to be contractual predecessors to Mechanical Completion (and Substantial Completion as well) once Footprint obtained the EFSB approval of its Notice of Project Change on January 31, 2018. We reject this argument due to Footprint's failure to share that Notice of Project Change with IEP, as it was required to do by the terms of EPC Contract. Accordingly, there would be no reason or basis for IEP to know that the rules and requirements for this permit had changed – and specifically that the Far Field Noise test's relationship to achievement of Mechanical and Substantial Completion had changed. Having withheld this critical information from IEP, Footprint cannot expect IEP to be governed by the undisclosed change in permit requirements.

---

[12] Yavary Affirmative Witness Statement, ¶¶71-72.

**5.3. Assumption of Risk for Greater Than 40-Hour Workweeks**

The issue of the "40-hour workweek" relates primarily to IEP's CON 61 submission, and its contention that it incurred additional costs when it was allegedly forced to employ a six-day per week, 10 hours per day work shift in order to attract sufficient skilled labor in the summer of 2016 to meet the needs of the Project and to achieve Footprint's acceleration and recovery demands. While this issue is not directly relevant to our analysis of delay or to Footprint's justification for the termination, we did ask the Parties to provide their positions on this as part of the discussion on delay. Consequently, we discuss herein their respective positions and our views on this issue.

*IEP's Position*

IEP acknowledges that the EPC Contract does not specifically speak to the issue of a 40-hour workweek or the Parties' expectations in that regard, noting, however, that Section 2.2(e)(i) states that "Contractor will provide and be solely responsible for all labor and personnel required in connection with the Work …." IEP's position on this issue is based upon what it considers to be the agreement of the Parties during the bidding and contracting time period that the work would and could be performed on a 40-hour workweek basis, and that there was sufficient float in the schedule to enable this to take place. Therefore, it claims that both the EPC Contract Price and Approved Project Schedule were based on that agreement and expectation. IEP also notes that Footprint received the benefit of the favorable pricing that came with avoiding overtime work.

*Footprint's Position*

Footprint also cites to Section 2.2 of the EPC Contract, noting that these provisions do not limit IEP's responsibility to workweeks of a particular length, and asserts that IEP assumed the risk that it would need to offer longer workweeks to attract sufficient labor to complete the Project within the allotted time. Further, Footprint argues that Section 18.4 of the EPC Contract includes an integration clause, such that pre-contractual understandings that are not captured in the language of the EPC Contract are of no import. As to those pre-contractual understandings, Footprint cites to evidence that IEP knew that it had the risks of higher labor costs in the Boston area, that the Boston-area labor unions were difficult with which to negotiate, and that it had ultimately finalized, accepted, and agreed to the PLA terms that were used on the Project.

*Tribunal Determination*

Although there is evidence supporting IEP's assertion that it lowered the Contract Price based on working a 40-hour week, the Tribunal finds that this in and of itself does not shift the risk of attracting sufficient labor from IEP to Footprint. IEP acknowledges that no express term of the EPC Contract supports an allocation of risk to Footprint for workweeks in excess of 40 hours, and Section 2.2 of the EPC Contract places upon IEP the responsibility for procuring and providing labor. These provisions do not limit IEP's responsibility to workweeks of a particular length. The Tribunal's resulting conclusion is that IEP assumed the risk that it would need to offer longer workweeks to attract sufficient labor to complete the Project within the allotted time. Further, we are mindful of the integration provision – Section 18.14 of the Contract ("Entire Agreement") – which provides that the written terms of the Contract "constitute[] the entire agreement and understanding between the Parties[.]"

We are also influenced by the Tribunal's experiences on lump sum EPC contracts. From our perspective, one would typically expect a contractor working under this type of contract to bear the risk of attracting sufficient and qualified labor, and understanding whether or not it needed to have a greater than 40 hour workweek to do so. If the Contract Price and Project schedule were based upon the assumption of

40-hour workweeks, one would have reasonably expected this assumption to be specifically stated in the contract itself, along with an explanation for the commercial ramifications if that assumption proved erroneous.  There is nothing in the EPC Contract that would reasonably lead one to conclude that IEP's labor risk was being shared with Footprint, let alone being shifted to Footprint, on any basis.  If this is what IEP truly intended, it was obligated (particularly given that it is a sophisticated contractor) to reflect this intention/understanding in the EPC Contract.

### 5.4.  Cause and Duration of Delays on the Project

The cause and duration of delays on the Project is highly relevant to the propriety of Footprint's termination for IEP's failure to achieve the Guaranteed Substantial Completion Date.  The general approach taken by each Party and its scheduling experts has been to address each of IEP's two delay claims – the delay to the berm and gabion wall (i.e., CON 70), and delay to the power island (i.e., CONs 61 and 72).  Given this, the Tribunal will address IEP's delay claim regarding the berm and gabion wall followed by IEP's delay claim regarding the power island.

#### 5.4.1.  Berm and Gabion Wall

During the hearings, extensive testimonial and documentary evidence was provided concerning the City of Salem's 48-inch drain line and the berm and gabion wall.  Many of the key facts are undisputed, including that the permit issued by the City of Salem's Planning Board for the Project required Footprint to abandon and relocate the 48-inch line that ran under the Project site.[13]  The EFSB incorporated this permit requirement into its October 10, 2013, Initial Approval and its February 24, 2014, Final Approval.[14]  IEP's scope of work under the EPC Contract did not include the removal or relocation of the 48-inch line, as this was work that Footprint took responsibility to perform.  While there is a dispute between the Parties as to how much of the 48-inch line was to be abandoned and relocated, it is undisputed that under the Project's original permitted drawings, no portion of the 48-inch line was to: (a) pass under the steepest portion of the berm; (b) pass under the gabion wall; (c) run under the length of the southern side of the Project site; or (d) pass underneath the berm and gabion wall on the eastern edge of the Project site.  Importantly, the condition of the 48-inch line was unknown to all of the Parties.

It is also undisputed that by May 2015, Footprint had second thoughts about abandoning and relocating the 48-inch line.  While the evidence on why it had second thoughts is unclear, they appear to have been driven by: (a) Footprint's desire to avoid the added expense of relocating the line; and/or (b) Footprint's concern that it would encounter further contaminants either during the filling of the existing line or the excavation for the new line, both of which would require further remediation and costs.  Regardless of the reason, Footprint's second thoughts about the 48-inch line led to a series of events that significantly affected the construction of the berm and gabion wall.  As discussed below, Footprint eventually decided that it would not abandon and relocate the 48-inch line.  However, by the time this happened and acceptable modifications were made to the design of the berm and gabion wall to accommodate leaving the line in place, the berm and gabion wall design and construction activities were significantly behind schedule.

There was extensive evidence presented in the arbitration that described the extended chronology associated with the 48-inch line and berm and gabion wall, and why they took so long to complete.  We will not repeat the full chronology here, as it is contained in both Witness Statements and the Parties' post-hearing submissions.  However, the evidence establishes that from April 2015 through January 31, 2017, Footprint was undecided about: (a) whether to abandon the 48-inch line or keep the line in place; and (b)

---

[13]  Ramirez Affirmative Witness Statement, ¶92.

[14]  Id.

what design it wanted for the berm and gabion wall to deal with a variety of concerns, including minimizing the load on the 48-inch line (i.e., to mitigate the potential of collapsing the line) and meeting ADA requirements for the berm pathway. IEP's design was not finalized until the May-June 2017 time period, which then enabled IEP to get a construction permit from the City of Salem on June 28, 2017,[15] and thereby begin construction of the berm and gabion wall through its subcontractor, Bond Brothers. This was already well past the expected Mechanical Completion date in the Approved Project Schedule, as well as past the May 31, 2017, Guaranteed Substantial Completion Date.

As is clear from the Parties' post-hearing submissions, the evidence and Parties' arguments on this issue are voluminous. There are substantial details of what happened on these elements of the work from essentially the beginning of the Project until not only the default termination on April 15, 2018, but into 2020, when this work was finally completed. What is set forth below in terms of each Party's position is derived primarily from what each Party offered on this subject in its proposed award. The Tribunal does not consider it necessary to address every allegation or issue raised by the Parties in this Award. Consequently, the recitation below of each Party's position and our determination is limited to what we considered to be material to deciding this issue.

### IEP's Position

In a nutshell, IEP argues that Footprint's lack of decisions rendered it impossible for IEP to complete both design and construction of the berm and gabion wall to achieve either Mechanical Completion or Substantial Completion in accordance with the Approved Project Schedule. IEP asserts that while the berm and gabion wall activities were not originally on the Project's critical path to Mechanical and Substantial Completion, they became so due to Footprint's changes to the design and construction of these Project elements, resulting primarily from Footprint's decision not to relocate the 48-inch drain line.

IEP's chronology notes that Footprint issued a Change Order Request to IEP in September 2015 to modify the berm and gabion wall design to accommodate that decision, primarily through the use of a GeoFoam solution for which Footprint had obtained the approval/agreement of the City of Salem City Engineer on May 7, 2015. IEP states that this constituted a clear modification to the Applicable Permits for the Project, and that Footprint did not provide this approval/agreement to IEP until May 2017, two years later.

IEP asserts that Footprint failed to act on IEP's proposal for the revised berm design work (labeled as "CON 69") in December 2015, choosing, instead, to consider other options for more than a year (until January 31, 2017) before Footprint provided definitive and unequivocal instruction to IEP to proceed with what was referred to as the "Option B" berm design, or the "pathways" design. Because this new design was a significant departure from both the permitted design and the GeoFoam approach that had been approved by the City of Salem Engineer, IEP asserts that this change required new permitting approvals that Footprint did not obtain until May/June 2017. IEP states that it consistently warned Footprint that delays in its decision-making with respect to the berm and gabion wall design were likely to impact the schedule for these activities.

IEP also argues that once it started construction of the berm and gabion wall on or about June 2017, its work was affected by the failure of Footprint to address certain "Owner Deliverables," which constituted actions IEP required from Footprint that affected the required berm and gabion wall construction activities impacted by the 48-inch drain line. These Owner Deliverables included:

---

[15] Footprint Post-Hearing Brief, ¶479.

- Modification of applicable permits to reflect Footprint's decision not to relocate the 48-inch drain line;

- Issuance of a Change Order to compensate IEP for the added costs and delays caused by Footprint's vacillation and ultimate decision to leave the 48-inch drain line in place; and

- Indemnity for any damage that may occur to the 48-inch drain line or to allow IEP to perform the inspections needed to verify the condition of the 48-inch drain line.

IEP alleged that Footprint's failure to accomplish these "Owner Deliverables" affected IEP's ability to construct the berm and gabion wall in the areas above and adjacent to the 48-inch drain line. In addition to the Owner Deliverables, IEP cited to other delays caused by Footprint on these Project elements between June 2017 and April 15, 2018, including: (a) Footprint's failure to address the copper found in the groundwater and the changes required to the drainage system in order to address the elevated copper levels; and (b) Footprint's failure to remove the AUL stockpile that it had previously indicated it would remove from the site (albeit at disputed cost).

As a result of all of the above, IEP asserts it was entitled to a 319-day extension of time to both Mechanical and Substantial Completion through the date of termination on April 15, 2018, which (but for Footprint's termination of the EPC Contract and absent a contract modification) would have extended the Mechanical and Substantial Completion milestone dates beyond April 15, 2018.

*Footprint's Position*

In a nutshell, Footprint argues that by no later than the summer of 2015, IEP should have been aware that the 48-inch drain line would remain in place and that IEP did not diligently apply itself to the task of developing a viable design solution for the berm and gabion wall. Footprint alleges that IEP dragged its feet for roughly two years, did not comply with Footprint's January 31, 2017 directive, and belatedly completed detailed design on the basis of Footprint's design concept. Footprint also argues that IEP was wrongful in withholding its performance on the basis of the Owner Deliverables, which IEP considered to be extra-contractual. As a result, Footprint alleges that IEP bears responsibility for any delays to the Project caused by the berm and gabion wall.

In its proposed award, Footprint identified five overarching issues that should form the basis for the Tribunal's determination on the berm and gabion wall.[16] These issues are as follows:

- Drawing C-104. This issue relates to a pre-contract version of Tetra Tech Drawing C-104, which showed the realigned 48-inch line as going completely outside of the berm and construction area. The Contract Documents have a different version of Drawing C-104, which showed a portion of the 48-inch line remaining in place, with another portion being abandoned. Footprint submits that the pre-contract version of Drawing C-104 should be barred by the EPC Contract's integration clause (Section 18.14) and have no bearing on IEP's contractual risks or obligations.

- Disclosure of the May 7, 2015 Letter Agreement with City. This letter agreement with the City of Salem Engineer recognized that the 48-inch line would remain in place, and that GeoFoam

---

[16] Footprint also argued that IEP knew of the decision to keep the 48-inch line in place by May 8, 2015 at the latest, yet did not submit CON 70 until November 28, 2016. Therefore, CON 70 was not submitted in compliance with Section 10.2(a), and IEP waived any right to an extension of time on this basis. This argument was considered by the Tribunal in Section 5.1 above and rejected.

would be used.  IEP alleges that Footprint did not provide this to IEP until May 2017, even though it was a clear modification to the Applicable Permits for the Project.  Footprint argues that IEP was not prejudiced by the timing of this disclosure, and points to other correspondence in April and May 2015 in which it informed IEP that the drain line would not be relocated and required IEP to perform work necessitated by the drain line remaining in place.  It specifically identified that Footprint provided IEP with a Change Order Request (COR) on September 24, 2015, seeking a proposal to modify the design and construction of the berm and gabion wall using GeoFoam.

- <u>IEP's Arguments for Not Progressing the Design in Late 2016</u>.  This issue relates to IEP's arguments that its design progress on the berm and gabion wall designs was impacted by: (a) Footprint's October 2016 directive (to stop work on the pathways design pending City feedback) and December 2016 directive (to abandon the pathways design and return to the original berm and gabion wall design); and (b) Footprint not having the approval of any permitting authority to deviate from the permitted design.  Footprint submits, among other things, that: (a) the October 2016 directive did not halt IEP's work on the pathways design and, to the extent it was on hold, only affected it by approximately five weeks; and (b) the December 2016 directive was overridden eight weeks later by Footprint's January 31, 2017, directive under Section 10.6 of the EPC Contract.  Footprint further states that: "the very next month and numerous times thereafter until right before termination, Footprint directed IEP, under Section 10.6, to perform the modified berm work despite the existence of the dispute related to CON 70."

- <u>Far Field Noise Test</u>.  This issue relates to the findings of ATCO (IEP's noise consultant) that the berm and gabion wall had to be completed for the plant to pass the Far Field Noise Test.  Footprint states that these findings were flawed, and that models by both ATCO and Tetra Tech (Footprint's consultant on this issue) showed that the Project would pass the test without full completion of the berm and gabion wall.

- <u>Owner Deliverables</u>.  This issue relates to the Owner Deliverables referenced in IEP's above-stated position.  IEP states that its revised forecasted Guaranteed Substantial Completion Date of May 24, 2018 was premised upon Footprint timely satisfying eight Owner Deliverables, with three of those deliverables being those referenced above.  Footprint argues that it had no obligation to provide these deliverables and that IEP could not withhold performance pending Footprint's satisfaction of them.

In addition to its argument that IEP failed to establish Footprint's responsibility for the alleged delays arising from the berm and gabion wall, Footprint disputes IEP's quantification of delays.   Footprint disagrees, stating that the Power Island occupied the critical path for the entire 319-day period claimed by IEP.

*Tribunal Determination*

Given the voluminous evidence and time spent during the hearings on the berm and gabion wall, one might have thought that the Tribunal would have a difficult time deciding who should bear responsibility for this issue and the associated delays.  We did not, as the ultimate determination of this issue boils down to some straightforward and undisputed facts, all of which lead us to conclude that Footprint is the party that bears responsibility for this issue.

First, there is no dispute that under the EPC Contract, a material portion of the 48-inch line was to be removed by Footprint, and that IEP had the right to expect this to be the case.  Next, there is no dispute

-19-

that Footprint, for whatever reason, decided at some point that it wanted to keep the entire 48-inch line in place.  This decision had major consequences, as it, among other things: (a) resulted in changes to the requirements of Approved Permits, necessitating the involvement of and approval from permitting authorities, including both the City of Salem and the EFSB; and (b) required modifications to IEP's design and construction for the berm and gabion wall.  Third, it is undisputed that Footprint, for whatever reason, vacillated on what it wanted with respect to this work, even to the point of directing IEP in December 2016 to go back to the original berm and gabion wall design and (presumably) remove the 48-inch line.  Finally, there is no dispute that Footprint did not communicate to IEP its final decision on this issue until January 31, 2017, which communication directed IEP to design the "pathways" solution.

Over the course of the hearing and in its post-hearing submissions, Footprint tried to justify its various directions, stops, starts, and position changes.  It also tried to dismiss the impact of these actions/inactions on the berm and gabion wall design and construction.  However, there is no question that Footprint poorly administered the entirety of the 48-inch line and berm and gabion wall issue.  Among other things, it demonstrated no sense of urgency in getting the scope of this work resolved.  A poignant example is what happened with the GeoFoam option.  As noted above, Footprint entered into the letter agreement with the City of Salem City Engineer on May 7, 2015, that allowed the 48-inch line to stay in place with the use of GeoFoam for the berm.  For some inexplicable reason, Footprint never provided this letter agreement to IEP to let it know what was transpiring – contrary to reasonable contract administration practices, but to the requirements of the EPC Contract as well.  As for urgency (or lack thereof), Footprint waited over four and a half months (i.e., until September 24, 2015) to send IEP a COR to ask for a proposal to implement the concepts in that letter agreement.

The evidence demonstrates that Footprint's ideas of what it wanted to do with the 48-inch line, as well as the actual design of the berm and gabion wall, were in a constant state of flux.  Given that Footprint was changing IEP's scope of work, it was incumbent upon Footprint to sort all of this out timely, and not for IEP to attempt to figure out what Footprint wanted.  By waiting until January 31, 2017 to finally communicate to IEP what it wanted for this work, Footprint essentially delayed both Mechanical Completion and Substantial Completion by over a year.  IEP's construction on this work could not start until late June 2017, as this was dependent on design completion and the City of Salem's issuance of a construction permit based on the completed design.  IEP's construction duration for the berm and gabion wall was 374 days.[17]  There is no credible evidence that Footprint ever objected to this duration as being unreasonable.  This meant that, absent any issues during construction (e.g., Owner Deliverables, copper, or the AUL stockpiles), IEP was forecasting the berm and gabion wall work for completion on May 22, 2018.[18]

The Tribunal was not only influenced by how Footprint administered this work, but also by Footprint's withholding from IEP critical information related to the berm and gabion wall.  For example:

- May 7, 2015 Letter Agreement with City of Salem.  As noted above, this key agreement with the City modified an Applicable Permit and allowed the 48-inch line to remain in place, based on the assumption that the new berm and gabion wall design would use GeoFoam.  There is compelling evidence that IEP never received this letter agreement until approximately two years later, in 2017.  Footprint witnesses were asked about this during the hearing (i.e., Messrs. Yavary and Christensen) and they provided no cogent explanation for why this happened.

---

[17]  IEP's Post-Hearing Brief, Part I, pp. 124-25.  The completion date and duration were based on IEP's updated construction schedule for the berm and gabion wall activities with a data date of June 30, 2017, transmitted to Footprint on July 3, 2017.

[18]  The completion date and duration were based on IEP's updated construction schedule for the berm and gabion wall activities with a data date of June 30, 2017, transmitted to Footprint on July 3, 2017.

- Condition H Compliance Filing with the EFSB.  On June 8, 2017, Footprint filed a Condition H Compliance Filing with the EFSB.  On June 22, 2017, the EFSB affixed a handwritten notation at the top of that filing stating that Footprint had complied with Condition H of the EFSB Permit.  Footprint's position is that the EFSB's handwritten note constituted a "permit modification" allowing the 48-inch drain line to remain in place.  While there was much testimony presented during the hearings about the implication and legal effect of this, suffice it to say that there is compelling evidence that Footprint never provided either its Condition H Compliance Filing or the EFSB's handwritten note to IEP until November 2018, well after IEP was terminated.[19]

- Tetra Tech's Noise Analysis.  One of the key issues being considered by the parties in mid-to-late 2017 was whether the Far Field Noise Test could be met without the complete berm and gabion wall being constructed.  As noted earlier, Footprint hired Tetra Tech to assess this and it eventually developed an analysis showing that the plant could pass the Far Field Noise Test without the fully completed berm and gabion wall.  This analysis was summarized in Tetra Tech's December 29, 2017, memorandum, and was contrary to what IEP's consultant (ATCO) had concluded.  There is compelling evidence that Footprint did not disclose any of these efforts by Tetra Tech, or the results of Tetra Tech's analysis, to IEP during the Project.  Importantly, Footprint used this analysis to seek permit modifications from the City, the MassDEP, and the EFSB.

- EFSB Approval of Footprint's January 2, 2018 Notice of Project Change.  The completion of the berm and gabion wall was a clear and express requirement of the applicable permits issued by the EFSB for Commercial Operation.  Footprint's application for a Notice of Project Change was approved by EFSB on January 30, 2018, allowing Footprint to commence Commercial Operation of the plant without the fully constructed berm and gabion wall in place.  There is compelling evidence that Footprint never told IEP that it was applying for a Notice of Project Change, and further that it never told IEP that it had received EFSB's approval, at any time prior to the termination of the EPC Contract on April 15, 2018.

Footprint offered no credible explanations as to why these key documents were not provided to IEP and specifically discussed with them.  As we noted in the Introduction, we found that Footprint ran this Project in a confrontational and non-cooperative project management style, and the failure to be forthcoming with IEP about these documents is a primary example of this.  There is a strong sense among the Tribunal that Footprint intentionally failed to disclose this information to keep IEP in the dark and give Footprint a tactical advantage – perhaps to help itself in the default termination.  While we stop short of reaching that conclusion, what we can say is that the failure to disclose this information constituted a breach of Footprint's obligations under Section 3.2 of the EPC Contract – a provision that the Tribunal concludes obligated Footprint to provide IEP, throughout the duration of the Project, with all documentation related to the Applicable Permits (including proposed and actual modifications to those permits).[20]

Footprint's failure to be forthcoming with IEP had a significant impact on IEP's ability to design and construct the berm and gabion wall.  We were particularly influenced by the fact that Footprint never

---

[19]  Footprint submits that IEP "did receive formal correspondence from Footprint the very next day after the EFSB approved Footprint's Condition H filing" and that Footprint's communications with the EFSB were a matter of public record (Footprint Reply Post-Hearing Brief, pp. 58-59). However, this misses the point.  There is no cogent explanation for why Footprint did not share the actual approved document with IEP during the course of the Project.

