## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SALEM HARBOR POWER DEVELOPMENT LP (f/k/a Footprint Power Salem Harbor Development LP), *et al.*,[1] | Case No. 22-10239 (MFW) |
| | (Jointly Administered) |
| Debtors. | **Ref. D.I. 175** |

### DEBTORS' OBJECTION TO THE MOTION OF IBERDROLA ENERGY PROJECTS INC. FOR AN ORDER PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE, FEDERAL RULE OF BANKRUPTCY PROCEDURE 2004, AND LOCAL BANKRUPTCY RULE 2004-1 AUTHORIZING AND DIRECTING THE EXAMINATION OF THE DEBTORS, PREPETITION OFFICERS, MANAGERS, AND POTENTIAL TRANSFER RECIPIENTS

Salem Harbor Power Development LP and its debtor affiliates (collectively, the "Debtors")

in the above-captioned chapter 11 cases, as debtors and debtors in possession, file this objection

(this "Objection")[2] to the *Motion of Iberdrola Energy Projects Inc. for an Order Pursuant to*

*Section 105(a) of the Bankruptcy Code, Federal Rule of Bankruptcy Procedure 2004, and Local*

*Bankruptcy Rule 2004-1 Authorizing and Directing the Examination of the Debtors, Prepetition*

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Salem Harbor Power Development LP (f/k/a Footprint Power Salem Harbor Development LP) (1360); Highstar Salem Harbor Holdings GP, LLC (f/k/a Highstar Footprint Holdings GP, LLC) (2253); Highstar Salem Harbor Power Holdings L.P. (f/k/a Highstar Footprint Power Holdings L.P.) (9509); Salem Harbor Power FinCo GP, LLC (f/k/a Footprint Power Salem Harbor FinCo GP, LLC) (N/A); Salem Harbor Power FinCo, LP (f/k/a Footprint Power Salem Harbor FinCo, LP) (9219); and SH Power DevCo GP LLC (f/k/a Footprint Power SH DevCo GP LLC) (9008).  The location of the Debtors' service address is:  c/o Tateswood Energy Company, LLC, 480 Wildwood Forest Drive, Suite 475, Spring, Texas 77380.

[2]  Capitalized terms used but not defined herein shall have the meaning ascribed to such term in the Motion or the *Joint Chapter 11 Plan of Salem Harbor Power Development LP and Its Debtor Affiliates* [D.I. 128] (the "Plan"), as applicable.

*Officers, Managers, and Potential Transfer Recipients* [D.I. 175] (the "Motion"), and submit the

*Declaration of Andrew J. Ehrlich* (the "Ehrlich Declaration") filed contemporaneously herewith,

and respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Motion is unnecessary, and professes a false urgency entirely of IEP's

own making.  Since IEP filed its Motion, the Debtors have agreed to voluntarily produce the

documents that are fairly and reasonably required to understand the transactions and events that

are the focus of IEP's inquiry.  *See* Ehrlich Decl. ¶ 9 and Exs. A, B.  Of IEP's 63 separate document

requests (the "Document Requests"), just two open items remain:  (a) IEP's request for *all*

communications between the Debtors and the Oaktree Entities without regard to responsiveness

and (b) IEP's request for additional communications between the Debtors and the Prepetition

Secured Parties (the "Remaining Requests").  Ehrlich Decl. ¶ 14 and Ex. A at 12–13.  In light of

the Debtors' extensive and ongoing cooperation to date, IEP's determination to prosecute the

Motion is completely wasteful.

2.      These cases were filed on March 23, 2022 (the "Petition Date").  On April 5,

2022, the U.S. Trustee filed a notice stating that no official committee of unsecured creditors had

been appointed.[3]  At such time and in the weeks following, IEP—which has pursued litigation in

various forums against the Debtors, the Prepetition Secured Parties, and entities affiliated with

Oaktree Capital Management, L.P., the Debtors' equity sponsor (collectively, the "Oaktree

Entities")—did nothing to pursue discovery.  On the evening of May 5, 2022, having sat idly by

for more than one month after these cases commenced, IEP served a draft Rule 2004 motion on

the Debtors and other parties in interest.  Ironically, that draft motion focused on the alleged limited

---

[3]      *See Statement that Unsecured Creditors Committee Has Not Been Appointed* [D.I. 71].

time available for discovery during the Challenge Period (as defined in the Cash Collateral Orders), a timetable to which IEP expressly agreed as part of the negotiated and consensual Cash Collateral Orders.

3.       IEP's delay is nothing more than a tactic to try to derail the Debtors' ongoing restructuring process.  This is made obvious by the fact that IEP has otherwise participated in these Chapter 11 Cases, including appearing before the Court at the Debtors' first and second day hearings, yet IEP never sought or requested the information identified in the Document Requests until the tail-end of the Challenge Period—and then asserts time is short.  In the early stages of the Chapter 11 Cases, IEP participated in extensive negotiations with the Debtors and the Prepetition Secured Parties, ultimately resulting in consensual Cash Collateral Orders being entered by the Court.  IEP received negotiated benefits in connection therewith—both on an interim and final basis.  [D.I. 54, 135.]  For example, certain modifications were made to paragraph 5(a) of the Final Cash Collateral Order at IEP's insistence.  Notably, paragraph 5(a) also sets forth the Challenge Period, which remained unchanged throughout negotiations among IEP, the Prepetition Secured Parties and the Debtors.  In contrast to its active participation in the negotiation of the Cash Collateral Orders, IEP made the decision to wait until less than one month prior to the conclusion of the Challenge Period—to which it consented to twice—to purport to commence its diligence efforts.[4]

4.       Notwithstanding IEP's tactical delay in serving its discovery requests so close to the end of the Challenge Period, the Debtors sprang into action upon receiving IEP's

---

[4]   For the avoidance of doubt, the Challenge Period set forth in paragraph 5(a) of the Cash Collateral Orders relates to the Debtors' Stipulations (as defined in the Cash Collateral Orders), and does not place any limitation with respect to potential estate causes of action against any party other than the Prepetition Secured Parties.

informal document requests.  On the second business day after receiving IEP's draft motion, the Debtors met and conferred with IEP, offered a detailed, written proposal as to how the Debtors would satisfy the document requests, and agreed to provide the requested witnesses for examination.  In the ensuing week, the Debtors gathered numerous categories of documents for production, propounded a draft protective order, and invited proposed search terms for additional document searches.