[20]  It also appears that Footprint breached its obligations under Section 3.13 of the EPC Contract to provide information requested by IEP over the course of the Project.  However, our determination on this issue is not dependent upon a finding of that breach.

told IEP that the berm and gabion wall were no longer a necessary predicate to the commencement of Commercial Operation from a permitting perspective. To the contrary, Footprint aggressively threatened and sent notices of material breach to IEP on the alleged basis that IEP had abandoned the berm and gabion wall work, and was, therefore, in breach of the EPC Contract for failing to progress the berm and gabion wall in the area of the 48-inch line.

While there are many other issues that could be addressed relative to the 48-inch line and the berm and gabion wall, the Tribunal will close-out its discussion of this section by addressing three points that we found of importance:

- **Drawing C-104 and the Risks of Keeping the 48-Inch Line in Service.** Because Footprint raised Drawing C-104 as one of its five overarching issues, we think it appropriate to address it. While IEP introduced the pre-contract version of C-104, and asserted that it reasonably thought that the entire 48-inch line would be removed from the Project site, this did not influence our determination. Nor did Footprint's arguments during the course of the hearings about IEP having an obligation to keep part of the line in place under the EPC Contract's version of Drawing C-104. What was relevant to us was that major portions of the 48-inch line were shown on the contract and permit version of C-104 to be abandoned that were associated with the berm and gabion wall, and Footprint changed that. This put a risk on IEP for which it never contracted. Footprint tried to argue that the "pathways" design resolved IEP's risks regarding the 48-inch line.[21] Not only does the Tribunal reject this, but so did Mr. Yavary. He specifically acknowledged this in questioning from the Tribunal, where he testified (in relation to the portion of the line that was to abandoned) that "there's a portion of the line that they [IEP] were not supposed to touch, but now they were going to be touching, and that could have created more liability."[22]

- **Footprint's Section 10.6 Directives.** Another overreaching issue raised by Footprint was that IEP did not comply with Section 10.6 of the EPC Contract and Footprint's directives, particularly in IEP's conditioning its performance on Footprint's compliance with the Owner Deliverables. The Tribunal appreciates the importance of provisions like Section 10.6 to an owner. However, we do not find that an owner can use the rights afforded under this type of provision unconditionally, and relative to the Owner Deliverables, we reject Footprint's view. We are particularly influenced by the fact that Footprint refused to give IEP an indemnity for damage to the 48-inch line. As noted in the previous bullet, the "pathways" design placed a risk on IEP that it never had before. Footprint was under an obligation to address this risk with IEP in its implementation of the design. If IEP had complied with the Section 10.6 directive, and the line had collapsed, or if there had been an environmental breach, there are myriad questions over who would have had responsibility, and to whom. It would have placed IEP in an untenable situation, particularly for a risk that the EPC Contract never required it to assume or that IEP ever intended to accept. We are also influenced by the fact that Footprint internally discussed whether IEP was too "dumb" to understand the risks associated with building above the 48-inch line and whether Footprint could outsmart IEP into taking on the risk and responsibility for the condition of the line and any damage to the line caused by the construction of the berm and gabion wall over it.[23] The Tribunal takes specific notice that Mr. Christensen

---

[21] Footprint's Reply Post-Hearing Brief (pp. 49-50).

[22] Yavary, Day 9 (Tr. 2644-46).

[23] This was set forth in Ex. FPP02684093, a January 28, 2016 email within the Footprint project organization, and discussed during Mr. Christensen's testimony on Day 11 (Tr. 3164-70).

advised Mr. Yavary that he did not think that was a risk that IEP should take.  Based on the evidence, and the failure of Footprint to resolve IEP's reasonable concerns about the risks of building the berm with the line remaining in place, the Tribunal concludes that neither Mr. Yavary or the Footprint organization cared about whether Footprint's position was reasonable.

- Excusable Delay Days.  Both Parties cited extensively to their forensic scheduling experts about the amount of delay associated with the berm and gabion wall.  Had IEP not been terminated, the details of their respective analyses might have been far more significant than they ultimately were.  We earlier concluded that the completion of the berm and gabion wall was a condition to both Mechanical and Substantial Completion.  We also find that these Project elements were shown to be on the critical path as of November 2016.  Because this work had not been completed as of April 15, 2018 (and not ultimately completed until sometime in 2020), the Tribunal does not find it necessary to determine the exact amount of time extension IEP would be entitled to for the berm and gabion wall issues.  We will further address the issue of time extensions in Section 5.3 below.

The Tribunal offers one final observation on the subject of the berm and gabion wall, although these comments did not affect our determination.  It is our view that if Footprint been forthright with IEP about what was happening with the permits and the Tetra Tech analysis, and attempted to work cooperatively with IEP, the overall impact of the berm and gabion wall on the Project (and potentially our findings in this arbitration) would likely have been quite different.  Perhaps disclosure of this information and the ensuing discussions would have led the Parties to have this work descoped from IEP's contract and/or removed this work as a prerequisite to Mechanical and/or Substantial Completion.  Perhaps it would have avoided the default termination.  We certainly recognize that there is no way of knowing how things might have played out differently or how IEP might have responded.  Because Footprint chose not to provide this information, we will never know, and as a result this arbitration is being decided based on the facts before us, which include: (a) Mechanical Completion and Substantial Completion being contractually tied to the completion of the berm and gabion wall; (b) completion of the berm and gabion wall remaining within IEP's scope of work as of April 15, 2018 and on the Project's critical path; and (c) Footprint's actions and inactions having caused the delays to the completion of the berm and gabion wall.

### 5.4.2.  Power Island

The delays and impacts claimed by IEP related to the power island are set forth in CONs 61 and 72.  As with the berm and gabion wall issue, each Party provided extensive testamentary and documentary evidence to support its position that the other Party was responsible for the problems experienced in this area of the Project.  Set forth below are the basic positions of the Parties.

#### *IEP's Position*

IEP argues that in addition to the berm and gabion wall delays it experienced that were driving the overall Project critical path to Mechanical and Substantial Completion, it also experienced delays to its work with respect to the power island.  The specific theories behind these claims (i.e., why Footprint is responsible) are identified in the CON 61 and CON 72 discussion earlier in this Award, as well as in the discussion below that describes the conclusions of IEP's scheduling expert, Mr. Gaudion.

Mr. Gaudion's analysis found that the Project's controlling delays were through the berm and gabion wall.  He testified that this analysis of the power island delays was intended to demonstrate that even in the absence of the berm and gabion wall delays, IEP experienced significant excusable delays to the power island activities that would justify an extension of time to Substantial Completion and various interim activities and milestones.  Without consideration of the berm and gabion wall delays, Mr. Gaudion

allocated the power island delays between the Parties as follows: (a) 204 days of delay (64%) allocated to Footprint; (b) 57 days of delay (17.9%) allocated to IEP; and (c) 58 days of delay (18.1%) as concurrent or shared responsibility between the Parties, and therefore excusable. This ultimately translates to 262 days of excusable days of delay to the power island.[24]

As noted above, the basis for the delays in the power island are set forth in CONs 61 and 72, and include the following:

- Delays to the start of pile driving operations in the Air Cooled Condenser (ACC) area. Mr. Gaudion determined that during the period between December 2, 2014, and June 8, 2015, there were 54 days of concurrent delay to the start of pile driving operations in the ACC area. He allocated responsibility for this delay equally between the Parties, citing the failure of Footprint to provide IEP with a construction-ready ACC area (as required by the EPC Contract) and the failure of IEP's engineer (WorleyParsons) to timely complete the ACC piling drawings.

- Delays to the start of Balance of Plant (BOP) piping installation. Mr. Gaudion determined that during the period between June 8, 2015 and June 24, 2016 there were 61 days of delay that impacted the start of BOP piping installation. He allocated 39 days of delay to Footprint on the basis that: (a) 37 days of delay were due to obstructions that the Parties contemporaneously agreed were Footprint's responsibility under the EPC Contract; and (b) two days of delay were due to a differing site condition encountered at the steam turbine building. He allocated 22 days of delay to IEP, on the basis that other issues unrelated to Footprint that delayed the civil works in the ACC and Steam Turbine building areas (e.g., pile quantity growth, delays in the issuance of piling drawings, and underestimations of planned schedule durations).

- Delays to BOP Piping and BOP Electrical Work. Mr. Gaudion determined that during the period between June 24, 2016, and October 31, 2017, there were 184 days of delay that impacted the BOP piping and electrical work. He allocated 153 days of delay to Footprint, on the basis that IEP was delayed in this work by: (a) its inability to procure a sufficient level of skilled workers on a 40-hour a week work schedule, and this was a risk to be borne by Footprint; (b) Footprint's unilateral decision to construct the Administration Building during the height of IEP's work, which negatively impacted IEP's BOP piping installation rate; and (c) its implementation of acceleration measures as a result of Footprint's demands for a Recovery Schedule in the summer of 2016, which had the ultimate effect of lowering production rates because of, among other things, congestion and stacking of trades. Mr. Gaudion allocated 31 days of delay to IEP, on the basis that the Exterior Rack was not available for BOP piping installation because of IEP's decision to resequence work in the Exterior Rack area.

- Delays to Commissioning. Mr. Gaudion determined that during the period between October 31, 2017, and February 9, 2018, there were 76 days of delay to the cold commissioning process. IEP's position is that the cold commissioning work was impacted due to the overlap of construction and commissioning. Based on his allocation of construction delays described in the preceding bullets, Mr. Gaudion allocated 48 days to Footprint, 14 days to IEP, and found 14 days to be concurrent.

---

[24] IEP Post-Hearing Brief, Part I, pp. 135-37.

*Footprint's Position*

Footprint's position is that the power island occupied the critical path for the entire 319-day period between the Guaranteed Substantial Completion Date and April 15, 2018, and that IEP is responsible for all of this delay. Footprint argued that CONs 61 and 72 were not timely filed in accordance with Section 10.2(a) of the EPC Contract,[25] and that IEP failed to comply with other change order procedures in the EPC Contract. Footprint's substantive arguments focused on the Project record, and the poor performance by IEP and its subcontractors throughout the Project. Examples of its assertions include:

- Engineering delays and problems that were experienced from the outset of the Project, which delays and problems ultimately led IEP to descope/terminate its original engineer, WorleyParsons. Footprint asserts that the WorleyParsons' delays in delivery of design documents affected every discipline and also delayed IEP's procurement efforts.

- Significant growth in material quantities from what IEP originally anticipated, which impacted the BOP piping and electrical construction work.

- Performance problems by AZCO, IEP's BOP piping subcontractor, and the fact that AZCO's inadequate production rates led IEP to take over portions of AZCO's work with other subcontractors.

- Recurrent performance problems by Kenny, IEP's electrical subcontractor, including Kenny's delays in performance and repeated work stoppages to demand commercial concessions from IEP. Kenny ultimately demobilized without completing its work on the Project.

- Delays by O'Connor Corporation, IEP's center line subcontractor that constructed the Project's power-generating systems.

Part of the documentary evidence Footprint produced was derived from the statements contained in witness statements and other submissions in the arbitrations that IEP had with these subcontractors.

Footprint also provided responses to the specific positions that IEP made in support of its power island delay claim as follows:

- As to alleged delays to the ACC area, Footprint points to IEP's confirmation on April 10, 2015, that it had not been delayed by lack of site access. Footprint points to the delays in engineering as the driving reason for problems with starting the ACC piling.

- As to the alleged delays for site obstructions, Footprint relies upon, among other things, Change Order No. 11, where the Parties agreed to a payment of $698,604 to deal with the obstructions discovered during the period January 1, 2015, through November 25, 2015, and wherein IEP had expressly acknowledged that the work had been completed in a timely manner that did not negatively impact the Approved Project Schedule. As to the two days identified by Mr. Gaudion for differing site conditions, Footprint states that these were caused by late piling engineering.

---

[25] CON 61 was submitted in March 2017. Footprint argued that because IEP based this CON on site access issues occurring between January 15, 2015, and April 15, 2015, its claim was waived under Section 10.2(a). CON 72 was submitted on December 7, 2016. Footprint argued that IEP was on notice of the concurrent construction of the Administrative Building by February 2016 at the very latest, and that this also constituted a waiver under Section 10.2(a). We rejected this defense based on our discussion under Section 5.1 and will not address this further.

- As to the alleged delays for BOP piping and electrical work, Footprint states that this was due, among other things, to: (a) the performance problems of WorleyParsons and IEP's construction subcontractors (as cited above); and (b) the failure of IEP to have planned to have more than a 40-hour work week, which created the labor shortage it allegedly experienced. Footprint further states that it had the right to ask for a Recovery Schedule and should not be held responsible for the consequences of IEP accelerating the schedule. Finally, as to the Administration Building component of this delay, Footprint states that: (a) it had the right to construct such building when it did; (b) it had worked with IEP to address its concerns during the performance of the work; and (c) IEP was unable to identify any distinct impact allegedly caused by Footprint's construction of such building.

- As to the alleged delays for commissioning, Footprint states that IEP's apportionment had no basis in accepted scheduling methodology because, among other things, it was based on delays in construction that were not Footprint's responsibility.

*Tribunal Determination*

As with the berm and gabion wall, the Parties provided voluminous evidence on the power island issues and delays. Similar to the berm and gabion wall, our ultimate determination of the power island issues and delays was based on some straightforward and undisputed facts. But contrary to our ruling on the berm and gabion wall, we found that IEP is the party that bears full responsibility for the power island issues and delays.

The evidence clearly showed that IEP's performance was substantially impacted by the delays and poor overall performance of WorleyParsons, and that this was the root cause of many of the problems and delays experienced by IEP during the Project. IEP attempted to downplay what happened with WorleyParsons, including by claiming that mitigated the WorleyParsons problems and transitioned WorleyParsons' scope of work to IDOM in May/June 2016. Regardless of whether this characterized as a "transition," descoping, or a partial termination, it was clear to the Tribunal that IEP and the schedule was deeply impacted by both WorleyParsons' performance and IEP's having to bring on IDOM as a successor engineer. IEP's contemporaneous documentation and internal reporting made it obvious that IEP felt the same way, and IEP's Post-Hearing submissions did not persuade the Tribunal otherwise.

The evidence also clearly showed that IEP's performance on the power island was substantially impacted by the delays and poor overall performance of its major construction subcontractors – particularly AZCO, Kenny and O'Connor. Some of these performance issues were attributable to WorleyParsons' deficient performance. The contemporaneous Project records, and in particular the statements contained in witness statements and other submissions in the arbitrations with subcontractors, portray the substantial problems IEP had with subcontractor performance and the impact of this on the Project. Regardless of the cause, responsibility for these subcontractor problems cannot reasonably be shifted from IEP to Footprint.

The evidence also demonstrates that IEP had project management issues of its own that impacted the power island. The decision to plan this Project with 40-hour work weeks was one of them. So too was IEP's procurement approach and procurement execution. There was evidence of major delays in purchasing critical components, partly because procurement approvals had to go through IEP's parent company executives in Spain. It also appeared that IEP was negatively impacted by some of its commercial decisions – particularly having entered into many of its subcontracts on a time and materials basis or unit price basis, and converting over the course of the Project some of its subcontracts from a lump-sum basis to a time and materials basis.

The Tribunal was influenced by the significant growth in material quantities during the course of the Project across a wide range of construction materials, including piles, BOP pipe installation and welding, and BOP cable installation. The evidence showed that this quantity growth resulted in the need for more subcontractor labor, which not only created a site congestion problem, but significantly affected IEP's productivity. The growth in subcontractor labor also resulted in IEP's own management being stretched. The Tribunal took note of the fact that at one point IEP had 10 electrical contractors working on the site, which the Tribunal knows from experience is not only highly unusual, but emblematic of a troubled project.

The above offers the Tribunal's global perspective of IEP's performance based on the evidence, and the substantial weight of the evidence supports Footprint's position that this is what caused the delays to the power island. While we have no doubt that IEP tried to mitigate these problems over the course of the Project, it failed to meet its burden of proof that these problems should be shifted to Footprint.

While the preceding sufficiently explains our rationale on the power island delays, we also did consider the specific assertions used as the basis for Mr. Gaudion's opinions on excusable days. In summary, we agreed with the characterizations of Footprint on these assertions, based on the following:

- Site access delays. IEP did not demonstrate that it encountered excusable site access delays that were attributable to Footprint. While the final turnover deed may have been dated May 19, 2015, the greater weight of the evidence supports that IEP had the access it needed to perform its work, and that if there were any issues affecting the schedule, they arose from the late development of WorleyParsons' design documents. We are also heavily influenced by the contemporaneous Project documentation on this subject, where IEP consistently stated that it was not delayed by site turnover.[26] While the Tribunal concluded that IEP had not waived its right to make a claim under Section 10.2 of the EPC Contract, that should not be construed as our belief that no notice was required at all. If IEP had problems with Footprint's site turnover, it was incumbent upon it to say something clearly to Footprint at the time, particularly in light of Footprint's April 10, 2015 letter. There is insufficient evidence that it did so. In fact, by all reasonable indications, IEP did not act as if site access was a problem – perhaps because of the delays in WorleyParsons' design documents.

- Site Obstructions. We agree with Footprint's view of Change Order No. 11, where IEP acknowledged that the work had been completed in a timely manner so as to have not negatively impact the Approved Project Schedule. IEP had the obligation to say something affirmatively if it objected to this clear acknowledgement, and there is no credible evidence that it did.

- BOP Piping, Electrical Work and Acceleration. Given our findings on the 40-hour work week and alleged delays from site access and site obstructions, IEP has not met its burden of proof on delays associated with these activities. As to constructive acceleration-related delay claims (e.g., inefficiency and stacking of trades), IEP has failed to demonstrate that it was wrongfully accelerated by Footprint, as there were no demonstrable power island critical path excusable delays.

---

[26] Footprint's Post-Hearing Brief (¶¶106-107) explains this, and cites to IEP's internal email on January 22, 2015, that the pile area is suitable for the work and that there was nothing to claim. It also cites to IEP's acknowledgement on April 10, 2015, that IEP has not been delayed by Footprint's turnover, and that IEP had been working in any areas that it needed to.

- <u>Commissioning</u>.  Because this delay claim was premised on and calculated by Mr. Gaudion based on the above-referenced construction delays to the power island, and given our findings on those alleged delays, IEP has failed to meet its burden of proof that it was entitled to any time extension for this activity.

We also agree with Footprint's positions regarding the Footprint's timing of the Administration Building construction not being a change under the EPC Contract.  While it may not have been directly mentioned as "concurrent work," IEP failed to meet its burden of proof that on this issue.  The Tribunal is highly skeptical that a reasonable contractor would assume that the Administration Building would have been built at a far later point in time than it was.  Moreover, as discussed above, even if IEP had proven entitlement, it failed to show the cause-and-effect needed to obtain any time or money associated solely with this element of the work.

Because our findings are based on the failure of IEP to meet its burden of proof on its entitlement to excusable delays on the power island, we do not find it necessary to provide any perspectives on the analysis of the Parties' respective scheduling experts.

### 5.4.3.  Overall Delay Analysis

As noted above in our discussion of the berm and gabion wall delay, determining the overall days of delay to the Guaranteed Substantial Completion Date and other milestones would have been more of a challenge if IEP had not been terminated and actually finished the Project.  Given that the April 15, 2018 default termination, and the actual claims of the Parties relative to delay, the specific issue before us is how to deal with the 319-days of delay between that termination date and the EPC Contract's original Guaranteed Substantial Completion Date of May 31, 2017.

Our conclusion is that the entire 319 days of delay are the concurrent responsibility of both Parties. The Project was clearly behind schedule early in the Project as a result of the power island problems for which we found IEP responsible.  As of no later than November 2016, the berm and gabion wall activities were on the critical path and never left the critical path as of the termination date.  Footprint had contractual responsibility for this delay.  While the Parties could quibble about how much delay was embedded into the Project as of November 2016, the Tribunal did not find that relevant.  Nor did we find the amount of power island delay time that IEP might have recovered through acceleration to be relevant.  To the extent non-concurrent delay might have existed, the Tribunal found that neither Party met its burden of proof of demonstrating that some portion of the 319 days of Project delay was the sole responsibility of one Party.

Stated differently, the greater weight of the evidence supports the view that the Project would not have achieved Mechanical Completion or Substantial Completion by April 15, 2018 if: (a) the power island delays had not occurred, because of the effect of the berm and gabion wall delays; and (b) the berm and gabion wall delays had not occurred, because of the effect of the power island delays.

## 6.  The Propriety of the Termination

The threshold question before this Tribunal is whether Footprint's default termination of IEP on April 15, 2018 was justified and properly carried out in accordance with the terms of the EPC Contract and applicable law.  Footprint's Notice of Termination letter (Ex. R-0308) identified sixteen (16) separate Contractor Events of Default under Section 13.2 of the EPC Contract, which the Tribunal will discuss in this section of the Award.  Consistent with Section 3.5 above, the Tribunal provided the Parties with an outline of certain issues of importance to the Tribunal relative to the termination, including the following topics and questions:

- Timeline of key events.

- Relevant contract provisions

- New York law on terminations, including: (a) the doctrine of substantial performance; (b) concepts of waiver and laches; and (c) the remedy for wrongful termination.

- Evidence as to the propriety of the termination as to each Contractor Event of Default set forth in Footprint's April 15, 2018 termination letter, and whether those were a legitimate basis for Footprint's termination of IEP's contract.

- Whether any of the Contractor Events of Default were either stale or not yet ripe to be grounds for termination, and whether there is there a basis to assert that Footprint waived its right to terminate as to any of the grounds?

- If the termination was wrongful, what, if any, of its costs to complete can Footprint recover?

- The state of the Project at termination and the work required to achieve completion of the Project by Burns & McDonnell.

As with our approach in Section 5, we have organized the topics in this section based on the above-referenced topics/questions.

### 6.1.    Timeline of Key Events

In response to the Tribunal's instructions, both Parties provided a timeline of key events in their respective Post-Hearing Briefs.[27]  The following is not as comprehensive as what was submitted by the Parties, but reflects the Tribunal's extraction of what it considers to be the key events:

- September 28, 2017.  Footprint sent a letter to IEP on this date, notifying it that it was in default of not having achieved Substantial Completion within the 120-day grace period following the May 31, 2017 Guaranteed Substantial Completion Date.  There is evidence that Footprint was considering terminating IEP at this time but chose not to do so.

- November 17, 2017.  Footprint meets with ISO-NE, which allegedly advised Footprint that the Project must achieve commercial operation of the facility by May 31, 2017, and that ISO-NE was prepared to terminate its capacity supply obligations ("CSOs") if that did not occur.