5.    Importantly, as of this date, the parties continue to meet and confer on the two Remaining Requests.  But to be clear, these two limited discovery disputes should not impede the progress of these cases.  All the more so where IEP is, and has been for years, as a result of its lengthy arbitration with the Debtors, in possession of the materials and documents necessary to reasonably make an assessment of whether there are any colorable estate causes of action. Compelling the Debtors to expend resources to produce documents outside the scope of their current proposals on the two disputed topics, and beyond what the Debtors have agreed to produce and what otherwise is or will soon be in IEP's possession, would not only place an undue burden on the Debtors' estates, but also would be a significant strain on the Debtors' already limited resources—for the sole purposes of indulging a disgruntled judgment creditor as the Debtors push to pursue a value-maximizing transaction and exit chapter 11.  IEP has failed to demonstrate that the necessary good cause exists to justify the relief requested in the Motion.

6.    Although just three issues remained open between the parties to fully resolve the requests in the draft motion (one of which has since been resolved), and notwithstanding the Debtors' stated willingness to work quickly and cooperatively through these open issues, IEP nevertheless filed the Motion, claiming it is purportedly pressed for time given the impending end of the Challenge Period.  The Motion is transparently IEP's attempt to poison

the well with its self-serving, inaccurate and incomplete recitation of the events leading up to the filing thereof.  While there is little remaining in dispute between the parties with respect to the discovery requested, the Debtors object to set the record straight.

7.    As a starting point, IEP is not new to the Debtors or their business—far from it.  Since IEP commenced an arbitration proceeding (the "IEP Arbitration") against the Debtors over four years ago, the parties have engaged in extensive discovery, negotiation and litigation in various forums about many of the very issues that are now the subject of the Motion. Consequently, notwithstanding IEP's assertions otherwise, it already possesses a trove of information responsive to the Document Requests it now seeks to compel the Debtors to produce pursuant to the Motion.

8.    Indeed, IEP's tactical filing neglects to mention any number of critical facts. Among them:

- *Before* the Motion was filed, the Debtors had agreed to facilitate IEP's requested examinations of the Debtors' chief restructuring officer and independent board members and to produce documents responsive to all but two of its 63 separate Document Requests.

- IEP has long possessed documents responsive to the overwhelming majority of its Document Requests.  For example, most of IEP's Document Requests can be satisfied by the nearly 900,000 documents from 30 custodians—amounting to more than 5.3 million pages of documents—that IEP received through the discovery process in the IEP Arbitration.  Ehrlich Decl. ¶ 4.  Given the massive prepetition production, all IEP had to do was sign the protective order that the Debtors proposed in order to access and use the extensive amount of information already within its possession.

- Moreover, prior to the Petition Date, as the Debtors sought to find a path toward a consensual restructuring, the Debtors voluntarily made hundreds of documents available to IEP through a diligence dataroom and held scheduled bi-weekly diligence and update calls with IEP with respect to, among other things, (a) the Debtors' financial condition and operations, (b) ongoing discussions with the Prepetition Secured Parties, and (c) the Debtors' prepetition sale and marketing process.  Ehrlich Decl. ¶ 5. And if IEP or its advisors asked questions of the Debtors in connection therewith, or made follow-up diligence requests, the Debtors promptly responded to each of them.

The Motion, of course, ignores this indisputable history.  Instead, it resorts to baseless allegations that demonstrate IEP's intent and strategy with respect to these Chapter 11 Cases.

9.    Indeed, IEP's conduct raises concerns that it is pursuing a separate agenda through its Motion.  The Motion omits that IEP is already pursuing actions in New York state court against the Prepetition Secured Parties and the Oaktree Entities arising out of the same facts and circumstances at issue in IEP's Document Requests.[5]  IEP's request for *all* communications between the Debtors and Oaktree Entities without regard to responsiveness to its Document Requests underscores IEP's ulterior motives—which is to obtain discovery here for use in its separate lawsuits.

10.    It also bears emphasis that the Motion is riddled with unfounded and disparaging allegations against the Debtors and other key stakeholders that are false, all in service of IEP's fictional and conspiracy-laden narrative.  For example: the Motion is replete with allegations that the Oaktree Entities received "disguised distributions" and "management fees" when IEP is well aware from the materials already in its possession that the Oaktree Entities have not recouped or received a single penny on account of their approximately $330 million investment in the Debtors' business.  There has never been a distribution, bonus, management fee, or other similar payment to any of the Oaktree Entities, and the Debtors' organizational documents

---

[5]    As of the date of this Objection, IEP maintains pending actions against (a) DevCo in Massachusetts state court (the "Massachusetts Action"), (b) the Prepetition Secured Parties in New York state court (the "IEP/Lender Action"), and (c) TopCo and TopCo GP in New York state court, which action was dismissed as to OCM-Aggregator and certain of its affiliates, including certain Oaktree Entities and certain current and former directors of the Debtors, on April 1, 2022 (the "IEP/OCM-Aggregator Action").  IEP has since sought to appeal the dismissal of the IEP/OCM-Aggregator Action as to OCM-Aggregator and its affiliates, as well as the dismissal of certain causes of action in the IEP/Lender Action.  The Massachusetts Action and the IEP/OCM Aggregator Action with respect to TopCo and TopCo GP remain stayed as of the date hereof.

expressly <u>prohibit</u> the equity owners' board appointees from being compensated for their board services.  Ehrlich Decl. ¶ 18 and Ex. E § 2.2.  At this time, the Oaktree Entities' interests in the Debtors are slated to be cancelled under the Plan with no recovery.  *See* Plan.