- November 28, 2017.  Footprint has an internal meeting at which it considers the possibility of replacing IEP and how it would do so.

- December 4, 2017.  Footprint's Mr. Yavary meets with Burns & McDonnell to obtain proposals for completing the Project.

- December 11-13, 2017.  Burns & McDonnell and its subsidiary, AZCO, visit the site to assess the status of the work.

---

[27] Footprint's timeline was set forth on pp. 127-152 of its brief, and IEP's was set forth in a table on Part II-pp. 1-8 of its brief.

- December 22, 2017.  Burns & McDonnell issues a completion plan for the takeover of the Project which contemplates a takeover in January 2018.

- January 8-10, 2018.  Meetings between Footprint and Burns & McDonnell to conduct a detailed estimate review and Burns & McDonnell's completion plan.

- January 10, 2018.  Settlement meeting in New York City between Footprint and IEP.

- January 22, 2018.  Telephone call between ISO-NE and Footprint to discuss ISO-NE's alleged demands for formal assurances of completion of the Project by May 15, 2018.

- January 24, 2018.  Footprint provides comments on ISO-NE's draft certification; IEP sends Footprint a proposed settlement term sheet with takeover target dates of April 15, 2018 for Unit 6 and May 15, 2018 for Unit 5.

- January 29, 2018.  Footprint certifies to ISO-NE that it will take steps necessary to achieve Commercial Operation by May 15, 2018.  The certification states that if Commercial Operation is not achieved by May 31, 2018, ISO-NE will file with the Federal Energy Regulatory Commission (FERC) to prevent Footprint from receiving any capacity payments.  On this date there is also a meeting among Footprint, Oaktree and Toyota (Project investor) to discuss Plan B (i.e., the takeover by Burns & McDonnell).

- January 31, 2018.  EFSB approves Footprint's proposed Commercial Operation of the plant prior to the completion of the berm and gabion wall.

- February 7, 2018.  Footprint issues revisions to IEP's January 24, 2018 proposed term sheet.

- February 22, 2018.  Settlement meeting between IEP and Footprint.

- March 9, 2018.  IEP provides revised draft term sheet, with a single takeover date of May 15, 2018 for both Units 5 and 6.

- March 16, 2018.  Footprint notifies IEP by letter that it is in material breach of the EPC Contract because work on the berm and gabion wall has ground to a halt because Bond Brothers has demobilized from the site.  The letter also notes that IEP has directed Sargent Electric not to complete heat trace installation and to discontinue its work, which amounts to IEP's abandonment of the work.

- March 20-21, 2018.  Footprint meetings with Burns & McDonnell to prepare for site mobilization.

- March 26, 2018.  Footprint issues revised settlement term sheet to IEP.

- March 29-31, 2018.  Footprint internal calls and letters regarding "mission readiness" for implementing Plan B.  Burn & McDonnell provides Footprint with information on Plan B, including subcontractors it intended to use to complete the work and a revised completion estimate.

- April 4, 2018.  IEP files $257 million mechanics' lien.

- April 5, 2018.  Footprint and IEP have a settlement meeting in Salem to discuss the draft term sheet.  Before and after this meeting, Footprint has internal meetings to discuss termination of EPC Contract, setting April 14, 2018 as the "target date" to "pull the trigger" on termination, and April 15, 2018 as the takeover date. It is further agreed that the notice of draw on the LOC is to be issued concurrently with the notice of IEP's termination.

- April 6, 2018.  Draft termination letter circulated internally by Footprint for review.

- April 7-9, 2018.  Footprint and IEP exchange information arising from April 5, 2018 settlement meeting, including Footprint sending a list of Action Items and IEP's draft punchlist, which was one of the action items.

- April 10, 2018.  "Mission readiness" meeting held among Burns & McDonnell, Footprint and others to prepare for termination of contract.  Footprint also sends IEP a notice of its continuing material breach of the EPC Contract for having allegedly abandoned the work.

- April 11, 2018.  Footprint and Oaktree meet with lenders to obtain approval to terminate IEP.

- April 12, 2018.  Internal Footprint email about Footprint and Oaktree senior individuals to be on site on April 15, 2018 to assist in the implementation of Plan. B.  Footprint sends a revised term sheet to IEP, stating that, "we are running out of time to negotiate a deal."  IEP responds that it needs more time to submit a revised draft.

- April 13, 2018.  Footprint pushes back on IEP's request for additional time to submit a counterproposal, but states that it is "fine" to send a counterproposal by the end of the afternoon on April 14, 2018.  Footprint "encourages" IEP to provide its "best and final position," and once Footprint sees the response, it will evaluate whether a meeting in New York the following week makes sense.  If IEP's response was acceptable, Footprint stated that the Parties could use the New York meeting to "nail down the agreed-to commercial concepts."  In addition, on this day: (a) the Footprint board of directors voted to terminate the EPC Contract for default (contingent on the receipt and review of the IEP final proposal); and (b) Footprint executed the completion agreement with Burn & McDonnell.

- April 14, 2018.  Footprint sends an early morning email to IEP asking whether it is ready to start walking down the punchlist, and IEP responds within 30 minutes with an email stating that it was ready to do so.  The walkdowns were conducted that afternoon.  IEP transmits its revised settlement term sheet, which now has a taking over date of June 1, 2018.  Footprint calls ISO-NE to inform them of Footprint's decision to terminate IEP.

- April 15, 2018.  Footprint has a telephonic meeting of its board to discuss IEP's proposal and decides to terminate IEP.  Footprint and IEP continue to conduct punchlist walkdowns in the morning, and IEP emails Footprint an updated punchlist at 5:44 p.m.  At 5:33 p.m., Footprint emails to IEP its notice of termination and intent to draw down on the LOC.  At 6:03 p.m., Footprint issues a Notice to Proceed to Burns & McDonnell.

Although not necessarily relevant to the termination timeline, the evidence demonstrates that Footprint ultimately declared Commercial Operation to ISO-NE as of May 31, 2018.

**6.2.    Relevant Contract Provisions**

Both Parties agree that the primary provision in the EPC Contract that is relevant to the termination issue is Section 13.2 ("Termination upon Contractor's Material Breach").  This provision states, in relevant part:

> If a Contractor Event of Default occurs and is continuing, then Owner may terminate this Contract without any liability by written notice to the Contractor. The termination of this Contract will be effective immediately upon receipt by Contractor of such notice. For purposes hereof, a "Contractor Event of Default" will occur if:

> (a)    Contractor (i) abandons the Work, and (ii) does not remedy such abandonment within ten Business Days after receiving written notice thereof from Owner;

> \*\*\*

> (d)    Contractor (i) fails or refuses to comply with any Applicable Laws or Applicable Permits, and (ii) either (A) within five days after obtaining knowledge of such non-compliance does not commence steps to comply or is not in compliance with such Applicable Laws or Applicable Permits within a reasonable period of time thereafter, (B) is prohibited by a Governmental Authority from continuing with the Work, or (C) Owner faces any civil or criminal penalty as a result of such non-compliance by Contractor;

> \*\*\*

> (g)    Contractor is late in achieving any of the milestones set forth in the Approved Project Schedule by more than 60 calendar days, and Contractor does not submit a Recovery Schedule in accordance with the terms hereof;

> (h)    Contractor has failed to cause the Facility to achieve Substantial Completion on or before the date that is 120 days after the Guaranteed Substantial Completion Date;

> (i)    Contractor (A) fails or refuses to perform any other material obligation under this Contract, and (B) does not remedy such nonperformance within 30 days after receiving written notice thereof from Owner (or, to the extent that such nonperformance cannot reasonably be cured within 30 days but can be cured within 90 days (or such longer time as is necessary for Contractor, using its best efforts, to procure required materials, for so long as Contractor is diligently pursuing such efforts to cure the breach) without materially adversely affecting Owner or the Project, does not diligently pursue and complete such remedy within 90 days (or such longer time as is necessary for Contractor, using its best efforts, to procure required materials, for so long as Contractor is diligently pursuing such efforts to cure the breach) after receiving written notice thereof from Owner).

As noted earlier, Footprint identified sixteen (16) separate Contractor Events of Default in its April 15, 2018 termination letter, and these will be addressed by the Tribunal in Section 6.4 below.

Footprint identifies three other provisions of the EPC Contract as relevant: (a) Section 18.6, which provides for non-waiver of any contractual right absent an express written agreement; (b) Section 18.14, which provides that the EPC Contract is an integrated agreement; and (c) Section 6.2(d)(ii), which provides that Footprint's receipt of late Substantial Completion Payments does not affect its right to terminate IEP for cause.  IEP also identifies as relevant Section 6.2(d)(ii)(D) of the EPC Contract, which it submits

identifies "less drastic/less nuclear alternatives to a termination (and legal forfeiture) of the EPC Contract" that Footprint could have selected in lieu of terminating the contract.

### 6.3.    Applicable Law on Termination

The Parties were asked to provide their positions on how New York law addresses default terminations. Each Party provided extensive input on these issues in their Pre-Hearing and Post-Hearing Briefs, including citations to New York and other applicable precedent. What follows below is a summary of their respective positions generally on this subject. Their respective positions on the Contractor Events of Default are discussed in Section 6.4 below.[28]

*IEP's Position*

IEP cites *Bruner & O'Connor on Construction Law* and *Beltrone Const. Co. Inc. v. State*¸ 682 N.Y.S.2d 299, 301 (1998) for the propositions that the party terminating a construction contract for cause has a hefty burden to demonstrate that the termination was proper, and that termination is considered by the New York courts as "a 'species of forfeiture' and 'drastic adjustment of the contracting relationship,'" which requires "strict accountability in [the use of] this sanction." IEP also cites *Bruner & O'Connor* as authority for the statement that breaches that are minor, technical, immaterial, without consequence or damage, that can be mitigated or compensated by an award of damages, or are either prospective in nature or stale do not satisfy this heightened standard. Its Post-Hearing Brief refers to numerous New York cases addressing the "materiality" standard, and that the breach must go to the "root of the agreement between the parties,"[29] and be "so substantial that it defeats the object of the parties in making the contract."[30] As will be discussed further in Section 6.4 below, IEP argues that many of the alleged Contractor Events of Default do not meet New York law's materiality standard.

IEP states that even if it had materially breached the EPC Contract in a manner that justified termination, New York law precludes an owner from terminating the contractor for cause if that contractor had substantially performed its work. It cited to a number of New York cases, as well as those from other jurisdictions, to support this proposition. IEP alleges that it had substantially completed the works in accordance with the EPC Contract by the time of termination, as evidenced by, among other things: (a) IEP's scope of work was more than 98% complete at the time of the termination; (b) the only remaining work as of the termination to support Commercial Operation was commissioning activities and certain performance testing and punchlist items; and (c) the power plant had already achieved first fire and demonstrated base load operation of both units (both individually and together) in the months preceding the termination, which showed that the facility was operational and functional for its intended purpose prior to termination.

IEP argues that it is well-settled in New York that a non-breaching party that either continues to perform or accepts the performance of the breaching party affirms the contract and waives its right to terminate. It cited several cases to support the position that a party in a similar position to Footprint waived any right to seek termination of the agreements by electing to continue to do business with its counterparty

---

[28] The Tribunal's intent in asking the Parties for submissions in this section was to understand fully the legal authority associated with the termination, as opposed to other issues that were associated with facts – such as Footprint's motives in terminating. We have limited our discussions in this section accordingly and will address other termination issues in a later section.

[29] *Donovan v. Ficus Investments, Inc*., 20 Misc.3d 1139(A), at *9 (Sup. Ct. N.Y. Cnty. Aug. 1, 2008) (citing *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997)).

[30] *In re Dissolution of Ongweoweh Corp*., 130 A.D.3d 1291, 1292 (3d Dept. 2015); *RR Chester LLC v. Arlington Bldg. Corp*., 22 A.D.3d 652, 654 (2d Dept. 2005).

after the alleged breaches, based on the doctrine of election of remedies (i.e., when a party materially breaches a contract, the non-breaching party may choose to continue to perform the contract or it may refuse to continue and terminate the agreement). IEP also cited to New York precedent holding that an owner that allowed a contractor to continue working on a project past the required substantial completion date was estopped from relying on the contractor's failure to achieve that substantial completion date as a basis for terminating or rescinding the contract.[31] IEP cites to numerous examples of Footprint having continued to accept IEP's performance after various rights to terminate allegedly arose, and thereby argues that the Tribunal should find that Footprint's termination was improper based on the principles of election of remedies, waiver and/or estoppel.

IEP also argues that New York law precludes a party in material breach of contract from terminating the non-breaching party for default. IEP claims that throughout the course of the Project, Footprint repeatedly breached its obligations under the EPC Contract, by, among other things, severely impacting IEP's scope of work, increasing the cost of the work, preventing IEP from completing the Project in accordance with the Approved Project Schedule and causing IEP to incur cost overruns. It argues that the most material breach was Footprint's failure and refusal to pay IEP amounts due and owing under approved payment applications, citing to evidence that IEP had achieved more than 96% completion of the Project through February 2018 based on approved Applications for Payment but was only paid for 89.9% of the total contract price at the time of termination. IEP also cites: (a) Footprint's failure to pay amounts due under the cost-sharing provisions of Section 5.4 of the EPC Contract and amounts due for Massachusetts Sales Tax; and (b) Footprint's failure to keep IEP abreast of permit modifications it sought and obtained, most particularly the Notice of Project Change approved by the EFSB in January 2018.

IEP cites New York precedent holding that a terminating party like Footprint is required to follow the contract's termination procedures precisely, and that its failure to do so renders the termination wrongful and bars that terminating party from recovering on a counterclaim. It also cites to legal authority that a breaching party has the right to be given an opportunity to cure its own material breach. IEP alleges that for those alleged Contractor Events of Default falling under Section 13.2(i), Footprint did not give it an opportunity to cure the default, despite the specific language of that provision which contained a 30-day cure period.

### *Footprint's Position*

Footprint asserts that Section 13.2 of the EPC Contract identifies the material breaches of EPC obligations that the Parties agreed would entitle Footprint to terminate IEP for cause, and that it had an equal right to terminate under each sub-section contained therein. It states that the Tribunal's analysis should follow the plain terms of Section 13.2, which provide that "[i]f a Contractor Event of Default occurs and is continuing, then Owner may terminate this Contract without any liability by written notice to the Contractor."

Footprint argues that IEP disregarded the express terms of the EPC Contract and relied on "vague assertions to the effect that New York law 'abhors' termination and views it as a 'drastic remedy.'"[32] For example, it noted that IEP cited various New York cases for the proposition that "not every 'material breach' will justify a termination for cause," but that it made no attempt to reconcile that general statement of law with Section 13.2, which Footprint argued identifies precisely those material breaches of EPC obligations that the Parties agreed would entitle Footprint to terminate IEP for cause.

---

[31] 75 N.Y. Jur. 2d § 80, citing *McPherson Builders, Inc. v. Performance Premises, LLC*, 171 A.D.3d 1270 (3d Dept. 2019).

[32] Footprint Reply Post-Hearing Brief, ¶146.

On the subject of IEP's assertion that it was substantially complete with its work at the time of termination, Footprint responds that the term "substantial completion" is defined in Section 6.2(a) of the Contract, and that definition had not been satisfied. In response to IEP's argument that Footprint had the ability to use the facility for its intended purpose, Footprint also cited to Section 6.2(a), which states that: "The parties acknowledge and agree that unless Substantial Completion of the Facility has been achieved, Owner does not have the ability to occupy or utilize the Facility for its intended use." Footprint also argued that IEP's 98% completion argument was contradicted by the voluminous evidence of the post-termination work performed by Burns & McDonnell and the testimony of Footprint witnesses. Given this, Footprint asserts that even if the Tribunal were to use the New York common law standard for substantial performance (versus the Section 6.2(a) standard for substantial completion), IEP's substantial performance argument would fail.

As for IEP's claim that Footprint was in material breach at the time of termination, and therefore could not terminate the EPC Contract, Footprint asserts that IEP failed to show the materiality of any alleged Footprint breaches under the New York law standard of materiality advocated by IEP. Footprint further argued that IEP basically raised every disputed issue in this arbitration as a "material breach," without explaining why that disputed issue met the New York materiality standard.

With respect to IEP's argument that Footprint failed to give IEP an opportunity to cure the alleged Section 13.2(i) Contractor Events of Default, Footprint argued that IEP conflated notices of default under this contract section with its right to issue a notice of termination, which was not subject to any further notice and cure period. Footprint provided evidence that it had in fact given notice on the applicable claims and that IEP nevertheless failed to cure them within the 30-day cure period. As a result, Footprint argues that it was entitled to terminate the EPC Contract immediately for those Contractor Events of Default listed in its April 15, 2018 termination letter.

With respect to IEP's assertion that Footprint either elected its remedy or waived its right to terminate, Footprint asserts that it repeatedly reserved its termination rights, and that Section 18.6 of the EPC Contract contains a non-waiver provision. As a result, Footprint alleges that IEP's waiver claim is unavailing. According to Footprint, so too is IEP's claim that Footprint elected its remedies by allowing continued performance and having the ability to collect liquidated damages. Footprint relies upon Section 6.2(d)(ii)(B) of the EPC Contract, which states that Footprint's receipt of liquidated damages shall not affect Owner's rights to terminate this Contract pursuant to Section 13.2.

*Tribunal Determination*

While we will address most of the legal issues in connection with our discussion of each of the Section 13.2 Contractor Events of Default in Section 6.4 below, we will address here Footprint's argument that Section 18.6 precludes IEP from arguing that Footprint waived its right to terminate under some or all of the Contractor Events of Default. Section 18.6 reads as follows:

> Except as may be specifically agreed in writing, the failure of Owner or Contractor to insist in any one or more instances upon the strict performance of any one or more of the provisions of this Contract or to exercise any right herein contained or provided by law or equity, shall not be construed as, or constitute in any way, a waiver, modification or relinquishment of the performance of such provision or rights, or of the right to subsequently demand such strict performance or exercise such rights, and all such rights shall continue unchanged and remain in full force and effect.

IEP has argued not only the doctrine of waiver, but also that some of Footprint's alleged events defaults should fail on the basis of estoppel. The Tribunal notes that although waiver and estoppel are often

mentioned together, there is a major difference between the two concepts. Section 18.6 does not address "estoppel," and the Tribunal concludes that this provision cannot be construed as precluding either Party from arguing that the other Party does not have the right to argue estoppel.

Importantly, as mentioned above, IEP cited *McPherson Builders, Inc. v. Performance Premises, LLC*,[33] a recent New York construction case that concluded, in part:

> Where an entity that has retained a construction company for a project allows a construction company to continue to work on a project past the date on which the project was to be substantially completed, it has been held that, by allowing the construction to continue, the entity that retained the contractor would be estopped from relying on the contractor's failure to substantially complete its work by the required date as a basis for terminating or rescinding the contract.

Footprint did not address this case in its post-hearing submissions, or explain why Section 18.6 would serve to nullify IEP's estoppel defense. Based on all of the above, the Tribunal concludes that it is appropriate to consider whether or not Footprint should be estopped from asserting its right to terminate for default.

## 6.4. The Propriety of Contractor Events of Default

Footprint states that the express terms of Section 13.2 govern the analysis of the propriety of Footprint's termination of IEP, and the relevant questions for determination by the Tribunal are whether: (a) a Contractor Event of Default had occurred; and (b) such Contractor Event of Default was "continuing" as of April 15, 2018. IEP states that the threshold question for the Tribunal is whether Footprint's termination on April 15, 2018 was justified and properly carried out in accordance with the terms of the EPC Contract and applicable law. We have concluded that Footprint was not justified in terminating IEP for default, for the reasons set forth below.

The post-hearing submissions by the Parties on these issues are extensive, and contain substantial details about the evidence presented to us. The Tribunal will not repeat each Party's respective position, review/repeat all of the evidence, or attempt to explain each and every reason we decided how we did. Instead, we will summarize the key points raised by the Parties and limit our determination discussion to the primary grounds that formed the basis for our conclusions.

### 6.4.1. The Failure to Achieve Substantial Completion Within 120 Days of the May 31, 2017 Guaranteed Substantial Completion Date

IEP was required to achieve Substantial Completion by no later than the Guaranteed Substantial Completion Date (May 31, 2017). Under Section 13.2(h) of the EPC Contract, a Contractor Event of Default would occur if IEP had not achieved "Substantial Completion on or before the date that is 120 days after the Guaranteed Substantial Completion Date" (i.e., September 28, 2017). As explained in Section 5 above, IEP did not reach Substantial Completion before it was terminated on April 15, 2018.

*IEP's Position*

IEP asserts, among other things, that any failure to achieve substantial completion is excused because IEP was entitled to extensions of time under the EPC Contract, which would extend the date by which the Guaranteed Substantial Completion Date was to be achieved. It also argues that Footprint

---

[33] 171 A.D.3d 1270 (3d Dept. 2019).

continued to accept performance after the right to terminate allegedly arose on September 28, 2017, and waited until the Project was substantially performed before pulling the trigger on termination.

*Footprint's Position*

Footprint asserts that IEP failed to demonstrate that it submitted timely, compliant CONs that justified a 199-day extension to the Guaranteed Substantial Completion Date (which would take the 120-day date out to April 15, 2018). It also argued the positions set forth generally in Section 6.3 above.

*Tribunal Determination*

As noted in Section 5 above, the Tribunal concluded that the 319 days of delay to the Project were concurrent, and that this would give IEP the right to a time extension to the Guaranteed Substantial Completion Date that would have extended to at least April 15, 2018. We also note that, as of April 15, 2018, the berm and gabion wall activity remained on the critical path to Substantial Completion and the delay to this activity was continuing as a result of Footprint's actions/inactions. For these and other reasons, we find that Footprint has failed to meet its burden of proof that this Contractor Event of Default was a proper basis for Footprint's termination of IEP.

### 6.4.2. Abandonment of the Project and Refusal to Proceed with the Work

Under Section 13.2(a) of the EPC Contract, a Contractor Event of Default occurs if "Contractor (i) abandons the Work, and (ii) does not remedy such abandonment within ten Business Days after receiving written notice thereof from Owner[.]" In addition, the EPC Contract required IEP to "diligently prosecute the Work," including pursuant to Footprint's directives under Section 10.6. Footprint notified IEP on March 16, 2018 and April 10, 2018 of its abandonment of the Project and failure to "diligently prosecute the Work," and IEP failed to cure this.

*IEP's Position*

IEP denies that it ever abandoned the Project or refused to proceed with available work, and, in response to Footprint's allegations, states that: (a) Bond Brothers had demobilized due to the need for resolution to the berm and gabion wall issues before it could work productively, and because Footprint failed to satisfy its Owner Deliverables; (b) Sargent Electric's work was consolidated into State Electric's subcontract; and (c) IEP's reductions in manpower were a natural consequence of the fact that the physical construction was coming to a close.