11.    Another example of the Motion's baselessness:  it includes unsupported allegations that the Debtors' estates maintain breach of fiduciary duty claims against the Debtors' board of managers (the "<u>Board</u>"), but fails to acknowledge that the Debtors' governance documents include a broad waiver of fiduciary duties.  Ehrlich Decl. Ex. F at 16, 50.  Moreover, prior to the Petition Date, the Board appointed a special committee that comprises two independent and disinterested managers (the "<u>Special Committee</u>"), and such Special Committee was provided with a full delegation and exclusive authority to investigate and pursue potential estate causes of action against the Debtors' insiders.  *See* First Day Decl. [D.I. 9] ¶¶ 51–53.  The Special Committee conducted an extensive investigation into potential estate causes of action against the Debtors' insiders, and concluded that the Board, at all relevant times, acted in compliance with, and fulfilled its fiduciary duties in accordance with, Delaware law, and that no colorable causes of action existed against such parties.[6]  *Id.* ¶¶ 54–55.

12.    The Motion also makes unfounded allegations that the Prepetition Secured Parties:  (a) "exercised undue control over the Debtors and were effectively steering the ship as to 'Plan B,'" (b) "have some power over who [the] Debtors' Managers are," and (c) "the independent members of the Board of Managers were selected from a slate acceptable to the Prepetition Secured Lenders."  Motion, ¶¶ 24, 17–18.  Again, these disparaging and false statements lack any foundation, as demonstrated from the voluminous discovery that IEP demanded and received in

---

[6]    Subject to certain arrangements to be agreed with IEP and its representatives, the Special Committee intends to make the Special Committee's investigation report available to IEP.

connection with the IEP Arbitration and prior to the Petition Date. As IEP most certainly knows, at no point have the Prepetition Secured Parties had any board representation at any of the Debtors. The Prepetition Secured Parties also had no involvement in the selection and appointment of the independent and disinterested managers of the Board who also serve as members of the Special Committee. Ehrlich Decl. ¶ 20; First Day Decl. ¶¶ 51–52. Further, IEP's unfounded assertions of potential lender liability causes of action do not adequately allege circumstances necessary to establish actionable lender liability claims, such as instances where a lender exercises control over a borrower's day-to-day operations such that, in effect, the lender becomes the borrower.[7] Instead, IEP's allegations demonstrate nothing more than the Prepetition Secured Parties monitoring the Debtors' business affairs and, in certain instances, providing waivers, consents, extensions, and amendments to the Credit Agreement to avoid or waive defaults, or placing restrictions on the Debtors with respect to payments to junior creditors—including IEP following the EPC Contract termination. Such behavior is routine and standard practice between commercial lenders and large enterprises where lenders restrict or limit a borrower's payment capacity through negative covenants in debt documents. In short, there is nothing extraordinary with respect to the Debtors' and the Prepetition Secured Parties' dealings. The Motion merely underscores IEP's longstanding ill will toward the Debtors, the Oaktree Entities, and the Prepetition Secured Parties, which cannot, and should not be confused with the requisite standard of good cause required to compel the Debtors to produce materials under Bankruptcy Rule 2004.

13.     Given that the vast majority of the Document Requests concern events which occurred prior to the Petition Date, the Debtors submit that there is no good reason why IEP could not have requested such information at the very outset of these cases. This is compounded

---

[7]     *See, e.g.*, *McFadden, Inc.* v. *Balt. Contractors, Inc.*, 609 F. Supp. 1102 (E.D. Pa. 1985).

by the fact that IEP knew exactly when the Debtors would file for chapter 11 protection because IEP's unilateral termination of the Standstill Agreement precipitated the filing.  First Day Decl. ¶ 64.  The Motion offers no justification whatsoever for IEP's decision to wait over 43 days after the Petition Date to advise the Debtors (and other parties) of its Document Requests.

14.    Notwithstanding IEP's procrastination and self-inflicted sense of urgency, and as detailed further below, the Debtors have sought to cooperate in good faith with IEP's requests in an expedited and reasonable manner without unduly harming the Debtors' estates. Accordingly, the Debtors submit that the Court should deny the Motion based upon the voluminous materials that the Debtors are in the process of producing, to IEP.