*Footprint's Position*

Footprint claims that the departures of Bond Brothers and Sargent Electric were both unjustified and evidence of IEP's decision to abandon the project and to use the lack of progress (coupled with Footprint's certification to the ISO-NE that the Project would be operational by May 31, 2018) as leverage with Footprint in the settlement negotiations. Footprint also argued that the reduced manpower levels of IEP's subcontractors in early 2018 were motivated by IEP's desire to avoid incurring additional costs in completing the work and demonstrate abandonment.

*Tribunal Determination*

The greater weight of the evidence supports IEP's explanations for the departures of Bond Brothers and Sargent Electric and for IEP's progress on the Project. We further find that Footprint created performance constraints for Bond Brothers' performance of the work when it, among other things, failed to

address some or all of the Owner Deliverables (as discussed in Section 5 above).  For these and other reasons, we find that Footprint has failed to meet its burden of proof that this Contractor Event of Default was a proper basis for Footprint's termination of IEP.

### 6.4.3.  Failure to Achieve Milestones in the Approved Project Schedule

Under Section 13.2(g), a Contractor Event of Default occurs if "Contractor is late in achieving any of the milestones set forth in the Approved Project Schedule by more than 60 calendar days, and Contractor does not submit a Recovery Schedule in accordance with the terms hereof[.]"  The April 15, 2018 letter included a Contractor Event of Default for nine (9) schedule milestones that were more than 60 days late and where IEP had allegedly failed to submit a Recovery Schedule in accordance with the terms of the EPC Contract.[34]

*IEP's Position*

IEP's position is similar to what it has alleged relative to the failure to meet Substantial Completion under Section 6.4.1 above, in that: (a) it was entitled to extensions of the Guaranteed Substantial Completion Date, as well as to interim milestones; (b) Footprint continued to accept performance after the right to terminate allegedly arose, thereby preventing Footprint from relying upon the failure to achieve dates in the Approved Project Schedule as a basis to terminate to the EPC Contract; and (c) Footprint failed to re-set the deadlines after allowing the original required completion dates to pass.  IEP also argued that it not only had in good faith provided reasonable Recovery Schedules, but it had completed seven out of the nine milestones identified by Footprint before the date on which Footprint terminated the EPC Contract, and this renders Footprint's termination stale.

*Footprint's Position*

Footprint stated that it had formally requested that IEP submit a Recovery Schedule no less than three times over the course of the Project, and that IEP continually refused to submit a valid Recovery Schedule, and falsely characterized Footprint's requests as demands for acceleration, which Footprint disputed.  It also stated that the evidence was clear that IEP consistently failed to achieve milestones within 60 days of their scheduled dates in IEP's schedules.  Footprint stated that it was undisputed that IEP failed to complete at least two of the nine milestones at any time prior to termination (Mechanical Completion and Start Performance Testing), and that because of this, Footprint had the unequivocal right to terminate on those two milestones alone.  However, Footprint argues that it could not be deprived of its termination rights on the other seven milestones even if IEP achieved those delayed milestones before termination – relying upon Section 18.6 to argue that it had not waived its rights on this issue.

*Tribunal Determination*

As with the delay to Substantial Completion discussed in Section 6.4.1 above, the Tribunal has found concurrent delays on the Project that entitled IEP to extensions of time, such that the delay to the achievement of the interim Milestones was not a proper basis for Footprint's termination of the Contract. We specifically note that the two milestones that were not achieved were directly dependent upon the

---

[34]  The nine Milestones were: (a) HIT 1170: Finish Installation of ACC 1 and ACC 2; (b) HIT 1100: Mechanical Completion; (c) HIT 1042: First Fire of Gas Turbine 1; (d) HIT 1043: First Fire of Gas Turbine 2; (e) HIT 1150: Complete Steam Blos of Unit 1; (f) HIT 1160: Complete Steam Blows of Unit 2; (g) HIT 1130: First Steam to Steam Turbine Unit 1; (h) HIT 1140: First Steam to Steam Turbine Unit 2; and (i) HIT 1110: Start "Performance Testing."

completion of the berm and gabion wall (based on the status of the EPC Contract as of April 15, 2018), and we found that to be the responsibility of Footprint.

Additionally, we find that Footprint is estopped from asserting the right to rely upon the seven completed Milestones. If Footprint wanted to exercise its rights for default termination on the basis of Section 13.2(g), it could have done so once the relevant interim milestone date had passed and IEP failed to deliver a Recovery Schedule. Instead, Footprint allowed IEP to continue its work on the Project which resulted in these milestones ultimately being completed. This, in effect, cured the problem and eliminated the need for a Recovery Schedule for those completed milestones. For these and other reasons, we find that Footprint has failed to meet its burden of proof that this Contractor Event of Default was a proper basis for Footprint's termination of IEP.

### 6.4.4.  Improper Conduct Relating to the Warranty Provided by GE

This Contractor Event of Default arises from Footprint's position that under Section 2.8(e) of the EPC Contract IEP had an obligation to not take any action "which could amend, modify, release, void, impair, discharge or waive any Major Subcontractor warranties." Schedule 2.2 to the EPC Contract further required IEP to "store, install, commission, operate and maintain the Facility in compliance with the Agreement and the manufacturer's recommendations and procedures so as to preserve the manufacturer's warranties to the fullest extent possible." General Electric (GE) was a Major Subcontractor and provided a warranty for, inter alia, the Steam Turbine Generator (STG).

In October 2017, GE wrote to IEP and stated that IEP had failed to meet the requirements for lube oil flush of the STG. GE said that: "[i]f damage occurs and the damage analysis traces back to a failure in meeting the GE cleanliness and flushing requirements, GE reserves the right to void the GE equipment warranty on all impacted equipment." Footprint eventually received a copy of this letter and on January 16, 2018, notified IEP of its material breach of Section 2.8(e). As stated in the April 15, 2018 letter, Footprint alleged that IEP materially breached the EPC Contract by "jeopardizing the GE warranty" with respect to the STGs, as IEP's deviations from GE's (and IEP's own) lube oil flush procedures "could impair the warranty provided by GE." Footprint wrote another letter to IEP on February 9, 2018, observing that IEP had failed to acknowledge the issues raised in GE's October 2017 notice, and stating that "[t]he mere fact that GE expressed its concern that Contractor had deviated from GE's recommended procedures, and thereby formally put Contractor on notice that Contractor's conduct could void GE's warranty, gives rise to a material breach."

#### *IEP's Position*

IEP maintains that this was, at best, a prospective breach that never occurred, as the GE warranty expired by its own terms without a claim ever being made by Footprint. It further argues that because there were no damages, this cannot be considered a material breach. IEP also states that it promptly cured any potential breach and that Footprint waived any such breach by continuing to accept performance for months prior to termination.

#### *Footprint's Position*

As noted above, Footprint asserts that its February 9, 2018 correspondence gave rise to a material breach by expressing GE's concern that IEP had deviated from GE's recommended procedures, and by formally putting IEP on notice that its conduct could void GE's warranty. Footprint argues that Section 2.8(e) of the Contract forbade IEP from taking any action that could void the GE warranty, and that Section 2.8(e) thus contemplates not only circumstances in which a Major Subcontractor warranty is actually voided, but also circumstances in which IEP's conduct creates the possibility that the warranty could be voided.

-39-

Consistent with its position on the previous default events, Footprint relies on Section 18.6 to defend against the argument that it waived its rights to assert this default.

*Tribunal Determination*

The Tribunal does not believe that the mere potential that an issue might arise in the future was sufficient to justify the termination of a contract of this magnitude at the stage of completion that IEP had achieved. We base this on the fact that: (a) at the time of termination there was no reason to believe that the warranty would be invoked, or that, if invoked, GE would deny a claim on the warranty; (b) the potential of warranty issues with GE did not impact further performance of the Project; (c) the record does not suggest that Burns & McDonnell did anything to address this issue; and (d) the LOC was available to address any monetary issues related to the warranty. Absent some pre-termination action by GE, the potential voiding of the warranty was too speculative a concern to warrant the drastic sanction of termination for default. For these and other reasons, we find that Footprint has failed to meet its burden of proof that this purported Contractor Event of Default was a proper basis for Footprint's termination of IEP.

### 6.4.5. Failure to Schedule Performance Testing of Emissions Units Within the Time Period Required by Applicable Permits

Section 2.4 of the EPC Contract required IEP to comply with Applicable Laws and Applicable Permits. Section 13.2(d) provided for a Contractor Event of Default if IEP: "(i) fails or refuses to comply with any Applicable Laws or Applicable Permits, and (ii) either (A) within five days after obtaining knowledge of such non-compliance does not commence steps to comply or is not in compliance with such Applicable Laws or Applicable Permits within a reasonable period of time thereafter …."

Footprint's April 15, 2018 letter focused on two Applicable Permits (the Air Quality Plan Approval ("AQPA") and the Prevention of Significant Deterioration permits) that required IEP to complete testing within 180 days after initial firing of each emissions unit to demonstrate compliance with specified emissions limits. The initial firing of the Auxiliary Boiler, Emissions Unit 1 and Emissions Unit 2 occurred on November 8, 2017, December 18, 2017, and February 9, 2018, respectively. Footprint alleges that IEP refused to schedule its emission testing within such 180-day periods, and had scheduled start dates for emissions testing that would occur on December 21, 2018, long after the expiration of such 180-day periods.

*IEP's Position*

IEP disputes Footprint's interpretation of the Applicable Permits, asserting that they required performance testing once the Facility as a whole had achieved the maximum production rate at which it will be operated. IEP also argues that, because completion of the berm and gabion wall was a condition precedent to completing the far field noise test ("FFNT"), and because compliance with all Applicable Permits was a condition precedent to Mechanical and Substantial Completion, it had no choice, absent a change to the AQPA requirements, to carry out Acceptance Tests in the schedule after completion of the berm and gabion wall. IEP asserts that MassDEP representatives agreed it would be premature to perform the FFNT prior to the completion of the berm and gabion wall.

IEP also asserts that this default was "prospective" and "not temporally ripe" because the 180-day periods had not yet expired at the time of its termination. Moreover, IEP argues that it was advancing its testing obligations and would have commenced emissions testing in May 2018 but for the termination on April 15, 2018.

*Footprint's Position*

Footprint argues that IEP had not scheduled emission testing within the 180-day periods outlined above, and that was a material breach of the EPC Contract's requirement.  As for IEP's assertion that Footprint's breach was "not temporally ripe," Footprint states that IEP acknowledged that its final emissions tests would remain scheduled in 2019 after achieving Mechanical Completion.  This was an admitted inability to complete emissions testing within the period required under Applicable Permits.  Footprint claims that it would have been futile to require Footprint to wait until after the expiration of that period, when IEP's violation of the Applicable Permits was complete and the Project had suffered the consequences of IEP's default, before exercising its right of termination on that basis.  Footprint was entitled to rely on IEP's stated anticipatory repudiation of its obligation to perform the emissions tests within the required period.  Footprint also rejected IEP's assertion that it would have started testing in May 2018, based upon the evidence presented in the hearing.

*Tribunal Determination*

The Tribunal finds that the contractual tie between the berm and gabion wall, FFNT and Mechanical Completion meant that either first fire had to be delayed or the 180-day emissions testing period had to be extended.  We have already found Footprint responsible for the delays to the berm and gabion wall and Mechanical Completion.  We also note that Footprint's failure to notify IEP about the changes to the FFNT in relation to Mechanical Completion, Commercial Operation, and the berm and gabion wall affected IEP ability to complete testing within 180 days after initial firing of each emissions unit.  For these and other reasons, we find that Footprint has failed to meet its burden of proof that this Contractor Event of Default was a proper basis for Footprint's termination of IEP.

### 6.4.6.  Failure to Comply with the Safety Requirements of the EPC Contract

Footprint relies upon Sections 13.2(d) and 13.2(i) of the EPC Contract to support its position that IEP failed to comply with the EPC Contract's safety requirements.  As noted in the preceding section, Section 13.2(d) addresses the failure to comply with Applicable Laws and Applicable Permits.  Section 13.2(i) addresses IEP's failure to remedy nonperformance of its safety obligations within 30 days of Footprint's notices of material breach.

*IEP's Position*

IEP asserts that its safety record on the Project was "impeccable and far in excess of industry norms," receiving only one OSHA citation over the life of the Project, which was characterized as "less than serious."  IEP further asserts that the alleged violations were stale by the time of termination and therefore waived by Footprint's acceptance of continued, post-violation performance by IEP.

*Footprint's Position*

In support of its default under Sections 13.2(d) and 13.2(i), Footprint cites Section 2.2(o) for IEP's obligation to take all reasonable precautions for the safety of all persons on site.  Footprint alleges that IEP took a "slack approach" to safety issues on the Project, and Footprint repeatedly pressed IEP to improve its safety performance.  It references February and May 2017 safety audits as evidence of IEP's safety violations, among other alleged safety incidents and concerns throughout 2017 and early 2018.  It also states that IEP's safety record became worse as the termination approached.  Footprint rejected the notion that this default was stale or that it had waived its rights to assert it.

*Tribunal Determination*

While Footprint has cited numerous examples and allegations of IEP's alleged safety violations and problems, the Tribunal disagrees that these examples and allegations, even if taken to be true, were of sufficient significance to constitute a breach under the EPC Contract. As an example, we are not persuaded by Footprint's allegations that IEP was in breach of contract in the final year of its contract based on: (a) the number of Safety Incident Reports generated by Footprint; (b) IEP's discontinuation of its weekly Safety Steering Committee Meetings; or (c) removal of its on-site first-aid clinic. For these and other reasons, we find that Footprint has failed to meet its burden of proof that this Contractor Event of Default was a proper basis for Footprint's termination of IEP.

### 6.4.7.  Failure to Make Prompt Payments to Its Subcontractors

Footprint's April 15, 2018 termination letter alleged that:

Pursuant to Section 13.2(e), a Contractor Event of Default occurs if: "Contractor does not make prompt payment duly owing to a Subcontractor, and such failure continues for 45 days." According to certain Subcontractors, Contractor has failed to make prompt payment to them, and such failure has continued for 45 days or more. The Subcontractors include but are not limited to: O'Connor Corporation, Kenny Construction and AZCO Inc. There may be others of which Owner is not yet aware. Insofar as the Subcontractor's claims are bona fide, Contractor's payment failures have given rise to several Contractor Events of Default.

*IEP's Position*

IEP claims that Footprint has assumed, but not proven, that subcontractor payment complaints were bona fide and that any payments were actually "duly owing to a Subcontractor" as required by Section 13.2(e). IEP also asserts that Footprint has not shown that it ever notified IEP of the alleged non-payment claims that form the basis of its termination. IEP denies that it failed to make prompt payments of sums "duly owing" to its subcontractors and provides lengthy explanations in its Post-Hearing Brief about its payment status with O'Connor, Kenny and AZCO. IEP noted that it bonded over and discharged all mechanics' liens filed on the Project promptly and as required by the EPC Contract. It also states that certain payments to subcontractors were delayed because of Footprint's failure to pay IEP the amounts due it for progress performed, given the "pay when paid" clause in IEP's subcontract.

*Footprint's Position*

Footprint offers the testimony of O'Connor Corporation's former Project Manager to the effect that IEP ordered acceleration for which it never paid. Footprint also points to liens recorded against the Project by several of IEP's subcontractors, and documentation provided by AZCO indicating that IEP had failed to pay amounts allegedly outstanding for more than 45 days. Footprint asserts that these allegations constitute proof of Events of Default under Section 13.2(e). Footprint further states that: (a) IEP only addressed the payment status with O'Connor, Kenny and AZCO; and (b) IEP's bonding of liens is not relevant to the analysis of breach under Section 13.2(e).

*Tribunal Determination*

The Tribunal finds that Footprint has failed to prove that any sums were "duly owing" to subcontractors at the time of termination. Generally speaking, mechanics' liens and complaints by subcontractors over payment do not constitute proof that monies are due or that a general contractor has violated its payment obligations. This is particularly the case on a project like this, where there are major

claims filed by the contractor that are disputed by the owner, and where the owner has stopped making payment to the general contractor.  Footprint has also given no adequate explanation for why IEP would be in default given the "pay when paid" clause in the subcontracts.  For these and other reasons, we find that Footprint has failed to meet its burden of proof that this Contractor Event of Default was a proper basis for Footprint's termination of IEP.

### 6.4.8.   Failure to Comply With Permits Governing Transportation of Equipment and Materials to the Site

This Contractor Event of Default is based on IEP's use of trucks to deliver equipment and materials to the Project site.  Footprint's April 15, 2018 letter asserted that IEP's use of trucks breached Section 2.8 of Schedule 2.2 of the EPC Contract, which states that:

> Equipment, construction equipment and materials will be delivered to the EPC Site via barge or suitable ocean vessel unless delivered in box trucks or common delivery vehicle. Articulated tractor trailer deliveries and larger heavy lift equipment shall not be used to deliver … equipment without the specific approval by Owner.

The letter also asserted that the use of trucks violated EFSB permit requirements, as well as the Traffic Management Plan submitted to the City of Salem and the Construction Management Plan, all of which allegedly required IEP to transport materials and equipment to the site by barge.

### *IEP's Position*

IEP asserts that the Project permits do not prohibit trucking of materials or equipment to the Site, that any violation was stale by the termination, and that any excessive trucking was, at best, a minor, technical breach that caused no damage to Footprint, and without damage there cannot be a breach.  IEP also asserts that Footprint's Mr. Christensen acknowledged that the trucking issue was used by Footprint solely as a means to gain leverage over IEP in commercial negotiations.

### *Footprint's Position*

Consistent with its April 15, 2018 letter, Footprint asserts that the various permits all required delivery of material and equipment by barge, and that IEP repeatedly violated these provisions.  Footprint alleges that it repeatedly notified IEP of such violations, but that IEP continued to deliver materials and equipment by truck without Footprint's prior approval, leading to an August 7, 2017 notice to IEP that Footprint considered it to be in material breach.

### *Tribunal Determination*

The greater weight of the evidence supports IEP's position that the Project permits did not prohibit either Footprint or IEP from trucking materials and equipment to the site. We are particularly influenced by: (a) the language of the permits, which do not expressly prohibit the use of trucks; and (b) the absence of evidence of any significant objections from the City of Salem to IEP's use of trucks for delivery of equipment and material.  We are also influenced by Mr. Christenson's testimony that Footprint was using these alleged breaches to gain leverage over IEP.

The Tribunal finds that these allegations of breach arose well after the bulk of the trucking had occurred.  If Footprint had seriously believed that the trucking issue was a breach warranting default termination, it should have done something well before it did.  We agree with IEP that this is a "stale"

claim, and that even if the evidence demonstrated that IEP was in violation of the permits or in breach of the EPC Contract, we would find that Footprint is estopped by its actions from raising it.

For these and other reasons, we find that Footprint has failed to meet its burden of proof that this Contractor Event of Default was a proper basis for Footprint's termination of IEP.

### 6.4.9.  Material Breaches of Other Obligations Under the EPC Contract.

In addition to the above alleged Events of Contractor Default, Footprint's April 15, 2018 letter identified the following alleged Events of Default:

- Termination Basis #9 – Contractor's Replacement of Project Director without Owner's Consent.

- Termination Basis #10 – Failure to incorporate Owner's comments with respect to multiple Design and Development Construction Documents.

- Termination Basis #11 – Failure to properly manage surplus AUL soils, and re-use of such soils

- Termination Basis #12 – Failure to provide Owner with timely, reasonable and prudent forecasts of natural gas needs.

- Termination Basis #13 – Failure to comply with Owner's requests for unpriced copies of the Subcontracts with Major Subcontractors.

- Termination Basis #14 – Failure to provide copies of the purchase order of all supplies, materials, and/or equipment used with respect to all Work for which Contractor has submitted an Application for Payment, or that the Contractor has performed.

- Termination Basis #15 – Failure to deliver to Owner a copy of each Subcontractor's executed acknowledgement and agreement of Section 2.8(c).

Both Parties provided summaries of their perspectives in their respective post-hearing submissions based on the record.  The Tribunal has reviewed the record and respective submissions.  Unlike the previous Contractor Events of Default, we will not repeat each Party's position herein.

The Tribunal finds that Footprint has failed to meet its burden of proof that the above-referenced Contractor Events of Default were a proper basis for Footprint's termination of IEP.  We reach this finding on several grounds, including but not limited to: (a) Footprint's failure to act on these alleged breaches for such an extended time estops Footprint from relying on them on April 15, 2018 as a basis for termination; (b) the minor nature of all of them, which under our view of both the EPC Contract and applicable law precludes them as being used as a basis for terminating IEP; and (c) the fact that many of these are addressable through money damages, not a default termination.  We were also heavily influenced by the failure of Footprint to demonstrate that IEP actually breached its obligations with respect to these items, or that IEP was given an ample opportunity to cure under the EPC Contract and applicable law.

### 6.5.    Other Issues Bearing Upon Termination

As noted in the discussion on applicable law, IEP raised several defenses to the default termination that were not directly related to the Section 13.2 events of default.  There were also some issues that arose

over the course of the hearings and in the Parties' submissions that were relevant to the termination. Based on our findings in Section 6.4, we need not address any of these defenses or issues. However, because our opinions of the case have been influenced by some of these defenses and issues, we wanted to briefly provide our thoughts on them.

### 6.5.1.  General Standards for Termination

IEP provided ample authority for the argument that the party terminating a construction contract for cause has a hefty burden to demonstrate that the termination was proper, and that, because termination is a drastic action, the breaches have to be material and significant. The Tribunal finds that the standards under New York law on this issue are essentially the same as those throughout the country. Consequently, while we examined Footprint's default events based on the language of Section 13.2 and the EPC Contract, we were mindful of the general standards as well and the spirit and intent of that contract.

In this regard, we found that many of the breaches alleged by Footprint were, in the context of terminating a $700 million EPC contract, minor, technical and immaterial breaches. We also concluded, as we stated to some extent in Section 6.4, that many of the alleged breaches were stale, which was a strong indication that even Footprint did not think at the time they occurred rose to the level of being a basis for termination. Stated differently, the fact that there are some problems or specific breaches of an obligation under an EPC Contract like this does not simply equate to that problem or breach being the basis for a termination. By raising a laundry list of minor defaults in its April 15, 2018 termination letter (e.g., failing to incorporate Footprint's changes into design documents and failing to give unpriced P.O.s from subcontractors), Footprint demonstrated that it was reaching for ways to justify the default and diminished its credibility with the Tribunal.