## BACKGROUND

15.    Since the Debtors terminated the EPC Contract with IEP in 2018, IEP has litigated five separate cases in four separate forums against the Debtors.  IEP also commenced additional actions against the Prepetition Secured Parties and the Oaktree Entities in New York state court, arising from allegations that both tortiously interfered with the EPC Contract.[8]

16.    By all accounts, IEP has received scores of documents in connection with those various proceedings.  The Debtors produced 884,000 documents from 30 custodians, amounting to 5.3 million pages regarding events from 2014 through the end of 2019 and beginning of 2020 in the IEP Arbitration.  Ehrlich Decl. ¶ 4.  Those 30 custodians included six from the Oaktree Entities.  *Id.*  The search terms were broad and included terms such as "Iberdrola," "IEP,"

---

[8]    *Iberdrola Energy Prods* v. *Oaktree Cap. Mgmt. L.P.*, No. 652514/2021 (N.Y. Sup. Ct.); *Iberdrola Energy Projects* v. *MUFG Union Bank, N.A.*, No. 653515/2021 (N.Y. Sup. Ct.); *In re Iberdrola Energy Projects, Inc.* and *Footprint Power Salem Harbor Dev., LP*, ICDR Case No. 01-18-0001-6009); *Iberdrola Energy Prods* v. *Footprint Power Salem Harbor Dev., LP*, No. 656017/2021 (N.Y. Sup. Ct.); *Iberdrola Energy Projects, Inc.* v. *Footprint Power Salem Harbor Dev. LP*, No. 1877CV1616 (Mass. Sup. Ct.).

"Letter of Credit," "LOC," "Terminat*," "Breach," "Default," "Lend*," and "finance." Ehrlich Decl. ¶ 9 and Ex. B at 2. The Debtors produced statements for 19 fact witnesses, making each available for cross-examination in that proceeding. Ehrlich Decl. ¶ 4. The transcript for the IEP Arbitration stretched 5,784 pages long. *Id.* IEP is also pursuing discovery against the Prepetition Secured Parties in *Iberdrola Energy Projects* v. *MUFG Union Bank, N.A., et al.*, Index No. 653515/2021 (N.Y. Sup. Ct.).

17.     In addition, prior to the Petition Date, in an effort to engage with IEP around a potential consensual restructuring transaction, the Debtors made approximately 450 documents concerning Debtors' finances, contracts, and operations available to IEP through a data room administered by the Debtors' investment banker, Houlihan Lokey, and held bi-weekly updates with IEP, answering all of IEP's diligence requests. Ehrlich Decl. ¶ 5. In no uncertain terms, the Debtors have been cooperative and readily available to IEP and its advisors.

18.     Notwithstanding the Debtors' extensive efforts to engage with IEP prior to the Petition Date, IEP refused to meaningfully engage, ultimately forcing the Debtors to commence the Chapter 11 Cases. Upon filing for chapter 11, the Debtors and the Prepetition Secured Parties worked with IEP to consensually negotiate the Cash Collateral Orders, modifying certain terms in order to avoid an objection by any party and presenting agreed forms of order to the Court. At the second-day hearing, Debtors' counsel explained that, under the Cash Collateral Order, any party "seek[ing] a challenge against the lenders . . . would have to do that within the challenge period." [D.I. 139 at 9:13-15.] IEP never objected to the Challenge Period. *Id.*

19.     IEP waited more than six weeks after the Petition Date to raise the prospect of potential discovery from the Debtors in a phone call on May 3, 2022, despite the looming Challenge Period deadline—just over four weeks away—and the fact that the Debtors, the

Prepetition Secured Parties and IEP had consensually negotiated two Cash Collateral Orders. Even then, IEP's counsel's only stated request was to modify the applicable protective order to allow IEP to utilize, in the Chapter 11 Cases, the mountain of documents it had collected in the IEP Arbitration. Ehrlich Decl. ¶ 7. Then, on May 5, 2022, IEP sent the Debtors a draft Rule 2004 Motion seeking 63 separate Document Requests covering a five-year period. Ehrlich Decl. Ex. A at 21–22. IEP made similar requests of the Oaktree Entities and the Prepetition Secured Parties. Ehrlich Decl. ¶ 8.

20.    Less than two business days later, on May 9, 2022, the Debtors met and conferred with IEP with respect to the 63 Document Requests directed to them. Ehrlich Decl. ¶ 9 and Ex. B. In connection therewith, the Debtors offered to produce documents in response to 55 of the 63 Document Requests. *Id.* And even for the remaining eight Document Requests, the Debtors explained that they were not foreclosing meeting those requests and were conducting due diligence in connection therewith. *Id.* The Debtors' comprehensive production protocol contemplated custodial searches, productions of thousands of pages of credit documents, notices of default, perfection-related documents, organizational charts, and much, much more—a substantial portion of which was previously available to IEP prior to the Petition Date. *Id.*

21.    Specifically, the Debtors agreed to produce or make available in the Chapter 11 Cases:

- the entirety of the 5.3 million pages of documents produced in the IEP Arbitration in response to 16 requests;

- credit documents, notices of default, perfection-related documents, UCC and mortgage documents, key operational contracts, business plans, financials, organizational charts, and more, which had previously been made available to IEP, but which IEP's counsel had not previously accessed, in response to nine requests;

- all communications between the Debtors' counsel at Paul, Weiss and counsel for the Prepetition Secured Parties from October 15, 2021, through the present based on custodial searches in response to ten requests;

11

- standalone productions of relevant default notices, the equity commitment agreement and lender forbearance on the equity commitment, board materials, including agendas, packages, and minutes, and the Debtors' D&O policies, in response to seven requests; and

- the investigation report prepared by the Special Committee's counsel, Young Conaway Stargatt & Taylor, LLP, concerning the Special Committee's evaluation of potential estate causes of action against the Debtors' insiders, in response to four requests. Ehrlich Decl. Ex. B.

22.     The Debtors also agreed to make witnesses available for a Bankruptcy Rule 2004 examination and investigate the remaining requests.  In addition, the Debtors later agreed to make a voluminous production associated with an investigation by FERC disclosed in the Disclosure Statement.  Ehrlich Decl. ¶ 9.