IEP argued extensively that the Project was substantially performed and that under New York law this was a basis for finding the termination deficient. Because Footprint disagreed with this, the Parties provided their respective evidence of what percentage completion had been achieved and what work remained, and why that evidence supported each of its positions. While the Tribunal was not heavily influenced by the details of what each Party raised in our deliberations, we were influenced by the fact that, under any definition of completion, the Project was quite far along, and that an owner's "late stage" termination for default imposes some obligation to justify why it has taken this step, as opposed to relying upon other remedies in the contract – given the general principle that termination is a drastic action and particularly when a $140 million LOC draw is at stake for the contractor.

### 6.5.2.  Footprint's Alleged Breach of Contract

IEP argued generally that Footprint was in breach of contract as of April 15, 2018, and that this rendered its default improper. One of the allegations made by IEP in support of that position was the failure of Footprint to be forthcoming with the status of permits, as well as Footprint's discussions and agreement with ISO-NE about the May 31, 2018 deadline.

The Tribunal does not need to make a finding on whether Footprint was in breach of contract on any ground given our conclusions under Section 6.4 above. However, as we indicated in our discussion of delays to the berm and gabion wall, we were heavily influenced by Footprint's lack of forthrightness on all of these issues. This was a strong indication to us that Footprint was purposefully hiding information from IEP for tactical reasons, and that, as it pertains to the termination, Footprint appears to have made the decision to default terminate IEP by late 2017, or no later than January 2018, and spent the early months of 2018 preparing to execute that decision. Footprint could offer no compelling reason as to why it did not directly disclose to IEP both: (a) the "mandate" from ISO-NE as to when the plant needed to be in

commercial operation; and (b) the fact that the EFSB had authorized the plant to be in commercial operation without the berm and gabion wall being completed.

As a result of these two actions, Commercial Operation, versus Substantial Completion, became the priority. This required Footprint to work with IEP to achieve this change, as Commercial Operation under the executed EPC Contract was to follow Substantial Completion. Instead, the evidence demonstrates that Footprint kept IEP in the dark, and continued to draft its letters and demands around Substantial Completion. Our view on this is unchanged by the notion that settlement negotiations were undertaken to modify the EPC Contract, particularly when Footprint was withholding critical information that was relevant to the settlement discussions and IEP's ability to execute the work. We believe that these actions by Footprint violated, among other things, Section 3.10 ("No Interference") of the EPC Contract, whereby Footprint was not to "intentionally … unreasonably interfere with Contractor's performance of the Work at the Facility Site."

Finally, we make a note about the sequencing of Commercial Operation and Substantial Completion. Until Substantial Completion, IEP had risk of loss under the EPC Contract (as is normally the case), and after Substantial Completion this shifted to Footprint (under Section 6.4 of the EPC Contract). When Commercial Operation occurs before Substantial Completion, this creates a major uncertainty and risk for a contractor, not only in terms of risk of loss, but also its ability to complete its work to achieve Substantial Completion (particularly relative to performance testing) without being interfered with by the plant's operation. For Footprint to accomplish this, it needed to reach agreement with IEP to modify the contract, yet never did.

### 6.5.3.  Footprint's Termination Process and Settlement Discussions

One of IEP's major defenses to the default termination was its claim that Footprint engaged in a bad faith scheme to accomplish a number of improper objectives, including getting access to the LOC proceeds. Footprint not only objected to this, but claims that IEP was engaged in its own bad faith scheme to put pressure on Footprint through, among other things, its October 2016 "Action Plan" and abandonment of the work in 2018 by not complying with Footprint's Section 10.6 directives.

As the timeline in Section 6.3 indicated, many things were happening from November, 2017 (when Footprint began to think about terminating IEP) through April 15, 2018 (when it formally executed the termination). We already noted in the preceding section that the evidence demonstrates to us that Footprint had made the decision to terminate by no later than January, 2018 – based on how it handled disclosure of information. However, we also found that Footprint's position and witness testimony asserting that the "final" decision to terminate did not occur until a Board meeting on the morning of April 15, 2018 did not ring true. The overwhelming weight of the evidence demonstrated that Footprint had tactically decided to wait as long as it could to terminate IEP and still achieve Commercial Operation by May 31, 2018. Because Footprint had stopped paying IEP, this meant that IEP would be funding completion costs (to the advantage of Footprint). Termination also ensured Footprint that it could get access to $140-plus million in LOC proceeds.

There was substantial evidence that this was Footprint's plan. However, it was made abundantly clear by two points:

- Footprint failed to specifically tell IEP that there was a Commercial Operation drop-dead date of May 15/31, 2018 because of ISO-NE, and that any of its schedules had to meet that date. Instead, testimony showed that IEP had to provide its own projected dates of completion, not knowing the ISO-NE requirement. Footprint then used these IEP-generated dates as grounds for saying that IEP could not meet the ISO-NE requirements.

- Footprint not only never gave IEP a best and final offer, but it never said that it needed IEP to provide a best and final offer. While there is nothing under the EPC Contract or applicable law that mandates Footprint giving a best and final offer, the fact that Footprint did not do so is relevant to its claims that it was open to keeping IEP on the Project. Footprint's witnesses were unable to state exactly what that offer needed to be, and danced around the question of whether Footprint's April 12, 2018 term sheet represented Footprint's best and final offer. Even as late as April 14, 2018, IEP believed that it was negotiating with Footprint and Footprint was sending strong signals that IEP's soon-to-be-submitted offer later in the afternoon of April 14, 2018 could be subject to a negotiation in New York.

The greater weight of the evidence supports the view that Footprint was going through the motions to make it appear that it was openminded to IEP remaining on the Project, when it really was not.

### 6.6.    Remedy for Wrongful Termination

Having found that Footprint wrongfully terminated the EPC Contract, the question before the Tribunal is what IEP's remedy should be.

*IEP's Position*

IEP argues strenuously that New York law is well-settled, and allows a wrongfully terminated contractor to "collect either [i] in *quantum meruit* for what has been finished, or [ii] in contract for the value of what plaintiff had lost – that is, the contract price, less payments made and less the cost of completion," citing *New Era Homes Corp. v. Forster*, 299 N.Y. 303, 307 (1949) (citations omitted), and *Paterno & Sons v. Town of New Windsor*, 43 A.D.2d 863, 864 (2d Dept. 1974). It also quotes from *Contractor's Damages for Wrongful Termination*, 4E N.Y. Prac., Com. Litig. in New York State Courts § 121:47 (4th ed.):

> If you find that the termination of Contractor's services under the Contract was a wrongful act by Owner, … that you should award Contractor the difference between the 'reasonable value' of the work that Contractor performed and the amount that Contractor was paid for its work.

Further, it quotes from *G.C.M. Metal Indus., Inc. v. J.B.C. Contracting Co., Inc.*, 7 Misc.3d 1031(A), at *5 (Sup. Ct. N.Y. County 2005):

> When the contract is terminated by one party against the consent of the other, the latter will not be confined to the contract price, but may bring his action for a breach of the contract and recover as damages all that he may lose by way of profits in not being allowed to fulfil the contract; or he may waive the contract and bring his action . . . for work and labor generally, and recover *what the work done is actually worth.*  (Citations omitted; emphasis added.)

IEP asserts that the Tribunal's task is to decide the reasonable value of IEP's work in *quantum meruit*, which, it asserts, is traditionally measured according to the formulation of termination for convenience damages under the EPC Contract (e.g., actual job cost, plus an allowance for overhead and profit, less amounts paid), citing *TY Elec. Corp. v. Delmonte*, 101 A.D.3d 1626, 1626 (4th Dept. 2012), *Najjar Indus. v City of New York*, 87 AD2d 329, 331-332 (1s Dept. 1982), and *Whitmyer Bros. v State of New York*, 47 NY2d 960, 962 (1979).

Further, IEP asserts that the cases cited by Footprint for its position that under New York law, wrongful termination damages are measured by the contract price, less payments made and less the cost of

completion are either not termination cases at all, or are termination cases where the wrongfully terminated contractor chose that measure over quantum meruit damages.

Relative to the question of how to handle Footprint's costs to complete, IEP's position is quite straightforward: "[i]f the Tribunal finds Footprint's termination of the EPC Contract to be wrongful, there is no mechanism in the EPC Contract or under New York law for Footprint to recover its costs to complete post-termination," citing *Gulf Ins. Co. v. Fidelity & Deposit Co. of Md.*, 16 Misc.3d 1116(A), *4 (Sup. Ct. N.Y. Cnty. June 20, 2007).

### *Footprint's Position*

Footprint quotes from *Hydraulitall v. Jones Inlet Marina, Inc.*, 71 A.D.3d 1087, 1089, 899 N.Y.S.2d 266 (2d Dept. 2010) for the proposition that New York law is clear that "[t]he general measure of damages in an action for breach of a fixed-price construction contract, where full performance of the contract is prevented by the owner, is 'the contract price, less payments made and less the cost of completion.'" Footprint cites several other New York cases for the same proposition, e.g., *Sproston v. Dias*, 112 N.Y.S.3d 436, *8 (N.Y. Sup. Ct. 2018), *Pilgrim Homes & Garages, Inc. v. Fiore*, 75 A.D.2d 846, 427 N.Y.S.2d 851, 853 (2d Dep't 1980), *Frank v. Feiss*, 266 A.D.2d 825, 698 N.Y.S.2d 363, 364 (4th Dept. 1999), and *Beaumont Birch Co. v. Najjar Indus., Inc.*, 477 F. Supp. 970, 972 (S.D.N.Y. 1979).

Relative to the question of how to handle costs to complete, Footprint argues that even if the Tribunal finds the termination wrongful, Footprint would still be entitled to an offset in the amount of its excess costs of completion. Further, Footprint asserts that if the Tribunal finds that IEP is entitled to damages on any of its claims, Footprint's cost to complete in excess of the remaining Contract Price should be offset against any such damages.

### *Tribunal Determination*

The Tribunal finds that Footprint has more accurately established the remedy for wrongful termination under New York law and the situation in this case. We did not find that the New York precedent cited by IEP in support of quantum meruit was analogous to this dispute, other than that they appeared to involve wrongful terminations. The projects discussed in these cases were relatively simple, the dollar values in dispute relatively small, and the reasons for the defaulted contractor choosing quantum meruit unclear. Importantly, these cases did not consider whether the formula for measuring quantum meruit damages advocated by IEP (i.e., the recovery of all of its actual costs plus overhead and profit) was appropriate when the defaulted contractor's actual job costs were inflated by self-inflicted wounds. Given this, we concluded that IEP did not demonstrate that there is binding precedent under New York law to justify the application of a quantum meruit theory of recovery under the facts of the case before us.

We were particularly influenced by the clear evidence of IEP's overall performance on this Project. Its self-inflicted wounds include bid errors, management shortcomings, and subcontractor and design consultant performance issues. They also include the costs incurred by IEP for the challenges and delays that it experienced on the power island, which we found were the sole responsibility of IEP and not caused by or the contractual responsibility of Footprint. There is compelling evidence that IEP would have lost hundreds of millions of dollars on the Project due to self-inflicted wounds. Given this, we found that IEP's view of "what the work done was actually worth" was not persuasive, notwithstanding its expert testimony to that effect.

We evaluated whether we could find another way to establish "what [IEP's] work done is actually worth," such as by discounting or reducing some of the aggregate costs incurred by IEP. Even if we were inclined to find such a way, and had the authority to do so under New York law, we found no reasonable

and logical way to accomplish this.  The self-inflicted wounds extended to far too many different categories of costs, and IEP's approach of having "all or nothing" on its quantum meruit approach made it inappropriate for us to try.  We also concluded that, after all was said and done, IEP's alternative "contract damages" approach, was a reasonable way to address the wrongful termination.

Regarding how to address costs to complete, we determined that neither Party's position was accurate or appropriate.  Contrary to IEP's position, we find that the reasonable cost to complete needs to be offset as part of the formula for determining damages under a wrongful termination.  Contrary to Footprint's position, we do not find that the costs incurred by Footprint to complete are the benchmark for what should be offset, and disagree that this is the New York standard.  Footprint's position essentially equates the remedies for a wrongful termination with those for a proper termination.  We do not find support in this equivalency under New York law, the EPC Contract or equity.  Our position is that the trier of fact (i.e., the Tribunal) can look at all the evidence and determine what a reasonable value is for the cost to complete, and that we are not bound by, nor need be heavily influenced by, Footprint's actual costs to complete.  This will be addressed further in Section 8.2.1 below.

## 7.  Massachusetts' Unfair Trade Practices Act ("Chapter 93A")

Footprint has a claim that IEP violated Massachusetts General Laws Chapter 93A.  Under Section 11 of Chapter 93A, "[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in . . . an unfair or deceptive act or practice" may assert a claim.  Footprint argues that Massachusetts courts have held that "coercive or extortionate tactics designed to extract undeserved concessions" constitute a violation of Chapter 93A.  Footprint also argues that IEP engaged in such tactics, as well as committed other actions that are actionable under Chapter 93A.  As noted in Section 4 above, its claim seeks treble damages under this statute.

IEP argues that Chapter 93A is inapplicable to the EPC Contract and to the claims at issue because the EPC Contract is governed by New York law and contains exclusive remedies and limitations of liability provisions that preclude the application of Massachusetts law and tort theories.  Footprint does not deny that New York law applies to the EPC Contract, but argues that its Chapter 93A claims are extra-contractual and, therefore, fall outside the choice of law, exclusive remedies and limitations of liability provisions in the EPC Contract.  IEP responds that even if Chapter 93A applies, the facts do not support the relief requested and that if any Party has committed Chapter 93A violations, it is Footprint.  As noted in Section 4 above, IEP argues that if the Tribunal were to find Chapter 93A applicable, IEP would be entitled to treble damages in its favor based on Footprint's conduct.

The Tribunal agrees with IEP that Chapter 93A is inapplicable based on Section 18.9 of the EPC Contract, which states that the EPC Contract shall be governed by, and construed in accordance with, the laws of the state of New York.  We did not find persuasive Footprint's argument that its Chapter 93A claims were based on tort, and therefore outside of Section 18.9.  Footprint's primary claims in this proceeding were that that IEP breached the EPC Contract, and it failed to meet its burden of proof that its tort damages were distinct from its breach of contract damages.[35]

Even if Chapter 93A was applicable, we conclude that neither Party met its burden of proving entitlement to relief under its provisions.  More specifically, neither Party demonstrated that the actions attributed to the other Party rise to the level that would constitute an actionable claim for willful misconduct

---

[35]  While we do not repeat herein case citations contained in IEP's Post-Hearing Brief (Part III, pp. 15-18), we note that these cases support our conclusions that Footprint did not demonstrate that it suffered a distinct injury or harm arising out of IEP's alleged bad conduct.

or deceptive practices under Chapter 93A.  This was a high stakes project for both Parties, and each Party at times took steps the other found to be uncooperative and aggressive.  However, each Party took steps to protect its commercial position, as to be expected from experienced and sophisticated players.[36]

For example, Footprint puts particular emphasis on the October 2016 internal IEP meeting that it contends resulted in an "Action Plan" to manufacture leverage to mitigate its margin loss through, among other things, launching a barrage of unfounded claims.  From the Tribunal's perspective, given the losses that IEP was incurring and the overall "hard-nose" contractual attitude of Footprint – particularly around the berm and gabion wall and 48-inch drain line, we would have been surprised if senior IEP executives had not met to discuss the Project and ways to respond to the uncooperative treatment it had been receiving from Mr. Yavary and his team.  The merits of those barrage of claims ultimately had to be convincing to an arbitration panel, but we found nothing wrong in having them asserted.  IEP was protecting its commercial position.

We have the same view of Footprint's conduct.  The uncooperative attitude of Footprint was intended, for reasons that only they know, to protect Footprint's commercial position.  The effect of that on the merits of Footprint's positions would eventually be considered by an arbitration panel.  So too would the failure of Footprint to disclose key information.  In fact, there is a similarity between: (a) the meetings Footprint held internally and with its lenders to strategize about how to terminate IEP's contract and draw down IEP's $140 million LOC; and (b) IEP's internal October 2016 meetings.  All were calculated to protect each Party's commercial position on a troubled project.

None of this is to be construed as the Tribunal condoning "sharp" business practices.  In fact, we have been highly critical of the approach taken by Footprint on several issues, and specifically noted that neither Party distinguished itself by its performance on the Project.  And the "sharp" business practices and performance shortfalls influenced how we viewed the credibility of the Parties' positions and witnesses.  However, given the sophistication of the Parties, we are unwilling to extend the remedy of treble damages under Chapter 93A to either Party, finding that the conduct contemplated under that statute is not present here.

## 8.  Damages

This section addresses the damages that each Party has sought based on its claims and counterclaims.

### 8.1.  IEP's Damages

Based on the Tribunal's determinations in Section 6, we have found that IEP is not entitled to recover in *quantum meruit*, but rather based on its alternative, breach of contract, claim.  A summary of the amounts claimed by IEP is set forth in Section 4 above.  This claim is essentially based upon the approach advocated by Footprint and which we agreed upon in Section 6.6 above, where the measure of damages for an owner's wrongful termination of a lump sum contract follows a relatively straightforward formula.  This formula considers the Contract Price (adjusted for changes), less amounts paid the contractor, less the reasonable costs to complete the work under the EPC Contract.

---

[36]  In this regard, Footprint has not shown that IEP's conduct constituted either gross negligence or willful misconduct in its attempt to void the limitation of liability clause in the EPC Contract. Aggressive commercial conduct motivated by economic self-interest, as present here, is insufficient to establish gross negligence or willful misconduct under New York law.

The following determination on IEP's damages follows the order that IEP used in its post-hearing submissions. As to the deduction for the reasonable cost to complete, we will address that under Section 8.2.1 below, where we consider Footprint's damages. We further note that both Parties used expert witnesses to support their positions on damages, and that Footprint has contested virtually every element of IEP's damages.

### 8.1.1. Non-Payment of Earned Contract Balance and Retainage

IEP seeks the recovery of $61,005,218 for this claim element. It is based upon the amounts earned and approved through February 27, 2018 in IEP Application for Payment ("AFP") 41.4. This amount is comprised of: (a) $26,286,759 for unpaid contract work; and (b) $34,718,459 in retainage through that date and AFP. AFP 41.4 shows a total amount billed of $694,369,181, and total amounts paid of $633,363,963.

We note that IEP's Final Payment Application for work performed through April 15, 2018 (AFP 41.5) shows an amount due of $75,486,126, with a total amount billed of $708,850,088.62. The differences between AFP 41.4 and AFP 41.5 are for: (a) Undisputed Works in the amount of $980,908;[37] and (b) $13,500,000 for cost sharing under Section 5.4(a) of the EPC Contract. Each of these items is addressed below, as they are within different elements of the claim.

Footprint does not provide any meaningful defense to the $61,005,218 for this claim element. Its primary position is that Footprint has incurred costs to complete and correct IEP's scope of work, and that this is an offset to the amount identified herein. As noted earlier, we will address deductions for costs to complete later in this Section.

The Tribunal finds that IEP has met its burden of proving that it is entitled to the unpaid earned contract balance and retainage in the full amount of $61,005,218.

### 8.1.2. CONs 61, 72 and 70

As noted earlier in this Award, IEP filed three major Change Order Notices that it alleged had a major impact on its costs and time to perform the work: CON 61 (Constructive Acceleration and Delays to Power Island); CON 72 (Unanticipated and Untimely Construction of Administration Building); and CON 70 (Berm and Gabion Wall). For purposes of calculating the claims, CON 61 and 72 were combined for a total of $144,110,317, and CON 70 was $10,604,714 (total of $154,715,031).

CONs 61 and 72 were discussed in Section 5.2 above relative to the power island delays and disruptions, and the alleged acceleration that followed. We found that IEP was responsible for the problems associated with CONs 61 and 72, and that Footprint is not responsible for the time or money associated with these claims. As to CON 70, while we did find that Footprint was responsible for such delays in Section 5.1 above, our overall conclusion in Section 5.3 was that these berm and gabion wall delays were concurrent with the power island delays. Therefore, while a time extension is due, IEP is not entitled to the costs associated with CON 72, as we find that they all are time-based costs that are not recoverable when there is a concurrent delay.

Accordingly, the Tribunal finds that IEP has failed to meet its burden of proof that it is entitled to an award for the costs claimed by it in CONs 61,70 and 72.

---

[37] The actual value of the Undisputed Works, as presented during the hearings and discussed below, is $2,198,172, as will be discussed in Section 8.5.1 below.

### 8.1.3.  Massachusetts Sales Tax

IEP contends that Footprint has failed to reimburse it for any Massachusetts sales tax which is due it, pursuant to Sections 2.2(f) and 3.14(a) of the EPC Contract.  IEP complains of Footprint's refusal to pay any reimbursement of Massachusetts sales tax, despite the fact that such taxes were clearly reimbursable under the EPC Contract.

IEP asserts that Footprint used hyper-technical reasons to avoid paying these monies, and uniformly refused to pay IEP a single cent in Massachusetts sales tax invoiced by IEP during the Project.  IEP alleges that it provided Footprint with invoices accompanied by compliant records of Massachusetts sales tax payments. Instead of paying the amounts it owed, Footprint allegedly responded with baseless and contrived excuses for not reimbursing any of the sales tax reimbursement claimed.  IEP complains of Footprint's refusal to reimburse any amount on an invoice even if it contained the most minimal error or invalid entry. As the job progressed, IEP described how Footprint's rejections failed to provide any basis for its rejection of the sales tax reimbursement.

The total amount of IEP's claim for sales tax is $1,018,439, based on the McGeehin Errata Report.[38] Mr. McGeehin notes that $874,937 of this amount is claimed under this category, and $143,502 of this amount is claimed under other claim components.[39]

Footprint contends that it was always willing to comply with the EPC Contract and pay reimbursements based upon valid submissions by IEP. Nevertheless, it claims IEP's failure to comply with the express requirements of the EPC Contract justified Footprint's not paying any reimbursement. Specifically, Footprint asserts that, under Section 3.14(a) of the EPC Contract, IEP was required to establish entitlement to reimbursement demonstrating seven conditions:

1.      The sales tax is a Massachusetts tax;

2.      The tax was actually paid to the Commonwealth of Massachusetts;

3.      The tax paid related to the work (as opposed to other categories of expense such as overhead);

4.      The sales tax was an incremental lability to IEP;

5.      The sales tax incurred did not qualify for an exemption;

6.      The sales tax was not incurred due to any action or inaction of IEP (such as failing to pursue an exemption); and

7.      IEP issued documentation to exempt or reduce any applicable sales tax.

Footprint further contends that IEP is only entitled to reimbursement of sales tax if it is able to demonstrate, on an invoice-by-invoice basis, that it satisfied the requirements of Section 3.14(a), and that IEP failed to make the showing during the Project and in this arbitration.