23.     Despite these productive conversations, IEP stated during its initial meet-and-confer that it intended to seek judicial relief notwithstanding the substantial offer that the Debtors made.  Ehrlich Decl. Ex. B at 2.  IEP delayed seeking judicial relief for an extra week, as the Debtors objected that IEP's Delaware counsel, Cozen O'Connor, which it selected to take the lead on the Rule 2004 motion, had represented the *Debtors* in the IEP Arbitration and thus was conflicted from pursuing discovery *against* the Debtors arising out of the same issues.[9]  *See* Ehrlich Decl. Exs. C, D.

24.     Amidst the delay caused by IEP's counsel's conflict, the parties continued to negotiate.  Rather than respond to the request-by-request proposal memorialized in the Debtors' May 9 letter, IEP made an entirely new request for a production of all communications "with the Lenders or Oaktree . . . from September 1, 2017 to the present."  Ehrlich Decl. Ex. A at 18. Although many relevant communications with Prepetition Secured Parties were produced in the IEP Arbitration and the Debtors had already agreed to produce all such communications from

---

[9]     The draft Rule 2004 motion was transmitted to the Debtors (and other parties in interest) by Cozen O'Connor and reflected only Cozen O'Connor as the sole signatory.

October 15, 2021, through the present, Debtors' counsel explained that it would also "coordinate with the Lenders" to produce additional relevant communications. *Id.* at 16. Thereafter, IEP and the Prepetition Secured Parties reached an agreement to produce communications with the Debtors and the Prepetition Agent during three separate periods from 2017 through the present. Ehrlich Decl. ¶ 12.

25.    As to IEP's request for *all* communications between the Debtors and the Oaktree Entities, the Debtors asked IEP to "identify 1-2 appropriate custodians for their requested search of communications with Oaktree as well as a limited number of search terms" and "the specific requests for which you seek responsive documents pertaining to communications with Oaktree." Ehrlich Decl. Ex. A at 13. Just this past the Thursday night, IEP identified, for the first time, six Oaktree custodians "who were involved with issues related to Plan B." *Id.* at 9. The Debtors explained that they do not have the ability to quickly search for and produce documents from Oaktree, and that such a search would raise significant privilege concerns. *Id.* at 7. Instead, the Debtors offered to produce communications between Oaktree and Debtors' Director of Finance, and the Debtors offered to discuss designating Ian Schapiro, a member of Debtors' Board, as a custodian. *Id.* at 7–8. Because IEP had not identified Mr. Schapiro as a desired custodian until the Thursday night before the Monday deadline to file this Objection, the Debtors have been unable to reach an agreement concerning the scope of such a production. The Debtors also reiterated that any documents responsive to issues pertaining to Plan B were produced in the arbitration. *Id.* at 1. In a meet-and-confer on Saturday May 21, 2022, Debtors reiterated that they are unable to search for documents from the period covered by the arbitration proceedings on short notice because those documents were kept in cold storage and removing them from cold storage would cost over $100,000 and take ten to twelve days. Ehrlich Decl. ¶ 17.

26.    IEP filed its Motion on May 16, 2022.  At that time, there remained only three key open issues that had not been resolved by the Debtors' voluntary offers to produce documents as outlined above: (a) IEP's request that the Debtors produce all communications between them and the Prepetition Secured Parties, notwithstanding that IEP concedes that it will receive a production from the Prepetition Agent; (b) IEP's request that the Debtors produce all communications between the Debtors and the Oaktree Entities for a five-year period; and (c) IEP's request for materials that would permit it to "understand [FERC's] claims" beyond the investigation materials that the Debtors have already agreed to re-produce.  Ehrlich Decl. Ex. A at 12–13.  The parties have since reached an agreement to produce responsive documents related to IEP's request for documents related to the FERC.  *Id.* at 10.

## ARGUMENT

### I.    Legal Standard

27.    Bankruptcy Rule 2004 provides, in relevant part, that the Court "may order the examination of any entity" relating "to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate . . ."  Fed. R. Bankr. P. 2004(a)–(b).  The purpose of an examination under Bankruptcy Rule 2004 is "to discover the nature and extent of the bankruptcy estate in order to distribute [the] debtor's assets for the benefit of its creditors," including by discovering assets, examining transactions, and determining whether wrongdoing has occurred.  *In re Millennium Lab Holdings II, LLC*, 562 B.R. 614, 626 (Bankr. D. Del. 2016).

28.    Parties do not have an absolute right to a Bankruptcy Rule 2004 examination; rather, such an examination may be granted at the discretion of the court in light of "the relevance of and necessity of" the information sought.  *See id*.  Critically, "[r]esort to Rule 2004 is only necessary where the target of an inquiry will not voluntarily cooperate."  *See,*

e.g., *Matter of Onatah Farms, LLC*, No. 21-10091 (REG), 2021 WL 2809902, at *2 (Bankr. N.D. Ind. Apr. 29, 2021) (denying Bankruptcy Rule 2004 motion where the debtors had already consented to examination).  Courts have also held that a Bankruptcy Rule 2004 examination is inappropriate "where the party requesting the Rule 2004 examination could benefit their pending litigation outside of the bankruptcy court against the proposed Rule 2004 examinee." *In re Wash. Mut., Inc.*, 408 B.R. 45, 50 (Bankr. D. Del. 2009) (internal quotation marks and citations omitted). And, more generally, Bankruptcy Rule 2004 examinations "may not be used for purposes of abuse or harassment and . . . cannot stray into matters which are not relevant to the basic inquiry." *Id.* (internal quotation marks and citations omitted).