---

[38]  We note that IEP claimed in its Post-Hearing Brief $1,085,666.34 for sales tax, which appears to be based on an earlier number before Mr. McGeehin made his adjustments.

[39]  McGeehin Day 19, Tr. 5635-37.  The $143,502 amount is set forth in Schedules 6 and 6.1 of the McGeehin Rebuttal Report.

Based on the chronology of events surrounding IEP's invoicing for reimbursement of sales tax payments and Footprint's uniform rejection of those invoices, often without stating the basis for rejection, it very much appears to the Tribunal that Footprint's confrontational project management style was at play. We find it difficult to understand, given that IEP had the contract right to be reimbursed for Massachusetts sales tax, that Footprint could not justify a single dollar of entitlement to sales tax throughout the life of the Project and in the arbitration itself. The weight of the evidence is that Footprint was abusing its review rights on this item, and relying on, among other things, insignificant clerical errors and minutia, as justification for its wholesale rejection of otherwise valid invoices. This is a disregard of its duty to cooperate, among other things.

The Tribunal is influenced by two additional points. First, it was evident that Mr. McGeehin conducted a thorough review of sales tax, and determined that IEP had paid the amounts claimed. The Tribunal specifically asked Mr. McGeehin questions on this subject and was satisfied that he had investigated this fully and fairly. Second, IEP offered nothing during the hearing to rebut Mr. McGeehin's quantification and analysis, other than to continue to base its objection on the seven items that it had relied upon during the course of the Project.

The Tribunal finds that IEP adequately responded to Footprint over the course of the Project on this issue and reasonably supported its reimbursement request. We further find that IEP has met its burden of proof on this claim and is entitled to the amount of $1,018,439, as contemplated by Sections 2.2(f) and 3.14(a) of the EPC Contract.[40]

### 8.1.4.  Cost Sharing

IEP claims it is owed $13,500,000 pursuant to Section 5.4(a) of the EPC Contract and that Footprint is in breach of contract for having refused to pay it. This provision reads as follows:

> Notwithstanding any other provision of this Contract, if at any time prior to Final Completion aggregate Construction Costs exceed $273,600,000, Owner shall reimburse Contractor for such excess over $273,600,000 of Construction Costs at a rate of 75% of such excess Construction Costs, up to a maximum amount of $13,500,000. For the purposes of this Section 5.4, "Construction Costs" means Direct Costs incurred by Contractor in carrying out the activities listed in Schedule 5.4(a).

The term "Direct Costs" is defined in the EPC Contract to "mean only the actual costs that are directly incurred by Contractor in connection with any Change for the following items …"

Footprint has based its rejection of this claim on the argument that IEP has not demonstrated that it incurred costs of more than $273,600,000 "in connection with any Change" in carrying out the activities listed in Schedule 5.4(a) of the EPC Contract. IEP contends that costs triggering the reimbursement were not intended to be limited to those incurred only in connection with Changes, but for the aggregate of all construction costs. It contends that the limiting of costs only to Changes was an error and it would be non-sensical to require Changes to exceed $273,600,000 or roughly 40% of the original Contract Price before cost sharing could occur.

---

[40]  In arriving at this finding, we specifically examined Schedule 6.1 and Footnotes 8, 9 and 10 to that Schedule, which address the $143,502 amount referenced above. While the Tribunal rejected IEP's entitlement to these other claim components, we did not address or make any findings in this Award on the sales tax component for those claims. Based on the McGeehin Errata Report and other evidence, we find that $143,502 amount has not been recovered elsewhere in this Award and that IEP is due such monies under Sections 2.2(f) and 3.14(a) of the EPC Contract.

In advancing its position, IEP explains that Footprint's interpretation was contrary to the intent of the parties, as the Section 5.4(a) reimbursement was to be funded from a contingency having nothing to do with Changes, and distinct from the Owner's contingency expressly relating to the funding of Changes. IEP relies upon support from Site Manager Majid Yavari who testified that during construction he understood the computation under this provision was not limited solely to the growth of costs of Changes. IEP also heavily relies upon the testimony of Footprint's principal, Peter Furniss, who negotiated the clause on behalf of Footprint.[41]  He acknowledged that the intent of Section 5.4(a) had nothing to do with change orders, but was to deal with cost sharing when construction costs exceeded the $273,600,000 threshold. Mr. Furniss further acknowledged that the provision, as drafted, is nonsensical.

Footprint argues, among other things, that under New York law the express terms of the EPC Contract must be given full effect, and that Section 5.4(a) unambiguously refers only to costs relating to Changes. Footprint attempts to explain away Messrs. Furniss and Yavari's expressions to the contrary by relying on the merger clause of the EPC Contract to negate any pre-contracting conflicting terms. It also states that IEP failed to seek reformation of Section 5.4(a) by arguing mutual mistake.

The Tribunal finds that IEP has met its burden of proof on this claim, and is entitled to $13,500,000 under Section 5.4(a) of the EPC Contract. The testimony presented in the hearing confirmed that this clause was not intended to address "changes" exceeding $273,600,000, but was intended to be for increases in the aggregate of construction costs incurred by IEP. We agree with Mr. Furniss that using Changes as a basis would be nonsensical. We are influenced by the fact that Footprint never introduced any witness to say that the intent was contrary to this, and never introduced evidence from the lawyers who drafted this clause to explain why this language captured the intent of the Parties and why Mr. Furniss, who did negotiate this provision, was mistaken. IEP has demonstrated, and there does not appear to be any dispute, that it incurred costs sufficiently in excess of $273,600,000 to justify being paid the entire $13,500,000 contemplated by Section 5.4(a) and the Parties.

In reaching our determination, we reject Footprint's argument that the merger clause precludes our consideration of the parole evidence on this issue, as we find that Section 5.4(a) is not free of ambiguity. We also find that IEP has demonstrated by clear and convincing evidence that Footprint's interpretation of Section 5.4(a) does not express the intentions of either Party, and, consequently, that if that was the interpretation, it would constitute a mutual mistake requiring reformation.

### 8.1.5. Amounts Invoiced as "Undisputed Work"

IEP claims the following six items that it characterizes as "Undisputed Work" and included in AFP 41.5:

- CON 71 (Foundations for Demineralized Water Containers) ($66,431)

- CON 74 (Interference in Unit 5 with NGrid) ($246,371)

- Change Order Request Gabion Wall – Berm Design ($15,361)

- Telecommunications System Scope ($1,257,285)

- Gabion Wall Construction ($281,007)

---

[41] Furniss, Day 10, Tr. 2805-09.

- Revised Berm Construction ($331,717)

The total amount of these items is $2,198,172.  Footprint disputes IEP's entitlement to these items on the grounds set forth below.  We will review each of them in the sections that follow:

### 8.1.5.1.  CON 71 (Foundations for Demineralized Water Containers)

This CON involves IEP's claim that it incurred additional design and construction costs in providing a concrete foundation to support the demineralized water containers instead of the asphalt paving that it alleges was specified in the EPC Contract.  Both Parties agree that Footprint had responsibility under the EPC Contract to provide the demineralized water system, contemplated to be in the format of several unit trailer/container mounted equipment modules.  IEP's scope of work for this particular work was to provide the civil and related work to accommodate that system.  Section 4.13.3 (Demineralized Water Makeup System) of Schedule 2.4 of the Technical Specification stated that IEP was to provide: "Paved [outdoor area for 2 filter and 2 demineralizer trailers (assume x57' x 45')."  Footprint selected GE Water as the vendor for the water system.

IEP claims that its scope and original design assumptions were based on the July 17, 2013 Permit Drawings, which were incorporated into the EPC Contract.  These plans specified a Demineralized Water Storage Tank with specific dimensions.  GE Water ultimately provided a system that, according to IEP, was different from what was in the Permit Drawings and had significantly greater dimensions and loads than expected from those Permit Drawings.  Consequently, instead of providing a Demineralization Tank that would rest on asphalt, the GE Water system chosen by Footprint required a continuous concrete foundation with process drains, grounding and locks that occupy half of the trailer area, with the remainder of the area remaining paved with asphalt.[42]

Footprint objects to this claim on the grounds that: (a) the reference to "paved area" does not prove that concrete was out-of-scope, as pavement can refer to concrete; (b) the paved area was ultimately smaller than contemplated in the EPC Contract and there was no attempt by IEP to provide a credit for this; (c) CON 71 was untimely and inequitable, and IEP was dilatory in performing this work; and (d) IEP failed to provide supporting documentation.[43]

The Tribunal finds that IEP has met its burden of proof on CON 71, and is entitled to the full $66,431 claimed.  While we agree with Footprint's point that the term "paved areas" could be construed to mean either asphalt or concrete, we do not construe that term to include concrete foundations and the extensive civil work that IEP was ultimately required to perform to accommodate Footprint's GE Water system.  The written and testamentary evidence demonstrates that Footprint (through GE Water) ultimately provided a system that had substantially greater dimensions than set forth in the Permit Drawings.  This appears to be the reason that a more robust substrate than a paved surface was required, as evident by what IEP designed and installed.  We are particularly influenced by IEP having been required to install rigid piping connections to the containers and interconnecting piping between the containers, and a locking arrangement.[44]  This work was not reasonably inferable from the Permit Drawings or the obligations under

---

[42] Ramirez Affirmative Witness Statement, ¶¶212-228; Arranz Affirmative Witness Statement, ¶¶394-398.

[43] Yavary Rebuttal Witness Statement, ¶¶327-335.

[44] Ex. R-1787; Yavary Rebuttal Witness Statement, ¶332.

Section 4.13.3 of Schedule 2.4 to provide "paving," and supports IEP's position that the GE Water system was materially different than what was originally contemplated by the EPC Contract.[45]

### 8.1.5.2.   CON 74 (Interference in Unit 5 with NGrid)

This CON arises out of additional work that IEP claims it was required to perform to interconnect the Power Island with the NGrid switchyard.  The work involved using a Trenwa precast trench system that would house the high voltage cables running to the NGrid switchyard equipment.  IEP claims that Footprint failed to provide correct coordinates for the interconnection point, and that this resulted in IEP incurring costs to modify its already completed engineering and the last part of the routing of the cable, including modifications to the Trenwa system, to reach the actual coordinates at the interconnection point.  Its claim amount is for $246,371, and includes Bond Brothers costs of $26,703.

Footprint objects to this claim on several grounds, including:[46]

- The failure of IEP's witnesses to provide evidence to support their statements that Footprint provided inaccurate coordinates.

- The fact that IEP had been coordinating directly with NGrid and Footprint's engineers (Leidos) on this issue for quite some time, and that IEP had issued a construction drawing showing an incorrect coordinate for the Unit 5 interconnection.  Leidos discovered this error and called it to IEP's attention in mid-2015.

- The Bond Brothers survey team was on site in September 2016 and should have been able to discover the issue before beginning the installation of the Trenwa system.

- IEP failed to verify the final details of the interconnection in accordance with the EPC Contract.

The Tribunal finds that IEP has failed to meet its burden of proof on this CON.  Neither of the IEP witnesses providing testimony in support of this claim (Messrs. Arranz and Ramirez) provided any specifics about the allegedly incorrect coordinates and how these were erroneously provided by Footprint (or NGrid or Leidos).  We are particularly influenced by the fact that there was compelling evidence to conclude that this was actually the result of an error by IEP.

### 8.1.5.3.   Change Order Request Gabion Wall – Berm Design

This claim addresses the added direct costs for the design changes made to the berm and gabion wall as a result of Footprint's decision to implement the "pathways" solution.  The record demonstrates that Footprint issued a request for a proposal on November 14, 2016 that included detailed scope and deliverables for this work, including design documents.  IEP provided its proposal on January 31, 2017, which included an estimated $32,580 for design and engineering.  On February 13, 2017, Footprint responded that the work contemplated by its COR did not amount to a change, but rather fell within IEP's original scope of work.  It stated that to the extent this work constituted a change, Footprint was directing IEP to proceed with that change under Section 10.6 of the EPC Contract.

---

[45]  In reaching our determination, we also rejected Footprint's other arguments, including that this claim was submitted untimely.  GE Water provided information on its system from February through May 2016, and it was clear that IEP responded promptly and notified Footprint that the system was different than expected by the Permit Drawings and could result in a change order request.

[46]  Yavary Rebuttal Witness Statement, ¶303-312.

IEP proceeded with the work under protest and subject to a reservation of rights.  IEP states that it began to invoice this work with AFP 34, and that its schedule of values for this work was based on the above estimated amount.  On October 9, 2017, IEP notified Footprint that it had updated its costs for this to $15,360.70.  At the time of termination, IEP asserts that it completed this design work and reflected this in its final payment application (AFP 41.5).

Footprint's position on this claim is unclear.  Unlike virtually every other IEP claim, Footprint did not specifically address this claim in its post-hearing submissions or its witness statements.  Moreover, its February 13, 2017 response did not state one way or the other whether Footprint considered this work to be changed work or within IEP's contractual scope.

The Tribunal finds that IEP has met its burden of proof on this claim, and is entitled to the full $15,361 claimed.  As discussed earlier in this Award, the "pathways" design was not originally contemplated under the EPC Contract, as the 48-inch line was to have been removed for areas that were, in effect, under the pathway.  This design work was the direct result of Footprint's decision to keep the 48-inch line in place, and it was Footprint that directed IEP to perform this work.  Moreover, we are also influenced by the fact that Footprint has provided no meaningful defense to IEP's entitlement to this claim or the quantum claimed.

### 8.1.5.4.  Telecommunications System Scope

This claim involves a disagreement between the Parties over responsibility for the design and installation of the Project's telecommunications system.  IEP has provided an extensive recitation of this dispute in its Post-Hearing Brief and through Mr. Ramirez's testimony, which we will not repeat in detail herein.[47]  However, to provide context to our determination, we will summarize some of the evidence presented to us.

Starting in the summer of 2015 through the end of 2015, the Parties engaged in a number of meetings and communications to develop a division of responsibility between them for the telecommunications and security work scope.  It does not appear to be disputed by Footprint that this engagement culminated in an agreed-upon document that reflected IEP's work.  In May 2016, as the result of an issue over duct bank routing, Footprint provided IEP with a different scope of work for the telecommunications system, which IEP argued should be subject to change order.  Footprint issued IEP with a Section 10.6 directive to proceed, which IEP did.  Later, in March 2017, Footprint instructed IEP to change the routing and linkage between the telecommunications room and demarcation point in the guard house, which IEP argued was a change from Footprint's May, 2016 scope document, as well as the previously agreed-upon document.  IEP alleges that it performed the engineering for the extra work it was directed by Footprint to perform at a cost of $46,353.  IEP further alleges that it paid its subcontractor (ECI Systems, LLC) $1,210,933 to perform the additional work, for a total claim of $1,257,285.

Footprint's defense of this claim is based upon Mr. Yavary's rebuttal witness statement and the documents cited therein.[48]  Footprint's arguments focus on:

- Section 2.2(y) of the EPC Contract, which generally required IEP to provide a turnkey facility, regardless of whether individual components were referenced in the scope of work.

---

[47]  IEP's Post-Hearing Brief (Part III – pp. 62-67).  Ramirez Affirmative Witness Statement, ¶239-242.

[48]  Yavary Rebuttal Witness Statement, ¶¶297-302.

- Section 2.2(e)(vii) of the Scope of Work, which stated that IEP was to furnish "complete electrical engineering services to include .. drawings for communications facilities."

- Its assertion that IEP performed its work in this area "extremely poorly," and provided no documentation verifying the costs.

The Tribunal finds that IEP has met its burden of proof on this claim, and is entitled to the full $1,257,285 claimed. We arrive at this determination for several reasons. First, Footprint's position under Section 2.2(y) is contradicted by the evidence that the Parties engaged for a protracted period of time in 2015 to refine the scope of IEP's work on the telecommunications system. These discussions and agreed-upon processes would not have been necessary if IEP had the full responsibility for the system under Section 2.2(y). The evidence demonstrated that each Party had some responsibilities relative to the system (e.g., the engineering services described in Section 2.2(e)(vii) above). The evidence further demonstrated that they conducted themselves accordingly until Footprint changed its position in May 2016.

In this regard, we are also influenced by other contractual provisions showing that IEP did not have full responsibility for this system. These include: (a) Schedule 2.2 (Scope of Work) of the EPC Contract, which identified "installation of communications circuits … to the communications point" to be Concurrent Work by Others (i.e., Footprint's responsibility); and (b) Section 6.12 (Communications Infrastructure) of Schedule 2.4 of the EPC Contract, which stated that Footprint's telephone contractor would provide the telephone system.

In reaching our findings, we concluded that IEP had reasonably demonstrated its costs for this item. While Footprint challenged this, we are influenced by its failure to provide an alternative calculation, or any specific evidence of shortcomings in IEP's performance that the Tribunal could consider in evaluating or discounting the quantum IEP has claimed.

### 8.1.5.5. Gabion Wall Construction

This claim addresses the direct costs for the gabion wall construction associated with the "pathways" design that was addressed in Section 8.1.5.3 above. IEP had provided Footprint an estimated value for this work of $1,178,672 in its May 11, 2017 cost update, which reflected the anticipated added costs to be incurred by IEP due to the modifications to the gabion wall design, less a credit for work omitted. Similar to the design work, IEP revised this amount on October 9, 2017 to a value of $1,185,472.63. As of the termination date, IEP asserts that it was 25% complete with this work, resulting in a claim value of $281,007.[49]

Footprint's Reply Brief addresses this claim. It states that this specific claim was not identified in IEP's Amended Statement of Claim. Footprint further states that to the extent this claim: (a) was not included within the scope of CON 70 relating to the berm, IEP does not have a pending claim for this claim in the arbitration and IEP is not entitled to recover: (b) is included within the scope of CON 70, IEP is not entitled to recover for the same reasons that IEP cannot prevail on CON 70.

The Tribunal finds that IEP has met its burden of proof on this claim, and is entitled to the full $281,007 claimed. Our determination is based on, among other things, our findings in Section 8.1.3.3 above, where we concluded that the "pathways" design was not originally contemplated under the EPC Contract and represented a change to IEP's scope of work. There were direct construction costs associated with implementing the ultimate design, which design was approved not only by Footprint but also by the

---

[49] Ramirez Affirmative Witness Statement, ¶¶204-211.

City of Salem. The greater weight of the evidence demonstrates that IEP's costs for this, as well as its estimated percentage of completion as of the termination, are reasonable.

As to Footprint's position, we find that: (a) IEP put Footprint sufficiently on notice not only in this arbitration, but during the Project (starting with AFP 34) that it would be seeking these direct costs; and (b) Footprint has demonstrated no harm or prejudice by how IEP may have pled its request for direct costs in this proceeding. CON 70 did not address these or other direct costs, and our rejection of CON 70 (based on concurrent delay) has no bearing on whether IEP is entitled to the direct costs for this extra work. Moreover, given Footprint's actions on the berm and gabion wall, and its clear direction to IEP to implement this changed work, we further find that Footprint is estopped from arguing that IEP should not be entitled to seek these direct costs, regardless of how they were sought in this proceeding.

### 8.1.5.6. Revised Berm Construction

This claim addresses the direct costs for the berm construction associated with the "pathways" design that was addressed in Section 8.1.5.3 above. IEP had provided Footprint with the estimated direct costs for the berm on May 26, 2017, in the amount of $3,015,611.64. As with the gabion wall estimate, this estimate reflected the anticipated added cost to be incurred by IEP due to the modifications to the berm design, less a credit for reduced volume of the berm. As of the termination date, IEP asserts that it was 11% complete with this work, resulting in a claim value of $331,717.[50] Footprint's Reply Brief addresses this claim in the same manner that it addressed the gabion wall construction claim above.

The Tribunal finds that IEP has met its burden of proof on this claim, and is entitled to the full $331,717 claimed. Our determination is based on what we set forth in Section 8.1.5.5 above relative to the gabion wall claim.

### 8.1.6. Other Change Orders

IEP claims the following eight items that it characterizes as both "Other Change Orders" and "Additional Change Orders." We note that there were two other items previously listed as "Other Change Orders" (CON 15: ACC Foundation Obstructions & Dewatering) and CON 84: (Commissioning Activities Delays Due to Extreme Weather Conditions) that IEP withdrew.[51]

- CON 79 (Test Pits for Berm and Gabion Wall) ($103,294)

- CON 80 (Concrete Obstruction at Outfall Area) ($1,499)

- CON 81 (Dewatering Costs) ($1,291,953)

- CON 82 (Ductbank Conflict with Drainage Pipe) ($9,599)

- CON 83 (Test Pits at Spectra Line Location) ($15,665)

- CON 86 (Internal Modifications to Demineralized Water Plant) ($30,784)

- CON 87 (Panel Wall Storage Costs) ($244,179)

---

[50] Ramirez Affirmative Witness Statement, ¶210; McGeehin Errata Report (Schedule 8).

[51] These were withdrawn based on both the McGeehin Errata Report (Schedule 9) and IEP's February 15, 2021 Attachment H spreadsheet.

- March 12, 2018 CO (Power Supply to Admin Building) ($71,255)

The total amount of these items is $1,768,228.  Footprint objects to six of them, on the grounds set forth below.

### 8.1.6.1.   CON 79 (Test Pits for Berm and Gabion Wall)

This CON involves the digging of test pits on the west side of the Project that IEP alleges were required to locate NGrid transmission ducts in the area where Bond Brothers was to install drainage beneath the berm.  The basis for IEP's claim is that Footprint did not provide IEP with sufficient information concerning the NGrid transmission line ducts located within the easement area under the berm and gabion wall.  Because a drainage system needed to be installed below the berm, IEP asserts that it needed to know the locations of the existing transmission line ducts before it could make such installation, and it had Bond Brothers dig test pits to obtain this information. The test pits ultimately revealed four transmission line ducts that crossed the proposed drainage system alignment, requiring IEP to redesign part of the drainage system in order to accommodate those ducts.[52]

Footprint defends this claim on several grounds, some of which include the following:[53]

- The EPC Contract referenced the existence of the NGrid easement and transmission lines on site survey drawings, and there was no as-built information available for these transmission lines.

- There was nothing in the EPC Contract that required Footprint to provide any further information regarding the NGrid transmission lines.

- IEP's scope included the responsibility to identify the location of the NGrid lines within the NGrid easement, including the obligation to conduct any additional geotechnical investigation to confirm and complete the existing survey.

- The reason IEP decided to dig test pits was because it changed the design of the perimeter drainage network to encroach on NGrid's easement.