29.     The party seeking to conduct a Bankruptcy Rule 2004 examination has the burden of showing good cause for the examination it seeks.  Generally, good cause requires establishing that the examination "is necessary to establish the claim of the party seeking the examination, or if denial of such request would cause the examiner undue hardship or injustice." *See In re Millennium Lab Holdings II, LLC*, 562 B.R. at 627 (internal quotation marks omitted). In "balanc[ing] the competing interests of the parties" at this step, courts must "weigh[] the relevance of and necessity of the information sought by examination*." Id.* at 626 (internal quotation marks omitted); *see also In re AOG Entm't, Inc.*, 558 B.R. 98, 109 (Bankr. S.D.N.Y. 2016).  Once the requesting party establishes "good cause," the burden shifts to the objecting party to show that examination would be oppressive or burdensome.  *In re Subpoena Duces Tecum*, 461 B.R. 823, 829 (Bankr. C.D. Cal. 2011).

## II.     The Requested Examination Is Unnecessary Because the Debtors Are Voluntarily Responding to the Vast Majority of IEP's Material Requests, Including by Re-Producing Information IEP Already Has

30.     Most of the information requested in the Motion has been in IEP's possession since before the Petition Date, and, although duplicative, the Debtors have voluntarily

agreed to make that information available to IEP again on a rolling basis. It is axiomatic that a party cannot avail itself of a Bankruptcy Rule 2004 examination to seek information already available to it, and that alone should warrant denial of the Motion even if the Debtors were taking no further steps address IEP's inquiry. *See, e.g.*, *In re First Conn. Consulting Grp., Inc.,* No. 02-50852 (JJT), 2017 WL 3089736, at *2 (Bankr. D. Conn. Jul. 19, 2017). In any event, IEP need not invoke the Court's power to compel a Bankruptcy Rule 2004 examination because the Debtors are already in the process of making available (through production or otherwise) responsive information sufficient to satisfy the majority of IEP's material Document Requests. *See Matter of Onatah Farms, LLC*, No. 21-10091 (REG), 2021 WL 2809902, at *2 (Bankr. N.D. Ind. Apr. 29, 2021) (denying Bankruptcy Rule 2004 motion where the debtors had already consented to examination).

31.    In connection with the IEP Arbitration, the Debtors already produced nearly 900,000 documents comprising over 5.3 million pages of materials from 30 custodians. Ehrlich Decl. Ex. B at 2. As discussed during the May 9, 2022, meet and confer with IEP and memorialized in the Debtors' May 9 letter, the Debtors drafted and proposed a protective order that will permit IEP to use materials produced in the IEP Arbitration in these Chapter 11 Cases. *Id*. To the extent that those documents are needed by IEP to establish a claim, once the protective order is entered, IEP will have effectively unrestricted access to those materials without resort to a Bankruptcy Rule 2004 examination.

32.    Separately, as stated above, beginning in January 2022, the Debtors made approximately 450 documents available to IEP through a virtual dataroom in an effort to engage with IEP regarding the terms of a potential consensual out-of-court restructuring. Ehrlich Decl. ¶ 5. To foster meaningful discussion among the parties, the Debtors made multiple formal

presentations to IEP prior to the Petition Date.  *Id.*  The Debtors also made numerous attempts to schedule diligence calls and follow-up presentations with IEP to facilitate the flow of information; however, only a handful of the Debtors' attempts were ever acknowledged.  *Id.*  And although IEP already had access to the documents through the virtual dataroom, IEP's counsel informed Debtors that they never reviewed those materials.  Ehrlich Decl. Ex. B at 2–3.  Therefore, the Debtors voluntarily produced to IEP Bates-stamped versions of the dataroom contents in response to IEP's Document Requests.  *Id*.

33.    The Debtors have also voluntarily agreed to (a) produce certain nonprivileged communications, dating from October 15, 2021 to present, between the Debtors' counsel and the Prepetition Secured Parties' advisors, which address 10 of the Document Requests; (b) turn over supplemental documents located through targeted collections in response to another 10 additional requests; and (c) produce, subject to appropriate confidentiality designations, certain materials that were previously produced to FERC in connection with an investigation in response to another five requests.  *See* Ehrlich Decl. Ex. A at 7–8, Ex. B at 2–4.

34.    Given the Debtors' extensive cooperation and willingness to provide IEP with responsive materials, including a vast number of materials that IEP could easily obtain by searching its own files, the Court need not order a Bankruptcy Rule 2004 examination.  To the extent open issues remain, the Debtors are committed to continuing to cooperate and rely on the meet-and-confer process to explore a mutually agreeable resolution that addresses IEP's reasonable discovery needs.

### III.    With Respect to the Remaining Requests, Good Cause Does Not Exist to Support IEP's Requested Examination

35.    To the extent that the Motion seeks information beyond that which the Debtors are already in the process of making available, the Debtors submit that the Motion should

be denied because the requested examination is unnecessary and its denial will not result in undue hardship to IEP.

36.     IEP cannot credibly assert that it needs the requested production to assess whether colorable estate causes of action exist because only two open issues remain between the parties after accounting for the wealth of information that the Debtors are making available for IEP's use in the Chapter 11 Cases.  The Remaining Requests include: (a) IEP's request that the Debtors produce *all* communications between them and the lenders, notwithstanding that IEP concedes that it will receive a production from the Prepetition Agent; and (b) IEP's request that the Debtors produce *all* communications between the Debtors and the Oaktree Entities for a five-year period.  Ehrlich Decl. ¶ 14.