The Tribunal finds that IEP has failed to meet its burden of proof on this CON.  The IEP witness providing testimony in support of this claim (Mr. Arranz) did not provide any specifics about what information Footprint failed to provide, or explain what provision of the EPC Contract Footprint violated.  While it appears that IEP made a prudent decision to use test pits, there is no compelling evidence to conclude that test pits were needed because of Footprint's actions or inactions.

### 8.1.6.2.   CON 80 (Concrete Obstruction at Outfall Area)

Footprint has acknowledged that IEP is entitled to the $1,499 claimed for this work, and therefore we need not discuss this any further.[54]

---

[52]  Arranz Affirmative Witness Statement, ¶¶362-369.

[53]  Yavary Rebuttal Witness Statement, ¶¶313-320.

[54]  Yavary Rebuttal Witness Statement, ¶358.

### 8.1.6.3.  CON 81 (Dewatering Costs)

This CON relates to dewatering costs allegedly incurred by IEP.  IEP alleges that dewatering was a nearly constant issue because of the proximity of the site to Salem Harbor and the pre-existing flooding problems on site.  In arguing that Footprint had financial responsibility for dewatering, IEP relies upon Schedule 2.2 to the EPC Contract, which contains the following exclusion in Section (b)(v): "Except as specifically provided for elsewhere in the Agreement or this Schedule 2.2, dewatering except for runoff during construction."  Dewatering was predominantly performed by Bond Brothers, which tracked the dewatering time through Daily Reports, and invoiced those amounts to IEP during the course of the Project. This claim was submitted to Footprint in CON 81 in November 2017, for costs incurred through October 10, 2017.[55]

Footprint rejected this claim on several grounds.  First, it argues that, consistent with the Schedule 2.2 exclusion, the following provisions of Schedule 2.4 to the Agreement specifically require IEP to dewater: (a) Section 5.5, which requires IEP to be responsible for all earth work, grading and site preparation necessary for the construction; (b) Section 5.5.3, which requires IEP to take appropriate measures, including dewatering, to prevent the foundation from becoming un-stabilized by the flow of water into the excavation; and (c) Section 5.5.4, which states that if dewatering of excavations is required, IEP is to dispose of the water in accordance with discharge permit.  Next, Footprint asserts that "dewatering" is identified as one of IEP's Construction Costs in Schedule 5.4(a) of the EPC Contract. Third, Footprint states that IEP performed dewatering for the first 2-1/2 years on the Project without seeking a Change Order, and in violation of Section 10.2 of the EPC Contract.[56]

The Tribunal finds that IEP has met its burden of proof on this claim, and is entitled to the full $1,291,953 claimed.  Our determination is based on the exclusion contained in Section (b)(v) of Schedule 2.2, which we find demonstrates a clear intent of the Parties to exclude from IEP's scope all dewatering costs except for runoff.  The contract provisions cited by Footprint are general, and we find that they do not fall within the "Except as specifically provided for elsewhere in the Agreement" caveat to Schedule 2.2. Likewise, the fact that "dewatering" is identified as a Construction Cost does not alter our thinking, because, among other things, IEP had responsibility for dealing with dewatering "runoff" and there is no indication that this provision meets the "except as specifically provided elsewhere" caveat.

Finally, we reject the argument by Footprint that this claim should be rejected for failure to comply with Section 10.2 of the EPC Contract based on the reasoning that we discussed in Section 5.2 of this Award relative to CONs 61, 70 and 72.  Simply stated, Footprint has shown no prejudice in this claim being submitted when it was, and there is no indication that it would have done anything differently if a claim for dewatering costs would have been presented earlier.

### 8.1.6.4.  CON 82 (Ductbank Conflict with Drainage Pipe)

Footprint has acknowledged that IEP is entitled to the $9,599 claimed for this work, and therefore we need not discuss this any further.[57]

### 8.1.6.5.  CON 83 (Test Pits at Spectra Line Location)

This CON is similar to CON 79, and involves the digging of test pits to locate a Spectra gas line in the Section 2 and 3 areas of the berm.  The basis for IEP's claim is that Footprint did not provide IEP with

---

[55]  Arranz Affirmative Witness Statement, ¶¶424-427; Ramirez Affirmative Witness Statement, ¶¶243-249.

[56]  Yavary Rebuttal Witness Statement, ¶¶287-296.

[57]  Yavary Rebuttal Witness Statement, ¶358.

sufficient information concerning the as-built Spectra line located within the Spectra easement area. Because a drainage system needed to be installed below the berm, IEP asserts that it needed to know the locations of the existing gas lines. As a result, IEP proceeded with test pits to locate the Spectra line.[58]

Footprint's position on this claim is also similar to that which it stated for CON 79. Primarily, it states that IEP had not alleged a specific contractual obligation relating to the provision of information that Footprint breached. Footprint also asserts that it provided whatever information it had to IEP pre-contract and during execution, specifically stating that it provided IEP with an updated as-built that it received from Spectra when IEP asked for it. It asserts that IEP chose to do the test pits as a matter of Prudent Industry Practices and based on IEP's own berm design drawings, which required IEP to complete test pits to locate utility lines before starting construction.[59]

Similar to CON 79, the Tribunal finds that IEP has failed to meet its burden of proof on this CON. While the IEP witness providing testimony in support of this claim (Mr. Arranz) stated that IEP wanted as-builts from Footprint, he did not provide any specifics about this. The greater weight of the evidence is that Footprint provided what it had on this, and that IEP itself had determined that test pits were needed based on its drawings. Most importantly, IEP failed to explain which provision of the EPC Contract Footprint violated. Again, while it appears that IEP made a prudent decision to use test pits, there is no compelling evidence to conclude that test pits were needed because of Footprint's actions or inactions.

### 8.1.6.6.  CON 86 (Internal Modifications to Demineralized Water Plant)

This CON relates to the Demineralized Water System discussed in CON 81 above, and addresses additional work that IEP claims needed to be made because of Footprint. IEP cites Section 3.1 of Schedule 2.2 (Scope of Work) of the EPC Contract, which required Footprint to provide rental water treatment equipment to produce demineralized water in compliance with the power island equipment vendor's water quality requirements. IEP claims that Footprint failed to provide final documentation necessary for IEP to perform its work, as it continuously provided IEP with documentation categorized as "preliminary." When Footprint provided the final information, IEP identified clearance issues, as the space was inadequate and too narrow. This allegedly required it to modify the design, relocate the water container electrical panels, and procure new cables to allow the connection to the panels.[60]

Footprint rejects this claim on several grounds, including the following:[61]

- IEP failed to identify any provision of the EPC Contract that Footprint breached, specifically relative to IEP's expectation that it would receive certain information earlier than it did.

- IEP failed to identify the specific information IEP believed it needed and asked for, or what information designated as preliminary later changed in a way that caused the modifications.

- Footprint provided information to IEP early in the process, and IEP, Footprint and GE continuously coordinated and exchanged communications regarding the final configuration of

---

[58]  Arranz Affirmative Witness Statement, ¶¶379-384.

[59]  Yavary Rebuttal Witness Statement, ¶¶347-351.

[60]  Ramirez Affirmative Witness Statement, ¶¶250-257.

[61]  Yavary Rebuttal Witness Statement, ¶¶337-345.

the system.  In May 2016, IEP agreed that the information provided to date allowed it to start the detailed design.[62]

- IEP's submission failed to meet the supporting document requirements of Section 10.2 of the EPC Contract, and was untimely, being submitted 4.5 months later than it should have.

The Tribunal finds that IEP has met its burden of proof on this claim, and is entitled to the full $30,784 claimed.  Unlike CONs 79 and 83, where IEP's claims related to information that was sought from public utilities, this CON is based on IEP's information requests from GE, with whom Footprint had a direct contract.  By so contracting, we find that Footprint had the duty to ensure that whatever information IEP needed from GE was provided promptly, and that IEP should not bear the consequences if that did not happen.

Given this, we found that the greater weight of the evidence demonstrated that IEP was impacted by the failure of Footprint to provide IEP promptly with final design information from GE.  We were particularly influenced by one of Mr. Yavary's statements, reflected in the bullets above, to the effects that IEP agreed in May 2016 that the information provided to date allowed it to start the detailed design.  That statement was taken from a May 3, 2016 letter from IEP to Footprint dealing with the Demineralized Water System.  Mr. Yavary's statement did not provide the full context of what IEP was saying, as is evident from a reading of the full paragraph:

> Contractor agrees with Owner in that the information provided to date allows Contractor to start the detail design. Contractor is protecting Owner's interest by pointing out that the information provided is qualified by GE Water as "preliminary", thus subject to change. Any change of the information provided or any delay in providing final information will cause additional work to Contractor, additional costs to Owner and potential delays in the Project.[63]

This letter clearly articulates the risks IEP saw in performing its design work based on GE's preliminary information.  It also put Footprint on notice that IEP expected to be compensated for changes in that preliminary information that would cause IEP to perform additional work.  The Tribunal finds that IEP has demonstrated sufficient cause-and-effect to justify entitlement to the additional work claimed in CON 86, and that Footprint's other bases for denying this claim were not meritorious.

### 8.1.6.7.  CON 87 (Panel Wall Storage Costs)

This CON addresses IEP's claim for $244,179 in additional costs incurred in transporting and storing the panel wall that was to be used in the section of the gabion wall that met the Administration Building.  According to IEP, the panel wall was procured by Bond Brothers and was to be transported to the Site and installed in late 2017.  Because Footprint did not complete the Owner Deliverables, IEP put the panel wall into offsite storage at the manufacturer's facilities, where it remained until at least July 31, 2018.  IEP alleges that following termination, it repeatedly requested Footprint's direction to organize the delivery of the panel wall to the site, but Footprint failed to provide it.[64]

Footprint defends this claim because, among other things: (a) IEP's witnesses did not explain what the "Owner Deliverables" were; (b) to the extent the Owner Deliverables were "invented milestones,"

---

[62]  Mr. Yavary cited to Ex. R-1787.

[63]  Ex. R-1787.

[64]  Barrio Affirmative Witness Statement, ¶52.5.Arranz Affirmative Witness Statement, ¶¶385-393.

Footprint rejected that these were its contractual obligations; (c) IEP failed to explain how the Owner Deliverables prevented IEP from bringing the panels to the site.[65]

The Tribunal finds that IEP has met its burden of proof on this claim, and is entitled to the full $244,179 claimed. As we concluded in Section 5.4.1 above, one of the failings of Footprint was that it did not properly address the Owner Deliverables that were raised by IEP. As we discussed in Section 5.4.1, Bond Brothers had demobilized from the site due to the need for resolution to the berm and gabion wall issues before it could work productively, and because Footprint failed to satisfy its Owner Deliverables. The greater weight of the evidence supports the view that IEP was prudent in not bringing the panels to the site until this issue was resolved, and hence incurred storage charges as the result of Footprint's actions and inactions. We were further influenced by the fact that Mr. McGeehin confirmed the accuracy of the claimed numbers, while Footprint offered nothing of substance to rebut the reasonableness of the costs claimed.

### 8.1.6.8.  March 12, 2018 CO (Power Supply to Admin Building)

This claim arises out of Footprint's request that IEP provide electrical cable to the Administration Building, a part of the Project for which IEP did not have responsibility. The first change order request was on August 25, 2016, and Footprint ultimately sent a revised change order request on September 6, 2017 that provided further clarification to the scope of work included in the change order request. The revised request asked IEP to provide a proposal to provide electrical cable and telecommunications cable for the Administration Building that would run to and from specific points. IEP provided a response to this change order request on November 7, 2017. IEP claims that Footprint (Mr. Yavary) took issue with the price and demanded an amended proposal. Mr. Yavary refused to provide a change order, asserted that IEP was in material breach for failing to provide a compliant change order, and asserted that one way for IEP to reduce its exposure was to pull the cables and then submit a claim for an equitable adjustment. IEP ultimately performed the work through its subcontractor, Fischbach and Moore.[66]

Footprint provides a chronology that is reasonably consistent with that set forth by IEP. Footprint acknowledges that it notified IEP that it was in material breach on September 27, 2017 and November 22, 2017 based on IEP having allegedly submitted non-compliant change order proposals that were too high in price. On April 4, 2018 (after receiving IEP's March 12, 2018 change order request), Footprint wrote a letter stating, among other things, that: (a) IEP's costs were exorbitant and unsupported; and (b) IEP had furnished cables that were too large, as the insulation was thicker than necessary and would not fit in the conduit at the Administration Building. Footprint also claims that IEP was attempting to recover for electrical and telecommunications cable that was part of its EPC Contract scope.[67]

The Tribunal finds that IEP has met its burden of proof on this claim, and is entitled to the full $71,255 claimed. It is undisputed that the cable work was an extra to IEP's contract, and that Footprint should have issued a change order for it. While Footprint may not have liked the proposed amount, it could have had this work performed on a time and material basis – given that it was clearly extra work. Instead, it wrote adversarial letters and declared IEP in material breach. The Tribunal found the tone of these letters to be consistent with the fact that they were written at the same time that Footprint was initiating its plan to replace IEP with Burns & McDonnell.[68] Finally, as to Footprint's argument that the cable provided by IEP was wrong, Footprint failed to demonstrate that this was the case, and whether it actually had the cable

---

[65]  Yavary Rebuttal Witness Statement, ¶¶352-355.

[66]  Arranz Affirmative Witness Statement, ¶¶420-421; Ramirez Affirmative Witness Statement, ¶¶259-271.

[67]  Yavary Rebuttal Witness Statement, ¶¶321-326.

[68]   See Exhibits R-1786, R-1752 and R-1857.

replaced.  Stated differently, we find that the weight of the evidence demonstrates that IEP provided what it understood Footprint required.

### 8.1.7.  LOC Extension

IEP seeks the costs it incurred to extend the LOC from April, 2018 through February, 2019, when it was ultimately drawn upon by Footprint.  IEP acknowledges that the EPC Contract required IEP to maintain the LOC until Final Completion of IEP's work on the Project, and that as a result of Project delays, IEP extended the LOC through June 30, 2018.  After Footprint sought to draw down the entirety of the LOC on or about April 23, 2018, formal dispute processes were initiated and, as discussed in Section 3.2.2 above, an Emergency Arbitrator was appointed by the ICDR and state court litigation was initiated as well. This ultimately resulted in the Parties agreeing to a stipulation whereby the LOC was extended through December 31, 2019.  IEP's claims on this items are based upon Footprint having improperly terminated IEP, as that is what IEP alleges precipitated it having to incur $231,487 in LOC extension costs.

Footprint counters this by arguing that because IEP was in default and Footprint had the right to draw upon the LOC, the extension costs claimed by IEP were a product of IEP's wrongful attempts to resist Footprint's draw and should be borne by IEP.   It also asserts that the calculation of the $231,487 by Mr. McGeehin was based only on the testimony of an IEP witness (Carlos Barrio) and that Mr. McGeehin only converted the claimed amount from Euros to dollars .

The Tribunal finds that IEP has met its burden of proof on this claim, and is entitled to $231,487. The LOC extensions costs were incurred as a result of Footprint's wrongful termination, and we conclude that Footprint is to bear these costs.  While it is certainly possible that IEP might have borne some additional LOC extension costs if it was not terminated on April 15, 2018, we will not attempt to speculate what might have happened.  As to the costs claimed, we find that Mr. McGeehin's analysis was sufficient, even if it was supported by information provided by others.  More importantly, we are heavily influenced by the fact that Footprint offered no credible evidence in rebuttal to provide us an alternative to the $231,487.

### 8.1.8.  Post-Termination Close-out Costs

IEP seeks $1,266,464 for "post-termination close-out costs," which are identified by the McGeehin Errata Report as "Wrongful Termination Costs."  These are comprised of the following components, and are described below as stated in IEP's Post-Hearing Brief:

- <u>IEP Staff Costs to Close-out the Project ($1,042,504)</u>.  This encompasses IEP staff time to demobilize and close-out the Project post-termination. Normally, demobilization and closeout would have been incurred at the end of the Project and would have been invoiced as part of the overall lump sum price. This never happened because of Footprint's early termination of the EPC Contract.

- <u>IEP Office Costs to Close-out the Project ($100,465)</u>.  This encompasses the costs that IEP incurred post-termination: (a) to procure offsite office space for personnel who remained in Salem following Footprint's termination of IEP; and (b) to move and store materials and equipment.

- <u>Legal Costs to Closeout Subcontracts and Purchase Orders ($123,495)</u>.  This encompasses legal and other costs to closeout its subcontracts and purchase orders post-termination. IEP contends that the legal fees incurred were extraordinary because of, and arose directly from, the wrongful termination. They included efforts at securing assignments from subcontractors and addressing claims and mechanics' liens due to the wrongful termination by Footprint.

Footprint generally contends that the costs claimed are those typically incurred at the completion of a project and were part of the scope included in IEP's lump sum price. Footprint also challenges entitlement because, in its view, it was unclear whether IEP spread the cost of post-completion activities through interim invoices, and some or all of the claims may be duplicative of its claim for withheld funds (i.e., $61,005,218), or in other IEP claims. It also challenged Mr. McGeehin's calculation of some of the costs claimed.

The Tribunal finds that IEP has failed to meet its burden of proof on the first two components of costs claimed (i.e., Staff Costs to Close-out the Project and Office Costs to Close-out the Project). Based on the evidence presented, IEP failed to demonstrate that these costs were additional costs that arose out of the termination, as opposed to being costs that were within IEP's base scope of work and would have been incurred whether or not it was wrongfully terminated by Footprint.

The Tribunal finds that IEP has met its burden of proof on the third component of costs claimed (i.e., Legal Costs to Closeout Subcontracts and Purchase Orders). The weight of the evidence supports the view that these costs arise directly from the wrongful termination of the EPC Contract by Footprint. Moreover, based on the evidence, the $123,495 in costs claimed for such amount appear reasonable and are supportable. We are influenced by the fact that Footprint did not offer another alternative number for this, or meaningfully challenge Mr. McGeehin's calculation.

### 8.1.9.  Letter of Credit Recovery

IEP seeks the return of the $140,881,675 in LOC proceeds drawn by Footprint. Its Post-Hearing Brief states that Footprint, in submissions to the Tribunal in conjunction with the motion for approval to draw upon the LOC, conceded that if Footprint could not prove its damages after adjudication on the merits, it had to pay IEP back for its draw, and that the LOC money was not a "windfall." IEP stated that, according to Footprint, the draw was "simply the right to access the money during the pendency of the dispute." IEP argues that because of its entitlement to the claims listed above, as well as the wrongful termination, Footprint is not entitled to any LOC proceeds.

Footprint denies any obligation to return the Letter of Credit proceeds to IEP, asserting that the aggregate of its claims exceed the LOC proceeds. Footprint credited IEP with the LOC proceeds in arriving at its net claim.

For purposes of this specific claim, it is irrelevant whether Footprint's draw on the LOC was wrongful or proper, or what the Tribunal's view of the LOC draw happens to be. It is undisputed by Footprint that the LOC draw amount is properly in IEP's "column" for purposes of determining the net amount of an Award. Footprint sought the $140,881,675 with the explicit understanding that it would be a credit in IEP's favor once all of the claims advocated by each Party were heard and adjudicated by the Tribunal. This is precisely what Footprint did in calculating its damages, as it offset the $140,881,675 from the gross amount of its damages to arrive at a net amount of damages of $8,837,455.

Given the above, IEP has met its burden of proof that it is entitled to be credited with the $140,881,675 that was drawn upon by Footprint. The issue of interest on this amount will be addressed later in this Award.

### 8.2.  Footprint's Damages

Footprint's damages substantially derive from its position that IEP was properly terminated for default under Article 13 of the EPC Contract and that IEP was responsible for 319 days of inexcusable delay to the Guaranteed Substantial Completion Date. As discussed earlier in this Award, the Tribunal

disagreed with both of these positions, and found that: (a) Footprint's termination of IEP was wrongful; and (b) the delays caused by Footprint to the berm and gabion wall entitled IEP to an excusable delay for the 319-day period between the May 31, 2017 Guaranteed Substantial Completion Date and the April 15, 2018 termination date.  Our determination of Footprint's damages is based on these prior rulings and set forth below.

### 8.2.1.  Cost to Complete

The Tribunal determined in Section 6.6 above that the appropriate measure of IEP's damages for Footprint's wrongful termination of the EPC Contract is the formula that considers the Contract Price (adjusted for changes), less amounts paid IEP, less the reasonable costs to complete the work under the EPC Contract.

Footprint's claimed total completion costs was $132,051,305, of which $114,504,744 was monies paid to Burns & McDonnell.[69]  These amounts include the costs to complete IEP's work as well as correct defective work.  Footprint bases this claim on the grounds that IEP was properly default terminated. However, Footprint also asserts that even if the Tribunal found the termination to be wrongful, Footprint's cost to complete in excess of the remaining Contract Price (i.e., the above-stated amount) should be offset against any damages awarded to IEP.[70]  It asserts that under New York law, an owner is entitled to "appropriate allowances for the cost of completing omissions and correcting defects" from the terminated contractor.[71]

IEP's post-hearing submissions challenged Footprint's $132,051,305 on a variety of bases, arguing in essence that this amount is inflated and includes improper charges.  Under its quantum meruit theory (which the Tribunal has rejected), IEP argues that cost to complete should not be considered at all.  Under its alternative, breach of contract claim, IEP has not offered the Tribunal a specific calculation of how to address cost to complete, suggesting by implication that we should not offset its recovery or award anything to Footprint for those costs.

The Tribunal has evaluated cost to complete based on all of the evidence presented.  As we noted in Section 6.6 above, we reject Footprint's position that $132,051,305 is the proper or appropriate amount. Accepting this figure would, in essence, equate a proper termination, where the owner's excess reprocurement costs are given some deference and are considered a recognized element of damages for default, with a wrongful termination, where the defaulting contractor is deprived of an opportunity to complete the work with its own forces and subcontractors.  What is particularly problematic about Footprint having equated the cost to complete under a proper and wrongful termination is that it does not factor in the ability of the defaulted contractor to hold its subcontractors accountable under the terms of their subcontracts.

As to the amount itself, we find that (in addition to the many objections raised by IEP), Footprint has failed to meet its burden of proof that this amount reflects what IEP would have incurred, particularly given that: (a) Burns & McDonnell did not use virtually any of IEP's subcontractors to complete the work; (b) had no incentive whatsoever to be economical, as it was billing on a cost reimbursable basis; and (c) Burns & McDonnell performed most of its work after Commercial Operation, when Footprint had care, custody and control of the Facility, which the Tribunal finds is materially different than what IEP had the right to do under the EPC Contract.  We were also influenced by the fact that Burns & McDonnell's estimate

---

[69]  Footprint Reply Brief, p. 166.

[70]  Footprint Post-Hearing Brief, p. 212.