37.     Each of the Remaining Requests is unnecessary, and IEP has not articulated any reasonable argument otherwise.  Indeed, with respect to the additional Prepetition Secured Party communications that IEP seeks, it has not explained why it cannot first ascertain the scope of the Prepetition Agent production offered by the Prepetition Agent before requesting the Debtors' supplementation.  The Debtors understand that its representatives would not have communicated individually with other Lenders besides the Prepetition Agent, meaning that any discovery from Debtors on this matter would be duplicative.  Ehrlich Decl. Ex. A at 12–13.  With respect to the Oaktree Entities' communications, IEP has not offered any justification for requesting such an expansive breadth of communications over a five-year span of time when only five of the Document Requests so much as mention the Oaktree Entities and the Debtors are already making available other information responsive to the same requests.

38.     Although IEP baselessly asserts that the Oaktree Entities received "disguised distributions" and/or "management fees" while the Debtors were insolvent and that the

Prepetition Secured Parties "exercised undue control over the Debtors and were effectively steering the ship as to 'Plan B,'" IEP fails to provide *any* basis to support these allegations. *See* Mot. ¶¶ 4, 20, 24.  Similarly, IEP contends in conclusory fashion that the Debtors may have equitable subordination claims against the Prepetition Secured Parties, *id.* ¶ 5, but then fails to state **any basis whatsoever** for such claims.  *See, e.g.*, *Off. Comm. of Unsecured Creditors* v. *Am. Tower Corp.* (*In re Verestar, Inc.*), 343 B.R. 444, 461 (Bankr. S.D.N.Y. 2006) (noting that inequitable conduct required for equitable subordination "encompasses conduct that may be lawful but is nevertheless contrary to equity and good conscience"); *Henry* v. *Lehman Com. Paper, Inc.* (*In re First All. Mortg. Co.*), 471 F.3d 977, 989 (9th Cir. 2006) (describing equitable subordination as requiring "gross or egregious misconduct that shocks the conscience of the court").  And for good reason:  IEP cannot articulate any shocking or egregious conduct on the part of the Prepetition Secured Parties that would provide justifiable grounds to assert equitable subordination against them because no such conduct ever took place.

39.    The Oaktree Entities have not received any disbursements or management fees from the Debtors.  Ehrlich Decl. ¶ 18 and Ex. E § 2.2.  Similarly, the Prepetition Secured Parties worked constructively with the Debtors prior to the commencement of these Chapter 11 Cases to address defaults and provide necessary extensions, waivers, and ultimately a forbearance in connection with the Credit Agreement.  *See, e.g.*, First Day Decl. ¶ 37.  The Special Committee conducted an extensive investigation into potential claims or causes of action against the Debtors' insiders.  *Id.* ¶¶ 54–55.  The Debtors' advisors also reviewed and analyzed the extent, validity, and priority of the Prepetition Secured Parties' liens and claims and assessed whether the Debtors had any affirmative causes of action prior to agreeing to the stipulations set forth in the Cash Collateral Orders and the mutual releases embodied in the RSA and Plan.  Ehrlich Decl. ¶ 6.

40.      IEP fares no better in attempting to establish undue hardship to show good cause because it can only point to the "compressed timeline" for its objections.  But any time pressure IEP faces is entirely of its own making and cannot support a showing of good cause for a Bankruptcy Rule 2004 examination.  As IEP correctly identifies, the deadline for filing a challenge is June 8, 2022.  IEP has known about that date, which has remained unchanged throughout negotiation of the Cash Collateral Orders, since the Petition Date—and IEP has indeed twice consented to the selected date.  Nevertheless, IEP decided to wait 43 days after the Petition Date and a month after learning that no official committee would be appointed to purport to begin its diligence efforts.  IEP's blatant attempt to manufacture an emergency to strong arm the Debtors into extending the Challenge Period, which would inevitably delay the progression of these Chapter 11 Cases and waste the Debtors' limited resources, should not be tolerated.

## IV.    The Motion Should Be Denied Because the Remaining Requests Impose Undue Burden on the Debtors

41.      Even if IEP could show good cause to overcome its initial burden—and it cannot—the Debtors submit that the Motion should still be denied because the requested examination as to the Remaining Requests would be oppressive and burdensome on the Debtors.

42.      IEP's Remaining Requests are essentially limitless and exceed the scope of what is reasonably necessary for IEP to conduct a thorough investigation into potential claims that the Debtors may have.  Collecting, reviewing, and producing materials beyond those the Debtors have already turned over or agreed to produce in short order will cost the Debtors and their professionals a substantial amount of time and resources.  Requiring key personnel to spend additional time responding to expansive discovery requests, and preparing for and attending related depositions, will necessarily disrupt and needlessly divert attention away from the Debtors'

operations and restructuring process—including the ongoing Sale Process—and cause significant harm to the Debtors' estates, for the reasons set forth in the Ehrlich Declaration.

43.     In particular, IEP's request for all communications with the Prepetition Secured Parties is duplicative of the forthcoming production from the Prepetition Agent, and would therefore waste scarce estate assets before IEP even makes a threshold determination as to whether it can secure the information it needs from the lenders' offered custodian.