[71]  Footprint's Reply Post-Hearing Brief, p. 163, citing *Pilgrim Homes & Garages, Inc. v. Fiore*, 75 A.D.2d 846, 846 (2d Dep't 1980).

of the cost to complete as of March 30, 2018 (just prior to the termination) was $70,267,932,[72] substantially lower than the actual claimed cost.

The cost to complete amount that the Tribunal found most credible was the $41.1 million referenced in Mr. Gaudion's Expert Report.[73]  This cost to complete was set forth in a May, 2018 IEP PowerPoint presentation.  The presentation (written in Spanish) summarized IEP's estimated costs to complete all remaining work under the EPC Contract, and arrived at a total cost of $36.9 million.  Mr. Gaudion noted that this amount did not include the $4.2 million required for IEP project management staff through December 2018, the anticipated completion date for the work, which we concluded must be added to the direct cost figure.

The Tribunal found that this was the best evidence in the record about what IEP would have incurred in completing the work but for Footprint's wrongful termination.  We conclude that it was based on IEP performing the work with its own forces, means and methods, and subcontractors.  Among other reasons we found this amount reasonable and credible was that: (a) IEP developed this number for its internal purposes and therefore it was likely a realistic assessment by management of IEP's financial exposure for the cost to complete; and (b) the $36.9 million of direct costs identified by IEP were reasonably comparable to the direct costs set forth in Burns & McDonnell's March 30, 2018 estimate (i.e., $48,238,124).[74]  As for Footprint's general argument that this did not consider, among other things, cost of correcting defective work, we did not find this persuasive.  If IEP had been allowed to complete the work, it had the ability to hold subcontractors accountable for remedying defects under their subcontracts.

Finally, in calculating the net amount associated with cost to complete (as recognized by Footprint), it is necessary to account for the remaining balance of the Contract Price that would have been left for IEP to complete the work.  Because of the manner in which IEP presented its claims (specifically the Non-Payment of Contract Balance and Retainage in Section 8.1.1), it did not perform a specific calculation identifying this balance.  However, according to the formula proffered by Footprint under New York law, the amount is readily calculated as follows:

- Contract Price.  There is no dispute that at the time of IEP's termination, the Contract Price, adjusted for approved change orders, was $704,408,377.[75]

- Amounts Paid.  There is no dispute that Footprint made payments to IEP totaling $633,363,963.[76]

---

[72] Exhibit R-561.

[73] Gaudion Expert Report, ¶¶158-159.

[74] The Tribunal did not attempt an "apples to oranges" comparison of these direct costs.  We did this for a general reasonableness test and concluded that the differential between these two direct costs amounts supported the IEP internal number's reasonableness.  We also found that this differential could be attributed to a variety of factors, including those mentioned in the preceding paragraph in relation to the $132 million figure, as well as rate differentials and contingency factors.

[75] McGeehin Errata Report, ¶4; Breakwater Affirmative Expert Report, ¶42; Yavary Rebuttal Witness Statement, ¶549.  Note that this figure does not include: (a) change orders recognized in this arbitration, which the Tribunal has already addressed in Section 8.6.1 above; (b) Breakwater's proposed reduction of $2,289,300 for items Footprint decided to delete from IEP's scope of work after termination; and (c) the allegedly Undisputed Amounts in IEP's AFP 41.5.

[76] Breakwater Affirmative Report, ¶43; McGeehin Errata Report, ¶27.

- <u>Unpaid Balance of Contract Price</u>.  The difference between the Contract Price and amounts paid is $71,044,414.

Under the traditional formula for calculating damages, IEP would be entitled to the $71,044,414, reduced by the reasonable cost to complete.  Because of the way in which IEP set forth its claim, we have already recognized $61,005,218 as being due IEP under its claim for the Non-Payment of Contract Balance and Retainage.  The differential of $10,039,196, is, in effect, the balance of monies in the Contract Price for IEP which, but for consideration of the cost to complete, it would be due.  However, because we have determined that the reasonable cost to complete is $41,100,000, there is a shortfall of $31,060,804.  To account for this shortfall, we have credited Footprint with this $31,060,804 amount to reflect IEP's responsibility for the cost to complete.

### 8.2.2.  Liquidated Damages

Footprint seeks $73 million in liquidated damages for the 319-days of delay between the May 31, 2017 Guaranteed Substantial Completion Date and April 15, 2018 termination date.  As discussed above, given the Tribunal's finding that IEP was entitled to a time extension for the berm and gabion wall, the Tribunal denies Footprint's claim for liquidated damages.

### 8.2.3.  Extended Project Management after Commercial Operation

Footprint seeks $7,115,230 for project management costs incurred by Footprint between the May 31, 2018 Commercial Operation date and Substantial Completion.  We find this claim to be barred not only by Footprint's wrongful termination of the EPC Contract, but also by the fact that, given the status with the berm and gabion wall, Footprint failed to prove that the extended project management time was caused solely by IEP.  In addition to these, we find this claim to be barred by virtue of the EPC Contract, specifically:

- Section 6.2(e), which expressly provides that the liquidated damages amounts set forth in Section 6.2(d) are the sole and exclusive remedy for failure to achieve Substantial Completion by the Guaranteed Substantial Completion Date.  This exclusive remedy precludes Footprint from seeking its actual damages for extended project management costs.

- Section 16.3, the waiver of consequential damages clause.  The Tribunal finds the extended project management costs to be consequential damages.

Footprint attempted to overcome both of these provisions by asserting that IEP's conduct amounted to gross negligence and willful misconduct.  We reject that assertion, for reasons that include those addressed in Section 7 of this Award.  We also reject Footprint's argument that the project management costs it claims for delay amount to $300,000 per month, as compared to the liquidated damages amount of $200,000 per day, which, in its words, "substantially reduces the amount of its claim damages and thus works to IEP's benefit."[77]  The fact that actual delay damages were less than could have been awarded under the liquidated damages provision does not impair the application of the exclusive remedy provision.  Even if we accepted Footprint's position, this would still not overcome the fact that we found the extended project management costs to be consequential damages and barred by Section 16.3 of the EPC Contract.

---

[77] Footprint Reply Post-Hearing Brief, ¶408.

### 8.2.4.  Cost of Excessive Natural Gas Purchases

Footprint seeks $2,735,301 based on its assertion that IEP breached the requirement in Section 2.4 of the EPC Contract to: "perform the Work … in a professional, prudent, economical, expeditious and workmanlike manner."  Footprint specifically claims that IEP overestimated the volume of natural gas needed for its start-up and commissioning activities, thereby requiring Footprint to purchase volumes of "excess natural gas" that went unused and were sold back onto the market, often at a loss.

IEP argues that Section 3.3 of the EPC Contract required Footprint to procure and supply to IEP, at Footprint's expense, all natural gas requested by IEP for startup and testing of the plant, and placed no parameters or limitations on that obligation.  IEP also argues that these are consequential damages that are barred under Section 16.3 of the EPC Contract.

The Tribunal finds that Footprint has failed to meet its burden of proof on this claim.  First and foremost, we do not find that the evidence demonstrates that IEP did anything wrong in estimating the volume of natural gas.  However, even if the evidence demonstrated this, we find Footprint's argument that IEP is liable under Section 2.4 unpersuasive.  We do not interpret Section 2.4 as applying to such purchases, particularly given Section 3.3, which required Footprint to accept the risk of all natural gas costs without any limitation.

### 8.2.5.  Lost Profits in 2018 and 2019

Footprint seeks $1,246,301 for lost profits due to outages allegedly incurred in 2018 and 2019. Footprint "does not dispute that this claim seeks consequential damages."[78]  However, similar to its position on the project management costs addressed in Section 8.2.3 above, it argues that IEP's gross negligence and willful misconduct falls within the consequential damages waiver exceptions of Section 16.3 of the EPC Contract.  Consistent with our findings in Section 8.2.3 above, we find that this claim is barred by Section 16.3, and that the gross negligence and willful misconduct exceptions in that clause do not apply. Moreover, aside from Section 16.3, we further deny this claim based upon: (a) Footprint's wrongful termination of the EPC Contract; and (b) Footprint's failure to meet its burden of proof that the lost profits were solely caused by IEP, given that IEP was entitled to a time extension for the berm and gabion wall.

### 8.2.6.  Additional Financing Costs

Footprint seeks $2,337,001 for additional financing costs incurred in extending terms under its Credit Agreement with its syndicate of lenders.  Similar to its position on lost profits, Footprint agrees that this claim seeks to recover consequential damages but that IEP's conduct allows recovery anyway. Consistent with our findings in Sections 8.2.3 and 8.2.5, we find that this claim is barred by Section 16.3, and that the gross negligence and willful misconduct exceptions in that clause do not apply.  Likewise, similar to our findings in Section 8.2.5, we further deny this claim based upon: (a) Footprint's wrongful termination of the EPC Contract; and (b) Footprint's failure to meet its burden of proof that the lost profits were solely caused by IEP, given that IEP was entitled to a time extension for the berm and gabion wall.

### 8.2.7.  Additional Damages on Chapter 93A Claim

Footprint seeks $236,348,928 as additional damages based on Chapter 93A.  As addressed in Section 7 above, the Tribunal denied Footprint's allegation that Chapter 93A was applicable or that IEP's conduct violated Chapter 93A.  Consequently, this claim is denied.

---

[78] Footprint Reply Post-Hearing Brief, ¶412.

### 8.3. Summary of Claims and Tribunal Decision

The following table provides a summary of the Tribunal's findings on damages.  With respect to IEP's damages, we have not included in this table its quantum meruit damages, as our Award is based on its alternative contract breach approach.  As set forth in the table, our findings demonstrate that the net amount awarded to IEP (after offsetting the $31,060,804 awarded to Footprint for cost to complete) is $48,418,905, before the consideration of interest, attorneys' fees and costs.

| IEP's Claims | | |
|---|---|---|
| **Name of Claim** | **Amount of Claim** | **Tribunal's Decision** |
| **Non-Payment of Earned Contract Balance and Retainage** | $61,005,218 | $61,005,218 |
| **CONs 61 and 72** | $144,110,317 | $0 |
| **CON 70** | $10,604,714 | $0 |
| **Massachusetts Sales Tax** | $874,937[79] | $1,018,439 |
| **Cost Sharing** | $13,500,000 | $13,500,000 |
| **Undisputed Work** | | |
| CON 71 | $66,431 | $66,431 |
| CON 74 | $246,371 | $0 |
| Change Order Request Gabion Wall-Berm Design | $15,361 | $15,361 |
| Telecommunications System Scope | $1,257,285 | $1,257,285 |
| Gabion Wall Construction | $281,007 | $281,007 |
| Revised Berm Construction | $331,717 | $331,717 |
| **Undisputed Works Subtotal** | $2,198,172 | $1,951,801 |

---

[79]  As stated in Section 8.1.3 above, the McGeehin Errata Report found IEP had supported that it incurred a total of $1,018,439 for Massachusetts Sales Tax.  One component of this figure is $874,937, the amount claimed under this category based upon IEP's theories of recovery (i.e., entitlement to CONs 61, 70 and 72).  The other component of this figure is $143,502, which is Massachusetts sales tax that was included in other categories of IEP's damages and not in the $874,937 figure.  Based on our findings in Section 8.1.3, the amount here reflects our finding in Section 8.1.3 that IEP is entitled to both of these categories of sales tax.

| IEP's Claims | | |
|---|---|---|
| **Name of Claim** | **Amount of Claim** | **Tribunal's Decision** |
| **Other Change Orders** | | |
| CON 79 | $103,294 | $0 |
| CON 80 | $1,499 | $1,499 |
| CON 81 | $1,291,953 | $1,291,953 |
| CON 82 | $9,599 | $9,599 |
| CON 83 | $15,665 | $0 |
| CON 86 | $30,784 | $30,784 |
| CON 87 | $244,179 | $244,179 |
| March 12, 2018, CO | $71,255 | 71,255 |
| **Other Change Orders Subtotal** | $1,768,228 | $1,649,269 |
| **LOC Extension** | $231,487 | $231,487 |
| **Post-Termination Close-out Costs** | $1,266,464 | $123,495 |
| **SUBTOTAL** | $235,559,537 | $79,479,709 |
| **Letter of Credit** | $140,881,675 | $140,881,675 |
| **GRAND TOTAL** | $376,441,212 | $220,361,384 |

| Footprint's Claims | | |
|---|---|---|
| **Name of Claim** | **Amount of Claim** | **Tribunal's Decision** |
| **Costs to Complete** | $63,285,119 | $31,060,804 |
| **Liquidated Damages** | $73,000,000 | $0 |
| **Extended Project Management after Commercial Operation** | $7,115,230 | $0 |
| **Cost of Excessive Natural Gas Purchases** | $2,735,301 | $0 |
| **Lost Profits in 2018 and 2019** | $1,246,479 | $0 |
| **Additional Financing Costs** | $2,337,001 | $0 |
| **SUBTOTAL 1** | $149,719,130 | $31,060,804 |
| **Less Letter of Credit** | ($140,881,675) | $0 |
| **SUBTOTAL 2** | $8,837,455 | $0 |
| **Additional Damages on Chapter 93A Claim** | $236,348,928 | $0 |
| **GRAND TOTAL** | $245,186,383 | $31,060,804 |

### 8.4. Pre-Award Interest

Both Parties agree that the Party recovering damages is entitled to prejudgment interest, though IEP cites to CPLR 5001(a), and Footprint relies on Section 18.5 of the EPC Contract.  Although IEP argues that the Tribunal has discretion to award interest at the New York statutory rate of 9%, we elect to follow Section 18.5, which provides that the rate is the lesser of the New York statutory rate (9%) or the contractual rate of prime plus 2%.  We therefore find that IEP is entitled to recover pre-award interest at the rate of prime plus 2%.  We note that each Party's forensic experts (Messrs. McGeehin and Egan) are in reasonable agreement as to the applicable prime rates.[80]  We further note that the prime rate has remained at 3.25% from April 2020 through the date of this Award.

Pre-award interest runs from the earliest ascertainable date that a cause of action existed. IEP's cause of action for wrongful termination accrued at the time of the wrongful termination, April 15, 2018, by which time IEP contends it incurred most if not all of its wrongful termination damages. IEP proposes that the accrual date for purposes of pre-award interest calculations for wrongful termination damages should be May 15, 2018.  We adopt that date.  As set forth above, IEP is awarded a net recovery of

---

[80]  Breakwater Affirmative Expert Report, Schedule 920; McGeehin Errata Report, Schedule LOC-2.

$48,418,905 for its non-LOC claims.[81]  We concluded that Mr. Egan's formula for calculating interest was appropriate and used that to do so.  IEP is, therefore, entitled to pre-award interest on the $48,418,905 from May 15, 2018 through October 12, 2021, the date of this Award, in the total amount of $10,366,488.[82]

As to the LOC drawdown, we note that Footprint has stated, in its Post-Hearing Brief, that: "IEP's claim for interest should be limited to the amount of any net amount recovered from the Letter of Credit proceeds, taking into account any offset in Footprint's favor against some or all of those proceeds."[83]  Based on our findings, the net amount recovered from the LOC is $140,881,675, and we deem February 16, 2019, to be the appropriate date for accrual of interest on that amount.[84]  We find that Mr. McGeehin's calculation of interest based on the prime rate plus 2% to be accurate, as set forth in Schedule LOC-1 and LOC-2 of the McGeehin Errata Report.  IEP is, therefore, entitled to prejudgment interest on the LOC from February 16, 2019 through October 12, 2021, the date of this Award, in the total amount of $22,526,861.[85]

Based on the above, IEP is entitled to total an award of pre-award interest (i.e., the sum of the two preceding amounts) of $32,893,349.

### 8.5. Attorneys' Fees and Costs

The Parties agree that Article 34 of the ICDR Rules empowers and authorizes the Tribunal to allocate the costs of this arbitration, including "reasonable legal and other costs incurred by the parties," as we determine is reasonable.  For example, in Footprint's Application for Costs, it states:

> [U]nder the ICDR Rules, the Tribunal "shall fix the costs of arbitration in its award" and "may allocate such costs among the parties if it determines that allocation is reasonable, taking into account the circumstances of the case." The circumstances of the case that may warrant a departure from the American Rule could include the parties' conduct during the Project, their respective positions in the arbitration, the comparison of those positions to the award issued by the Tribunal, and/or the comparison of the award to the parties' settlement positions, which the Tribunal will receive in this case after it determines the merits award (details were filed by Footprint with the AAA administrator).[86]

We are persuaded that an award of attorneys' fees and costs to IEP is particularly justified given the circumstances of this case, including but not limited to Footprint's: (a) wrongful termination of the EPC Contract as the Project approached Commercial Operation; (b) failure to pay IEP for months of work prior

---

[81]  This is computed by subtracting Footprint's Cost to Complete amount of $31,060,804 from the IEP Subtotal of $79,479,709.

[82]  This was calculated using Breakwater's Affirmative Expert Report (Attachment 905), and the Monthly Interest Rate on Past Due Amounts set forth in Column A.  That Schedule stopped the calculation of interest as of March 2021 at 0.44%.  Because the prime rate has not changed through the date of this Award, we continued to use that monthly interest rate through October 12, 2021.

[83]  Footprint Post-Hearing Brief, ¶601.

[84]  We note that IEP's Post-Hearing Brief (Part III, p. 106) states that the date of the LOC drawdown was February 4, 2019.  Both IEP's Post-Hearing Brief and the McGeehin Errata Report starts the running of interest on February 16, 2019.

[85]  This is based on Schedule LOC-1 and LOC-2 of the McGeehin Errata Report, and is the sum of: (a) $18,575,381 in interest from February 16, 2019, through March 31, 2011; and (b) $3,951,480 in interest (195 days from April 1, 2021, through October 12, 2021, at the daily rate of $20,264).

[86]  Footprint's Application for Costs, ¶ 6, citing ICDR Rules, Art. 37.  Although the rules cited by Footprint took effect after the commencement of arbitration hearings, for the purposes of this issue, the differences between Art. 37 of the March 2021 ICDR Rules and Art. 34 of the prior rules are not material to our Award.

to the wrongful termination; and (c) draw on the LOC.  We are also influenced by Footprint's failure to pay IEP for both Massachusetts sales tax and the $13.5 million due under Section 5.4(a) of the EPC Contract.

Before addressing the specifics of such an award, we must consider the request of Footprint that we evaluate the impact, if any, of the settlement offer apparently sent to IEP's counsel on December 29, 2020.  Although the terms of that offer are somewhat vague, it is clear that the total amount offered is significantly less than the damages awarded to IEP in Sections 8.1 through 8.3, above.  As a result, the offer has no impact on our award under Article 34.

Turning to specifics of our award of fees and costs, we find that IEP is entitled to recover the fees and expenses of the Tribunal, to be fixed by the ICDR, the fees and expenses of the Administrator, to be fixed by the ICDR, and outside legal costs incurred, and litigation expenses (including its expert fees, vendor costs, and other litigation-related expenses).  Having reviewed the submissions of the Parties regarding attorneys' fees and litigation expenses, the reasonableness of the amount of attorneys' fees and costs sought by IEP, amounting to $14,128,928.40, is best illustrated when compared to Footprint's attorneys' fees and costs in this regard, amounting to $50,075,008.91.  This comparison is shown in the following table:

| Category of Fees/Costs | Amount Incurred | |
| --- | --- | --- |
| | Incurred by IEP | Incurred by Footprint |
| Legal Fees and Expenses | $7,339,398.90 | $41,022,570.66 |
| Expert, Consultant, Witness Fees and Expenses | $5,650,908.00 | $6,186,559.17 |
| Third Party Vendor Expenses | $1,138,621.53 | $2,865,879.08 |
| Total | $14,128,928.43 | $50,075,008.91 |

In each category, Footprint's expenditure exceeds that of IEP; IEP's total is less than a third of Footprint's.  Even if we focus solely on the legal fees incurred by the two firms who presented the Party's cases in the arbitration hearings[87], we note that the fees of Footprint's trial firm are nearly 2.5 times those of IEP's, notwithstanding that Footprint's trial lawyers' invoices span a 15-month period, while IEP's span 31 months.  Also, the fact that the Parties' expert, consultant, and witness fees and expenses are within ten percent gives credence to the reasonableness of IEP's costs in these categories.

We therefore award IEP the amount it seeks for attorneys' fees and expenses, expert fees and expenses, third party vendor costs, consulting fees and costs, and third party vendor costs, in the amount of $14,128,928.[88]

---

[87] In addition to the $17.9 million paid to the trial firm, Footprint's itemization of attorneys' fees includes $23 million in fees paid to three other law firms.

[88] Consistent with how the Parties have approached their other claims, we have rounded this figure to the nearest dollar.

## AWARD

1.      For the reasons set forth above, we award the following sums to Iberdrola Energy Projects, Inc. ("IEP") and Footprint Power Salem Harbor Development, LP ("Footprint"):

A.      IEP is awarded the sum of US$220,361,348, which is comprised of: (a) $79,479,709 for the specific claim items identified in the Table set forth in Section 8.4 above; and (b) $140,881,675 for its claim for the return of the proceeds withdrawn by Footprint under the Letter of Credit.

B.      Footprint is awarded the sum of US$31,060,804.

C.      IEP is further awarded the sum of US$10,387,255 for pre-award interest on $48,418,905 (i.e., the difference between the $79,479,709 and $31,060,804), as set forth in Section 8.4 above.

D.      IEP is further awarded the sum of US$22,587,650 for pre-award interest on the Letter of Credit, as set forth in Section 8.4 above.

E.      IEP is further awarded the sum of US$14,128,928 for attorneys' fees and costs, as set forth in Section 8.5 above.

2.      After an offset of the awarded sums, which are detailed in Paragraph 1, we hereby award the total of US$236,404,377 to IEP. Therefore, within 30 days from the date of this Final Award Footprint shall pay IEP the amount of US$236,404,377.

3.      In addition, we find that the administrative fees of the ICDR totaling US$186,824.18 shall be borne by Footprint, and the compensation and expenses of the arbitrators totaling US$1,151,895.73 shall be borne by Footprint.  Therefore, Footprint shall reimburse IEP the amount of US$700,703.01, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by IEP.

4.      Post-Award interest at the rate of 9% per annum simple interest, in accord with NY CPLR Section 5004, shall accrue from the date of this Award, but only to the extent that the Award is not paid in full within thirty (30) days of this Award.

5.      This Final Award resolves all issues presented for determination in this arbitration.  Any claims not specifically granted herein are hereby denied.

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, United States of America.

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

## THE ARBITRAL TRIBUNAL

_____
Michael C. Loulakis, Arbitrator

_____
John A. Wolf, Arbitrator

_____
John R. Heisse, Chair