44.     The request to the Debtors for all communications with the Oaktree Entities is similarly burdensome, and disproportionately so given the small number of requests that even refer to the Oaktree Entities.  A collection of all the communications requested by IEP would implicate significant privilege concerns—and thus require the commitment of additional time and attorney resources to the review—without reducing in any way the Debtors' counsel burden of review in preparation for examination as counsel would be required to review all produced documents to adequately prepare witnesses.  Considering that the Debtors have already agreed to make available other information responsive to the same small universe of requests and have designated Debtors' Director of Finance as an appropriate custodian for this request, and have expressed a willingness to consider designating boardmember, Ian Schapiro, as a custodian, IEP's demand for all communications for a five-year period is overly burdensome.  Notably, when asked to identify appropriate Salem Harbor custodians to search for such communications, IEP only identified Oaktree custodians, and refused the Debtors' proposal to search for and produce communications between Tateswood, the Debtors' asset manager, and Oaktree.  Ehrlich Dec. Ex. A at 5–6.

45.     As noted above, the Debtors have no objection to producing some of the requested information and, indeed, have already produced, or are in the process of producing or

re-producing, responsive materials—even if IEP had access to that information prior to the Petition Date. But the Remaining Requests otherwise go beyond what is reasonably necessary to investigate alleged potential estate causes of action and will impose a significant burden on the Debtors, particularly given the time period IEP has proposed for discovery, which dates back five years.

46.    If, however, the Court determines that good cause exists for a Bankruptcy Rule 2004 examination of the Debtors beyond what the Debtors have already voluntarily agreed to provide to IEP, the Debtors respectfully request that the Court condition any such authorization on a substantial narrowing of the scope of the examination. The "permissive, conditional language" of Bankruptcy Rule 2004 can be used "to restrict discovery that appears unduly intrusive or burdensome," *In re Roman Cath. Church of Diocese of Gallup*, 513 B.R. 761, 766 (Bankr. D.N.M. 2014), and to "limit, condition or even forbid the use of Rule 2004" to prevent abuse or harassment, *Martin* v. *Schaap Moving Sys., Inc*., 152 F.3d 919 (2d Cir. 1998) (table decision) (internal quotation marks omitted). Imposing a scope limitation here is the only way for the Court to properly balance IEP's interest in collecting further information concerning alleged potential estate causes of action versus the burden imposed on the Debtors and third parties, as Bankruptcy Rule 2004 requires. *See, e.g.*, *In re Irwin* (ELF), No. 10-14407, 2010 WL 9499416, at *1 (Bankr. E.D. Pa. Dec. 2, 2010).

47.    Specifically, the Debtors request that the Court limit discovery in this matter to the following documents:

- the entirety of the 5.3 million pages of documents produced in the IEP Arbitration;

- credit documents, notices of default, perfection-related documents, UCC and mortgage documents, key operational contracts, business plans, financials, organizational charts;

- all communications between the Debtors' counsel at Paul, Weiss and counsel for the Prepetition Secured Parties from October 15, 2021, through the present based on custodial searches;

- all communications between Debtors' Director of Finance, Donna Roberts, and Oaktree concerning Debtors' financial condition or solvency;

- standalone productions of relevant default notices, the equity commitment agreement and lender forbearance on the equity commitment, board materials, including agendas, packages, and minutes, and the Debtors' D&O policies; and

- the investigation report prepared by the Special Committee's counsel, Young Conaway Stargatt & Taylor, LLP, concerning the Special Committee's evaluation of potential estate causes of action against the Debtors' insiders, as well as documents cited therein and documents reviewed in connection therewith.

## CONCLUSION

48.     Both prior to the Motion being filed and countless times since then, the Debtors have made clear to IEP that they will voluntarily produce all documents that are fairly and reasonably required to understand the transactions and events that are the focus of IEP's inquiry. To that end, the Debtors are in the process of producing and re-producing responsive information, and intend to continue cooperating with IEP's reasonable inquiries and making further reasonable productions on a rolling basis.  Under these circumstances, the Debtors submit that a Bankruptcy Rule 2004 examination is unnecessary and wasteful.  Accordingly, the Court should deny the Motion.

## RESERVATION OF RIGHTS

49.     While the Debtors object to the Motion as set forth herein, they reserve all of their rights with respect to any subpoena or other discovery request served in these Chapter 11 Cases, including without limitation, their right to object on customary grounds of overbreadth, burden and relevance, to assert any applicable claim of privilege, and to condition any production upon entry of an appropriate protective order.

WHEREFORE, the Debtors respectfully request that the Motion be denied.

Dated:   May 23, 2022                    Respectfully submitted,

                                        **YOUNG CONAWAY
                                        STARGATT & TAYLOR, LLP**

                                        _/s/ Andrew L. Magaziner_
                                        Pauline K. Morgan (No. 3650)
                                        Andrew L. Magaziner (No. 5426)
                                        Katelin A. Morales (No. 6683)
                                        Timothy R. Powell (No. 6894)
                                        Rodney Square
                                        1000 North King Street
                                        Wilmington, Delaware 19801
                                        Tel:    (302) 571-6600
                                        Fax:    (302) 571-1253
                                        Email:  pmorgan@ycst.com
                                                amagaziner@ycst.com
                                                kmorales@ycst.com
                                                tpowell@ycst.com

                                        - and -

                                        **PAUL, WEISS, RIFKIND,
                                        WHARTON & GARRISON LLP**
                                        Andrew J. Ehrlich (admitted _pro hac vice_)
                                        Brian S. Hermann (admitted _pro hac vice_)
                                        John T. Weber (admitted _pro hac vice_)
                                        Carter Greenbaum (admitted _pro hac vice_)
                                        1285 Avenue of the Americas
                                        New York, New York 10019
                                        Tel:    (212) 373-3000
                                        Fax:    (212) 757-3990
                                        Email:  aehrlich@paulweiss.com
                                                bhermann@paulweiss.com
                                                jweber@paulweiss.com
                                                cgreenbaum@paulweiss.com

                                        _Counsel to the Debtors and Debtors in Possession_